RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
CHRISTOPHER P. FREY
Assistant Federal Public Defender
Nevada State Bar No. 10589
Chris_Frey@fd.org
KATE BERRY
Assistant Federal Public Defender
Nevada State Bar No. 14346
Kate_Berry@fd.org
ALLIE WILSON
Assistant Federal Public Defender
Allie_Wilson@fd.org
200 S. Virginia Street, Ste. 340
Reno, Nevada 89501
(775) 321-8451/Phone

RICHARD G. NOVAK
California State Bar No. 149303
richard@rgnlaw.com
P.O. Box 5549
Berkeley, CA 94705
(626) 808-7908/Phone

Attorneys for CORY SPURLOCK

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CORY SPURLOCK,<br>Defendant. | Case No. 3:23-cr-00022-MMD-CLB<br>**MOTION TO SUPPRESS TOWER DUMP DATA AND THE RESULTS OF THE DERIVATIVE USE OF THAT DATA**<br>[Evidentiary hearing requested] |

CORY SPURLOCK, by and through his counsel of record, moves to suppress the direct and derivative fruits of the tower dump search warrant.

This motion is based on the attached points and authorities, and any evidence and oral argument presented at the hearing this matter.[1]

## I. FACTUAL BACKGROUND[2]

On November 8, 2020, two bodies were discovered by a snowplow driver on the shoulder of U.S. 395 at mile marker 84.5 seven miles north of Bridgeport, California. The bodies were identified as William and Yesenia Larsen. Both had been shot and stabbed.

Investigators from the Mono County Sheriff's Office responded first. As they inspected the scene, Mono County investigators located multiple .9mm bullet casings surrounding the bodies, together with a suspected .22 expended cartridge. They also located an iPhone buried in the snow a foot away from Yesenia Larsen's body. The phone was collected for evidence. The San Bernadino Sheriff's Office (SBSO) was then contacted to process the scene, and the bodies were sent the Orange County Coroner's Office for autopsy.[3] In the meantime, Mono County investigators continued their death investigation.

When the Larsens' bodies were discovered on the highway shoulder, there was no vehicle on scene. However, on November 10, 2020, the California Highway Patrol (CHP) located a suspected abandoned Jeep Gladiator just south of Bridgeport at mile marker 74.5. The vehicle was unlocked with its keys still in the ignition. A wallet and cellphone were inside. And apparent blood was found on the vehicle's exterior and interior surfaces.

The Jeep Gladiator's California plates were run and came back to William and Yesenia Larsen of Burbank, California. Now coordinating efforts between multiple agencies in furtherance of their death investigation, Mono County investigators had CHP seal the Jeep

---

[1] This motion is timely filed. ECF No. 238.

[2] Many of the facts in this section are derived from the discovery produced by the government to date. The defense reserves the right to challenge any of these facts.

[3] While the Mono County Sheriff acts as that jurisdiction's Coroner and conducts death investigations, Mono County does not have a medical examiner's office and appears to rely on forensic pathologists from outside jurisdictions, like Orange County, for autopsy services.

Gladiator as evidence, submitted it to SBSO for forensics, then contacted local police in Burbank for a welfare check at the Larsens' residence. Nobody answered the door.

Immediately after the bodies were first discovered Mono County investigators started collecting video surveillance from surrounding communities. The goal was to identify the Larsens' vehicle and develop any suspect leads. A review of the collected video showed the Larsens' Jeep Gladiator in Bridgeport on November 8, 2020, at approximately 2007 hours.

### A. The Tower Dump Warrant

On November 13, 2020, now equipped with the geographic coordinates of mile marker 74.5 (where the Larsens' bodies were found) and mile marker 84.5 (where the Larsens' vehicle was found), Sergeant Magdaleno Hernandez of the Mono County Sheriff's Office requested a "tower dump" search warrant. Exhibit A (USAO 15646).

The application targeted all devices connecting to cell towers servicing the immediate area of U.S. 395 around and between both mile markers from 1700 hours to 2300 hours on November 8, 2020. There is no limit on the number of devices whose data could be captured under the warrant, no means of anonymizing or otherwise protecting the data of unconnected third-parties, and no grounds for the request's six-hour temporal period.

On the other hand, the application spelled out in detail the three categories of records being sought:

> a. Tower Dump/Download records . . . that would support any and all communications[,] including voice calls, text messages, any data connections and any available HLR (Home Local Registry) or VLR (Visitor Local Registry) records showing subscriber equipment that were idle but still connected to the provider's network on but not placing a call, test, or date connection but were in the same area as referenced above connecting to the network.
>
> b. Records identifying the device (make and model), phone numbers associated with any communications, locations, date, times, duration of all calls, text messages, and data connections identified in response to item "a," above.

c. Records showing the addresses and/or map GPS coordinates of all cell sites identified as having active connections in item "a." above and maps with marking showing the location of each cell site and the theoretical wireless coverage area provided by each site, commonly called an RF footprint and/or propagation map.

Exhibit A at USAO 15647.

At the time the tower dump warrant application was submitted, no suspects or leads had been developed, and none were identified to the issuing judge. The "Target of [the] warrant" specified nobody in particular, but instead "[a]ny subjects related to [this] active homicide investigation." *Id*. at USAO 015648. Accordingly, the search warrant was issued on the expectation that tower dump records would "tend to show that a particular person" committed the crime. *Id*. at USAO 015648. The affiant swore and attested to the same belief that these records might "reveal [a suspect's] presence." *Id*. USAO 015655.

As articulated in the affidavit, this belief rested on the assumption that "the person(s) involved in the murder had most likely communicated with one another via cell phone, either before and/or after the murder in order to communicate and coordinate efforts." *Id.* at USAO 015655. However, there were no facts supporting an assumption of suspect cell phone use between the identified mile markers from 1700 hours to 2300 hours on November 8, 2020. The only facts offered for probable cause to seek records within the geographic and temporal parameters of the warrant were that the Larsens' vehicle was seen on video "dr[iving] through" Bridgeport at 2007 hours and the deceased couple had cell phones. *Id*. at USAO 15654.

According to the search warrant materials in discovery, the warrant was approved on November 13, 2020, at 10:47 a.m. by the presiding judge of the Mono County Superior Court. Exhibit A at USAO 015649. Although the November 13, 2020, warrant notes reliance on Sergeant Magdaleno's sworn and subscribed affidavit, that affidavit is post-dated November 20, 2020. *Id*. at USAO 15656. The search warrant directed compliance from the providers on or before November 19, 2020. *Id*. at USAO 015647.

**B. How Tower Dumps Work**

Cell phones are a ubiquitous part of American life, with "396 million cell phone service accounts in the United States—for a Nation of 326 million people." *Carpenter v. United States*, 585 U.S. 296, 300 (2018). These devices "faithfully follow[] [their] owners," *id.* at 311, connecting to nearby cell sites "several times a minute whenever their signal is on, even if the owner is not using one of the phone's features."[4] *Id.* at 300.

When a cell phone connects with a cell tower, it creates cell site location information (CSLI), which identifies a cell phone's approximate location. *Id.* As the number of cell phone users increases, as in urban areas, so too does the number of cell sites. In rural areas, in contrast, fewer cell sites mean that any one cell site can cover dozens of square miles, receiving signals from greater distances. In addition to cell towers, cell sites can be found on "light posts, flagpoles, church steeples, or the sides of buildings." *Id.* at 300.

A tower dump "pull[s] in the phone numbers and [proximate] location of everyone in the vicinity of the event." Nate Anderson, *How "Cell Tower Dumps Caught the High Country Bandits—and Why It Matters*, Ars Technica, Aug. 29, 2013, https://arstechnica.com/tech-policy/2013/08/how-cell-tower-dumps-caught-the-high-country-bandits-and-why-it-matters/. In other words, it provides the government with a record of every individual that was near a cell

---

[4] Today, almost 77% of Americans use smartphones. *Mobile Fact Sheet*, Pew. Res. Ctr., Feb. 5, 2018, http://www.pewinternet.org/fact-sheet/mobile/. Smartphones connect to cell sites without users having to interact with the device at all. *See Carpenter*, 138 S. Ct. at 329 ("[A] cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up"). These connections occur as frequently as every seven seconds. Susan Freiwald, *Cell Phone Location Data and the Fourth Amendment: A Question of Law, Not Fact*, 70 Md. L. Rev. 681, 703 (2011). Tower dump requests will therefore reveal increasingly large and precise amounts of location data as even more Americans switch to smartphones, and as improved technology permits cell phones to connect with towers at an even faster speed.

tower, or group of cell towers, during a given time period. These searches capture the data of not just one individual, but potentially thousands of people.

### C. The Tower Dump Warrant Return

On November 24, 2020, Verizon returned records in response to the warrant. Only one tower was "dumped,"[5] which is highlighted in graphic below:




[5] The search warrant sought records from Verizon and AT&T. Although both providers operated cell towers in the area, only the Verizon data appears in discovery. The AT&T data has been requested from the government but is not available as of the time of this writing.

Those requested records revealed called party phone numbers, calling party phone numbers, unique identifying numbers for devices (IMEI and IMSI), device model, call duration, relevant cell site sector, and access distance (the distance from the initial sector for the event). In total, the tower records obtained by law enforcement implicated the private data of 1,686 users, some as far away from the "dumped" tower as 13.83 miles.

**D. Subsequent Investigation—Cell Phone Search Warrants**

Although the warrant return was dated November 24, 2020,[6] Mono County investigators appeared to possess the tower dump data days before that. Using the tower dump data, several phone numbers were identified, leading to additional investigation and the procurement of multiple search warrants for the CSLI specific to those numbers.

Between November 16, 2020. and November 24, 2020, search warrants were obtained for at least the phone numbers belonging to Vanessa Covin, Bradley Kohorst, Orit Oged, and Cory Spurlock.[7] Regarding Mr. Spurlock, law enforcement obtained four warrants, one for a burner phone (775-399-8466) law enforcement attributed to Mr. Spurlock and three warrants for phone numbers also attributed to Mr. Spurlock (760-687-8043; 406-218-8139; and 775-301-3218). Each of the four warrants relied on law enforcement's analysis of the tower dump data and cumulatively built on each other for probable cause.

**1. 775-399-8466**

The first warrant related to 775-399-8466 (20-SW-66) was obtained on November 17, 2020. As noted in the affidavit, the original tower dump data provided investigators with "cellular identification data" as well as "call data." Exhibit B at USAO 015812. Through their "investigative research," this data "revealed" to investigators "multiple calls between 4062141975, 4063700475, [and] 7753998466 between 1952 hours and 2020 hours which is the

---

[6] USAO 007794.

[7] By warrant number those warrants are: 20-SW-62, 20-SW-63, 20-SW-64, 20-SW-65, 20-SW-71, 20-SW-72, and 20-SW-76.

time frame of the homicide." *Id*. Through additional "investigative research," investigators associated the latter number with Mr. Spurlock's burner phone.

**2. 760-687-8043**

On November 19, 2020, investigators sought another warrant, this time for 760-687-8043. Based on more "investigative research," this number was attributed to Mr. Spurlock's permanent cell phone. Exhibit C at USAO 15980. Because law enforcement believed that Mr. Spurlock had a burner phone and that number to the burner phone was captured in the tower dump data, the affiant asserted that "[i]t is reasonable to believe Spurlock would have also possessed his permanent cell phone 7606878043 during the crime, as well as during travel to and from the location of the crime." *Id*. Nothing else was offered to support this assertion.

**3. 760-687-8043**

The next day, November 20, 2020, investigators applied for a third search warrant targeting Mr. Spurlock's cell phone data. Citing tower dump data and the data from the previous 760-687-8043 warrant, the affidavit explained that "[b]ased on" this data it was believed that Mr. Spurlock was "within the area of the crime scene at the time the homicide occurred." Exhibit D at USAO 15909. Another number was revealed to investigators in the original tower dump data: (406) 218-8139. Investigators suspected this number also belonged to Mr. Spurlock, through their "investigative research." *Id*.

**4. 775-301-3218**

On November 24, 2020, investigators sought a final phone warrant for Mr. Spurlock. Exhibit E at USAO 015962. According to this affidavit, "[a]s a result of several search warrants of registered and unregistered cellphone numbers" and additional investigation up to that point, investigators identified one more number as purportedly associated with Mr. Spurlock: 775-301-3218. Like the three Spurlock warrants that came before it, this warrant sought broad swathes of private information beyond just CSLI, to include subscriber records, cloud storage data, call detail records, and "specialized location records." *Id*. at USAO 015962.

### E. Use of Tower Dump Data in Subsequent Investigation

The tower dump warrant was the first cell phone search warrant sought. Its results produced the foundational data set for the investigation. By dumping all of the private user data from the tower that serviced the area where the bodies of the Larsens were found,[8] investigators were able to identify suspect cell phone numbers, then targeted those numbers with more specific search warrants. *See, e.g.*, Exhibits B-E (cell phone search warrants for Mr. Spurlock).

The tower dump data is this investigation's original forensic data set. It oriented the decision-making of investigators from the beginning, helping them narrow the focus of the investigation to Mr. Spurlock and his alleged co-conspirators. After the tower dump warrant was approved on November 13, 2020, law enforcement incorporated findings from that data into the proffered probable cause for approximately 90 different search warrants over the course of this investigation—for cell phone information, various physical locations, data extractions of seized devices, Stringray cell site stimulators, geofences, a wiretap, and ultimately to force entry into Mr. Spurlock's home in Missoula, Montana, and arrest him and his wife at gunpoint.

### F. CAST Analysis and PowerPoint

On February 2, 2021, FBI Special Agent Christopher Johnson gathered all of the available cell phone data from the various warrants served on providers and submitted a request to the FBI's Cellular Analysis Survey Team (CAST).[9] SA Johnson provided a synopsis of the case, identified phone numbers "revealed" in the tower dump data and subsequently collected

---

[8] It appears that only one tower serviced that area, or only one service provider was responsive to the tower dump warrant. That warrant sought data from AT&T and Verizon. Exhibit A at USAO 015646. The defense understands that only Verizon responded.

[9] Mono County investigators had sought the search warrants, but the FBI appears to have been conducting a parallel investigation into federal charges, leading to a willingness to make CAST resources available to local law enforcement. At some point in the early days of the investigation the FBI appears to have obtained OCEDTF approval to carry on its own investigation with very few limitations on resources.

data, and listed relevant locations in the case.[10] SA Johnson sent CAST all the case's cell phone data on a "hard drive."[11] The purpose of doing so was for CAST to create a visual representation of the location history of Mr. Spurlock and his alleged co-conspirators before, during, and after the Larsen murders on November 8, 2020, as well as around the timeframe of Jered Stefansky's disappearance on or about June 19, 2020. In response, CAST mapped the cell phone data and produced a PowerPoint presentation for government use as an exhibit at trial.

## II. ARGUMENT

Reverse warrants are utilized to identify a suspect when none is known. Like other reverse warrants,[12] tower dump warrants invert the probable cause analysis, allowing law enforcement to obtain broad swathes of private information on a belief that a suspect could be identified, and thereby search every person within a warrant's geographic and temporal parameters. Despite their utility to law enforcement at the inception of an investigation, tower dump warrants are materially indistinguishable from general warrants. They are therefore categorically unconstitutional. The tower dump warrant here therefore fails for this reason.

It also fails for several independent reasons. Because a tower dump is a Fourth Amendment search, any warrant request must satisfy normal warrant requirements of particularity and probable cause. By operating in "reverse" (i.e., demanding data to find a suspect rather than finding a suspect then demanding data), this warrant is by definition devoid of particularity and overbroad. The affidavit also fails to articulate probable cause or a records-crime nexus. Moreover, the good faith exception has no application here. The barebones affidavit and irregularities in the warrant materials indicate the issuing judge failed to neutrally

---

[10] USAO 008000-03.

[11] *Id.*

[12] Geofence warrants and reverse keyword warrants operate in the same way by demanding production of the identity of every person within a defined area during a defined time.

screen the application. The affidavit is fatally deficient in probable cause. And general warrants like this one are facially invalid. The good faith exception thus cannot apply.

Because the tower dump warrant was totally lacking in probable cause and particularity, total suppression is required. Moreover, as the original data set for later cell phone search warrants and the springboard for subsequent investigation, the fruits of the follow-on warrants for the cell phone data of Mr. Spurlock's alleged co-conspirators must also be suppressed. The fruits of the subsequent investigation that are traceable to law enforcement's un-cabined ability to rummage at will through the tower dump data likewise must be suppressed.

**A. A Tower Dump is a Search Under the Fourth Amendment.**

In *Carpenter v. United States*, 585 U.S. 296, 310 (2018), the Supreme Court held that an individual "maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." The Court determined that 127-days' worth of "location information obtained" from an identified suspect's wireless carrier is "the product of a search." *Id.* Consistent with that logic, a tower dump—which produces the location information of not one but all active cell phone user within a given area—is also a search for purposes of the Fourth Amendment. As a consequence, a warrant is required to obtain tower dump records, and any warrant must comply with the traditional requirements of particularity and probable cause.

The majority of courts analyzing the Fourth Amendment implications of reverse warrants have done so in the context of geofence warrants. *See, e.g.*, *United States v. Smith*, 110 F.4th 817, 820 (5th Cir. 2024); *United States v. Chatrie*, 107 F.4th 319, 332 (4th Cir. 2024). The Fifth Circuit in *Smith* and the Fourth Circuit in *Chatrie* reached opposite conclusions on whether a geofence request was a search. The Fifth Circuit determined that a geofence request was a search under *Carpenter*, while the Fourth Circuit determined it was not in part because (unlike with the CSLI at issue in *Carpenter* and here) users have to opt in to location sharing

before their data will appear in a geofence warrant return.[13] *See Smith*, 110 F.4th at 836; *Chatrie*, 107 F.4th at 331-32. The Ninth Circuit appears to have never addressed geofences or tower dumps, or the constitutionality of reverse warrants more generally.[14]

Tower dumps and geofence warrants have a similar investigatory purpose and operate in a similarly sweeping way. Each is sought when "law enforcement officials have *no idea* who they are looking for." *Smith*, 110 F.4th at 837. And, to solve for that unknown, tower dumps and geofence warrants seek the historical location information of every person within a geographic area during a specific period of time in hopes a suspect may be among them. *Id*. (recognizing that "the quintessential problem with these [geofence] warrants is that they never include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search"). There is no material difference between these reverse warrants.

This was the conclusion just this February in *In Re Four Applications For Search Warrants Seeking Information Associated With Particular Cellular Towers a/k/a Tower-Dump Warrants*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000 *8 (S.D. Miss. Feb. 21, 2025). There, the magistrate judge was confronted with a tower dump warrant request and rejected it, finding the following. First, tower dump data is functionally "identical" to geofence data, since both reveal a person's historical location and are indiscriminate in the scope of potential users impacted. *Id*. at *5. Second, this data is constantly automatically generated, so a user does not

[13] The Fourth Circuit has granted a petition to rehear *Chatrie* en banc, leaving the district court opinion intact that the geofence warrant there lacked "particularized probable cause." *United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022), *rehearing en banc granted,* 2024 WL 4648102 (4th Cir. 2024) (geofence). In contrast, the government petitioned for en banc rehearing in *Smith* but was denied. *United States v. Smith*, No. 23-60321, Order on Petition for Rehearing En Banc (5th Cir. Jan. 14, 2025).

[14] The closest an in-circuit court has come to addressing the search implications of a reverse warrant appears to be *United States v. Foster*, No. 3:21-CR-00114-SLG, 2023 WL 155442, at *1 (D. Alaska Jan. 11, 2023). There the district court "assume[d], without deciding, that the Government conducted a Fourth Amendment search when it acquired [the defendant's] cell site tower data." *Id*.

voluntarily "share" this data in any normal sense of the term. *Id.* at *4-6. Based on these findings, and acknowledging the ubiquitous and insistent nature of cellular phones in modern life, the court concluded there is a "reasonable expectation of privacy in the location data revealed in a tower dump"[15] and therefore "a tower dump is a search under *Smith*'s interpretation of *Carpenter* and the Fourth Amendment."[16] *Id.* at 6.

The Ninth Circuit has yet to address the constitutionality of tower dumps or reverse warrants generally as a category of law enforcement technique. Nevertheless, the Fifth Circuit's reading of *Carpenter* in *Smith* is correct. *Carpenter*'s digital privacy logic applies to all forms of "reverse" location information, whether sought through a geofence warrant or a tower dump. In either case, the request intrudes on a reasonable expectation of privacy under *Katz v. United States*, 389 U.S. 347 (1967) and constitutes a Fourth Amendment search.

Moreover, because historical CSLI constitutes a "paper or effect,"[17] it is separately protected under a traditional, property-based understanding of the Fourth Amendment. *See*

---

[15] Other federal cases have suggested there is a reasonable expectation of privacy in tower dump data. *See, e.g.*, *United States v. Medina*, 712 F. Supp. 3d 226 (D.R.I. 2024), vacated and remanded, 125 F.4th 310 (1st Cir. 2025); *Commonwealth v. Perry*, 184 N.E.3d 745, 773 (Mass. 2022); *In re U.S. ex rel. Ord. Pursuant to 18 U.S.C. Section 2703(d),* 930 F. Supp. 2d 698, 702 (S.D. Tex. 2012)("Owsley I"); *In re Application of U.S. for an Ord. Pursuant to 18 USC § 2703(d)*, 964 F. Supp. 2d 674, 678 (S.D. Tex. 2013)("Owsley II"); *In re Search of Cellular Tel. Towers*, 945 F. Supp. 2d 769, 771 (S.D. Tex. 2013)("Owsley III"); *United States v. James*, 2018 WL 6566000, at *2 (D Minn. 2018).

[16] Indeed, by seeking a warrant in this case law enforcement implicitly concedes this information is protected under the Fourth Amendment, a conclusion other courts have explicitly reached over the years. *See, e.g.*, *In re U.S. ex rel. Ord. Pursuant to 18 U.S.C. Section 2703(d)*, 930 F. Supp. 2d 698, 701 (S.D. Tex. 2012) (holding that "cell site data are protected pursuant to the Fourth Amendment from warrantless searches").

[17] By this point in the digital age it should go without saying that digital representations of information are equivalent to paper documents. *See* Jim Harper, *Administering the Fourth Amendment in the Digital Age*, National Constitution Center, A Twenty-First Century Framework for Digital Privacy – White Paper Series (May 10, 2017) *available at* https://constitutioncenter.org/news-debate/special-projects/digital-privacy/the-fourth-amendment-in-the-digital-age#footnote-157. They are equivalent, for example, for court filings, discovery, and email. *See id*. at 28. Storing data digitally rather than on paper "changes nothing about their Fourth Amendment significance." *Id*. As the Sixth Circuit recognized, "it

*Carpenter*, 585 U.S. at 397 (Gorsuch, J., dissenting) (noting that "the traditional approach asked if a house, paper or effect was yours under law. No more was required to trigger the Fourth Amendment."); *see also Florida. v. Jardines*, 569 U.S. 1, 5 (2013) ("The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred.") (internal quotation marks omitted).

Cell phone location information is protected by the federal Telecommunications Act, which categorizes location information as "customer proprietary network information" and requires "express prior authorization" of the customer before a provider can "use or disclose it." 47 U.S.C. § 222(f), (h)(1)(a). It is also protected by California's Electronic Communications Privacy Act, which provides that users retain privacy and possessory interests in that data and a right to exclude others, including law enforcement, except in limited circumstances, to include a warrant. *See* Cal. Penal Code § 1546 et seq.

When "positive law" accords property rights to data held by a third party, Fourth Amendment protections apply. *See Carpenter*, 585 U.S. at 400 (Gorsuch, J., dissenting). Indeed, just as individuals retain a property interest in their physical mail while in USPS custody, they retain a property interest in their location data, even though stored by a private service provider. *See Carpenter*, 585 U.S. at 400 (Gorsuch, J., dissenting) (noting that "letters bailed to a third party," even the government, doesn't change their Fourth Amendment protection). For all these reasons, a tower dump is just as much a Fourth Amendment search under property principles as it is under the *Katz* framework.

///

///

---

would defy common sense" to afford data less Fourth Amendment protection based on the medium of storage. *United States v. Warshak*, 631 F.3d 266, 285-86 (6th Cir. 2010).

**B. The Tower Dump Warrant is a General Warrant Categorically Forbidden by the Fourth Amendment.**

A tower dump warrant is a modern-day writ of assistance. This type of warrant authorizes the exploratory rummaging through the private data of multitudes of people without particularized suspicion as to any one of them in the hopes that a suspect might be identified. Like any general warrant, a tower dump warrant can never be constitutional.

The abuse of general warrants and writs of assistance catalyzed a revolution and the adoption of the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 403 (2014) (noting that writs of assistance "allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity" and that "[o]pposition to such searches was . . . one of the driving forces behind the Revolution itself."); *Stanford v. State of Tex.*, 379 U.S. 476, 481 (1965) (stating that the text of the Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects" from intrusion and seizure by officers acting under the unbridled authority of a general warrant"); *see also* Michael Price, *Rethinking Privacy: Fourth Amendment "Papers" and the Third-Party Doctrine*, 8 J. Nat'l Security L. & Pol'y 247, 256 (2016) (detailing one infamous instance of a general warrant which authorized search and seizure authority to discover authorship of a satirical pamphlet critical of King George III). The very purpose of the Fourth Amendment prohibition against "unreasonable search and seizure" was to outlaw the government's authority to engage in "exploratory rummaging" through a person's belongings. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (noting that this was the "'specific evil' of the 'general warrant' abhorred by the colonists").

Yet approval to rummage is the undisguised purpose of the tower dump warrant here, which seeks access to a vast array of private cellular phone data of a potentially unlimited number of people to identify a criminal suspect the police don't yet know about. *See* Exhibit A at USAO 15648; USAO 15655. This is equivalent to authorizing the search of every home

within the radius of a reported gunshot or allowing law enforcement to search the bags of everyone in the radius of a theft. Each type of unrestrained search is prohibited by the Fourth Amendment. The digital nature of a tower dump doesn't make the search any less illegal.

However, the digital nature of a tower dump does make it a more pervasive and invidious invasion of privacy. Not only does a tower dump reveal a precise record of an individual's movements; it reveals a precise record of the movements of all individuals at a particular location. *See Riley*, 573 U.S. at 396 (citing *Jones*, 565 U.S. at 415). In rural areas where a phone may connect with a tower that is many miles away, the tower dump returns will produce location data and other information for any individual within an immense amount of territory. The indiscriminate sweep of a tower dump warrant, resulting in the capture of broad swathes of private data of an untold number of innocent users, only confirms the impermissible "dragnet" quality of the search.[18] *See In re U.S. for an Ord. Authorizing the Release of Hist. Cell-Site Info.*, 809 F. Supp. 2d 113, 119 (E.D.N.Y. 2011) ("[T]he collection of cell-site-location records effectively enables 'mass' or 'wholesale' electronic surveillance, and raises greater Fourth Amendment concerns than a single electronically surveilled car trip."); *see also United States v. Knotts*, 460 U.S. 276, 284 (1983) (cautioning against dragnet searches techniques); *Carpenter*, 585 U.S. at 306 (noting that *Knotts* "was careful to distinguish between . . . rudimentary tracking . . . and more sweeping modes of surveillance"); *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir. 2007) (addressing concerns raised by "wholesale" and "mass" surveillance through the use of GPS trackers); *United States v. Marquez*, 605 F.3d 604, 610 (8th Cir. 2010) (recognizing that "'wholesale surveillance" of large numbers of people "to

[18] Moreover, because no suspect is yet identified, tower dump warrants by definition leave to law enforcement post-production to determine which records are relevant to an investigation, resulting in the same kind of un-cabined discretion and open-endedness the Fourth Amendment cannot tolerate.

analyze the volumes of data produced for suspicious patterns of activity" raises different set of Fourth Amendment concerns than tracking one individual).

In tracking cases like *Knotts* and *United Sates v. Jones*, 565 U.S. 400 (2012), law enforcement at least knew its target based on prior investigation. In contrast, law enforcement does not know who the target is with a tower dump warrant, and does not need to know, since "[w]ith just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Carpenter*, 585 U.S. at 311; *see also Garcia*, 474 F.3d at 998 ("Technological progress poses a threat to privacy by enabling an extent of surveillance that in earlier times would have been prohibitively expensive."); *Prince Jones v. United States*, 168 A.3d 703, 713 (D.D.C. Sept. 21, 2017) (observing that tower dump records permit the government to "discover" a person "remotely and at will" without possessing any information about the individual's identity or phone number prior to the search). As the Ninth Circuit observed, such requests by "law enforcement for broad authorization to examine electronic records . . . creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam); *accord United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013).

General warrants have two defining hallmarks. They either lack particularity or lack probable cause, or both. The absence of one or the other is expected to "dissuade" courts from approving them. *See United States v. Pilling*, 721 F. Supp. 3d 1113, 1121 (D. Idaho 2024). Tower dump warrants by definition lack a known suspect. They thus lack sufficient particularity on their face to pass constitutional muster just by a casual inspection of their terms. For the same reason, they lack probable cause to seek the private data of any one individual in a given vicinity, let alone the data of everyone in a given vicinity. "[M]ere propinquity" to a crime does not suffice for probable cause. *See Ybarra v. Illinois*, 444 U.S. 85, 86 (1979). Accordingly, tower dump warrants per se lack both particularity and probable case. Like a general warrant

or a colonial-era writ of assistance, they can never be constitutional and are categorically forbidden under the Fourth Amendment. *Cf. Smith*, 110 F.4th at 836 (observing that "[i]t is undeniable that general warrants are plainly unconstitutional" and "hold[ing] that geofence warrants are general warrants categorically prohibited by the Fourth Amendment").

**1. This Tower Dump Warrant Lacks Particularity And is Overbroad.**

Even if a tower dump warrant could ever be constitutional when "law enforcement officials have no idea who they are looking for,"[19] *Smith*, 110 F.4th at 837, nor any idea if the records sought will ultimately contain evidence of a crime, the tower dump warrant in this case fails on its face since it lacks any particularity and is fatally overbroad.

While a tower dump warrant might be able to identify the service provider to be searched, by definition it cannot identify with particularity a single targeted individual who is the subject of the search. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (holding that the warrant was "deficient in particularity" because "in the space set aside for a description of the items to be seized, the warrant stated that the items consisted of a 'single dwelling residence . . . blue in color.' In other words, the warrant did not describe the items to be seized at all"); *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (holding that there is "a heightened sensitivity to the particularity requirement in the context of digital searches") (citing *Comprehensive Drug Testing, Inc.,* 621 F.3d at 1176.

Because a tower dump warrant is inherently incapable of particularity, the consequence is that it is a request that a warrant cannot authorize. Even if a warrant were an appropriate vehicle for a tower dump request, this warrant still lacked particularity for three reasons.

First, where this warrant asks to designate a "Target," it lists "Any subjects related to the active homicide investigation." Exhibit A at USAO 15648. This obvious deficiency is

[19] The burden falls on the government to articulate when such a warrant could ever be constitutional.

enough to render the search practically "warrantless." *Cf. Ramirez*, 540 U.S. at 558. Second, the warrant issued on the expectation that tower dump records would "tend to show that a particular person" committed a felony." *Id*. at USAO 015648. The problem is that this puts the cart before the horse. Particularity (along with probable cause) must exist ex ante before a warrant is issued; a warrant can't be used to particularize who a suspect might be post hoc.[20] *Cf. Smith*, 110 F.4th at 837 ("[T]he quintessential problem with these warrants is that they *never* include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search.").

Third, the warrant is insufficiently particular as to its targeted area and timeframe. The warrant demands data from all "cell sites servicing" the areas "around" mile marker 84.5 and 74.5. Exhibit A at USAO 15646-15647. "Around" is a standardless term; it can mean anything to a provider who is left to define that term for itself, as Verizon was here. And while a cell tower might be "around" an area of interest, a cell tower's three antennae (or, "sectors") face different directions, allowing for 360-degree coverage. Exhibit F at USAO 44552 (slide from draft PowerPoint of the FBI's Cellular Analysis Survey Team). The actual coverage area of a cell tower extends well beyond what one sector happens to be "around."[21] Relatedly, while the warrant specifies a time period between 1700 hours to 2300 hours, there is nothing offered to justify that particular six-hour timeframe. *See id*. at USAO 15647; 15651-15656.

For these reasons and those below, the warrant as drafted is also fatally overbroad.

By insisting on particularity, the Fourth Amendment, by the same token, "forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009); *see also*

---

[20] Moreover, the collateral impact to the privacy interests of innocent users cannot be overstated. Law enforcement's failure to develop probable cause as to a particular suspect cannot be justification for invading the privacy of multitudes.

[21] A cell site and cell tower are interchangeable terms. *See In re Application for Tel. Info. Needed for a Crim. Investigation*, 119 F. Supp. 3d 1011, 1014 (N.D. Cal. 2015) (providing and overview of how cell towers work and collect and maintain historical CSLI)

*United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). Three factors typically guide the overbreadth analysis: (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available. *See United States v. Spilotro*, 800 F.2d 959, 960 (9th Cir. 1986); *see also United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995). This warrant fails on all fronts.

First, because it lacks a known target, the warrant concededly seeks the private data of people for whom there is no probable cause to suspect of a crime. Exhibit A at USAO 15648 (listing as its target "Any subjects related to the active homicide investigation"). Second, the request is not limited by cell site sector or sufficiently narrowed in its timeframe, and so directs the search of records of users who may have been miles in the opposite direction from the homicides hours before or after it occurred. Third, it places no limit on the amount and type of records to be produced, impermissibly leaving it to the discretion of the provider what records to produce, and to law enforcement discretion on how to conduct the search. *See United States v. Holzman*, 871 F.2d 1496, 1508 (9th Cir. 1989) (noting that a sufficiently particular warrant "must leave the executing officers no discretion as to what items are to be seized"); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (internal quotation marks omitted)).

Fourth, and most problematically, the warrant authorizes access to much more than historical CSLI. It authorizes access to the actual content of communications, not just evidence of a cell phone's connections to the network. Notably, the warrant makes a request for records that would support "any and all communications," and then provides a non-exhaustive list of categories. Exhibit A at USAO 15647; USAO 15652. This request is sweeping on its own. But the extent of the warrant's overbreadth is clear when this request is read together with the subsection entitled, "**Communications to be searched for and seized**." *Id.* at USAO 15648.

That subsection explicitly authorizes the search and seizure of "stored electronic communications," which are further defined as "content." *Id*. at USAO 15648. The warrant thus on its face authorizes a search for much more than even the affiant was asking for. *Compare* USAO 15648, *with* USAO 15652; USAO 15654.

**2. There is No Probable Cause.**

Similar to the tower dump warrants that were denied just this February in *In re Four Applications*, this warrant asked for access to an "entire haystack because it may contain a needle," even though the affiant "lack[ed] probable cause both as to the needle's identifying characteristics and as to the many other flakes of hay in the stack." 2025 WL 603000 *8; *In re Search of Google Email Accounts identified in Attachment A*, 92 F. Supp. 3d 944, 952 (D. Alaska 2015). The warrant application here was not based on probable cause; it was based on the hope of developing probable cause through an indiscriminate search of the private cell phone date of an untold multitude of people in case it might help identify someone who was "around" when the homicides occurred. However, "mere propinquity" to a crime is insufficient as a matter of law to establish probable cause. *See Ybarra*, 444 U.S. at 86.

**3. There is No Nexus to The Place to Be Searched or The Crime Under Investigation.**

Because there was no known suspect, the stated purpose of this tower dump warrant was to develop one. Yet unlike cases approving tower dump warrants, there was no proof in the first instance that an unknown suspect even used a cellular phone. There is thus no apparent nexus between the cell phone records sought and this roadside homicide.

When applying for any search warrant, two nexuses must exist. First, there must "probable cause to believe that contraband or evidence is located *in a particular place*." *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *United States v. Kvashuk*, 29 F.4th 1077, 1086 (9th Cir. 2022). And "[t]here must . . . be a nexus . . . between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307 (1967); *see also In re Four Applications*, 2025

WL 603000, at *7 n.12 (applying the nexus requirement to tower dumps and holding that "[a]n affidavit supporting a search warrant must make it apparent, therefore, that there is some nexus between the items to be seized and the criminal activity being investigated." (internal quotation marks omitted). Neither of these nexuses was present here.

Cases approving tower dump warrants despite a nexus challenge share a common fact: in each case the suspect either used a cell phone to commit a crime or was observed talking on one. In *Foster* the defendant was captured on video at multiple locations committing acts of vandalism wearing the same outfit, operating the same vehicles, employing the same modus operandi, and "most importantly" using "a cell phone to take photographs" of his handiwork "and or text." *See United States v. Foster*, No. 321CR000114SLGMMS, 2022 WL 18587677, at *9 (D. Alaska Nov. 17, 2022), report and recommendation adopted in part, rejected in part, No. 3:21-CR-00114-SLG, 2023 WL 155442 (D. Alaska Jan. 11, 2023) (adopting the magistrate judge's probable cause reasoning but rejecting the application of the good faith exception as "unnecessary to the Court's determination"). Similarly, the magistrate judge in *In re Search of Cellular Tel. Towers*, 945 F. Supp. 2d 769, 771 (S.D. Tex. 2013) had no problem concluding a nexus existed. The government there actually "demonstrated that the subject of the investigation used a cell phone during the criminal activity in furtherance of the offense." *Id*.

No such proof existed here. The affiant appeared to merely surmise that because the Larsens carried cell phones the unknown suspect therefore used a cell phone to commit the crimes. This is non-sequitur reasoning. And, unlike the government in *In re Search of Cellular Tel. Towers*, the affiant here did not "demonstrate" that "the person(s) involved in the murder had most likely communicated with one another via cell phone, either before and/or after the murder in order to communicate and coordinate efforts." Exhibit A at USAO 015655. Absent "case-specific" evidence linking a suspect's use of a cell phone to the crime, there was nothing to "nudge" the affiant's hunch from "speculation across the line to probable cause. *United States v. Bertini*, No. 23 CR. 61 (PGG), 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023) (internal

quotation marks omitted) (granting motion to suppress tower dump data where the asserted probable cause was based on the affiant's invocation of his training and experience as an investigator and his "[a]ppeals to [c]ommon [s]ense" that everyone carries cell phones).

The affiant's conjecture here failed to establish that an unknown's suspect's cell phone data would be revealed in a tower dump. And it failed to establish that cell phone records had a probable cause nexus to the crime under investigation. Because this tower dump application fails to establish a two-fold nexus, the issuing judge lacked a "substantial basis" for granting the warrant. *United States v. Weber*, 923 F.2d 1338, 1343 (9th Cir. 1990)

**C. The Good Faith Exception Does Not Apply.**

Tower dump warrants are general warrants by definition and incompatible with the Fourth Amendment as a matter of law. The invalidity of those warrants is apparent on sight. Even assuming a tower dump warrant can ever be constitutional, the one at bar is so facially deficient that no issuing judge or officer could have reasonably presumed its validity.

As an initial matter, a good faith analysis does not apply unless there is "at least a colorable argument for probable cause" in the affidavit *See United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007); *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) ("A colorable argument is made when thoughtful and competent judges could disagree that probable cause does not exist.") (internal quotation marks omitted). There is no such argument here. Like all tower dumps, the affidavit by definition lacks a target and articulates no ex ante probable cause. In other words, it seeks a haystack without any sense of the needle, which is a reversal of sequencing in the probable cause analysis. *In re Four Applications*, 2025 WL 603000 *8; *In re Search of Google Email Accounts*, 92 F. Supp. 3d at 952. The affidavit also offers only conjecture about cell phone use without facts to "demonstrate" it. *In re Search of Cellular Tel. Towers*, 945 F. Supp. 2d at 771. In *Weber*, the Ninth Circuit looked past "foundationless" expert opinion when assessing the sufficiency of an affidavit's probable cause

for purposes of good faith. 923 F.2d at 1346. Looking past the conjecture here, this affidavit, like the affidavit in *Weber*, is "bare bones" and thus "deficient under *Leon*." *Id*. at 1346.

Moreover, a tower dump warrant is a general warrant on its own terms and is as incompatible with the Fourth Amendment as a colonial-era writ of assistance. The digital context of a tower dump doesn't make its illegality any less recognizable. If "[i]t is undeniable that general warrants are plainly unconstitutional," *Smith*, 110 F.4th at 836, and a tower dump warrant is a general warrant, then it necessarily follows that this warrant "is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid." *See Crews*, 502 F.3d at 1136. It similarly follows that the "affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith."[22] *Id.* Thus, even if the good faith exception could apply to save a general warrant, *see Smith*, 110 F.4th at 839 n.13 (appreciating that it could not but declining to rule on that proposition in that case), it can't apply to save the warrant here given its naked deficits in particularity and probable cause.

Furthermore, no neutral and detached judicial officer could grant such a warrant, except as a "rubber stamp." *Crews*, 502 F.3d at 1136. Indeed, when an affidavit is "bare bones," the act of approving the warrant itself is evidence the judicial role has been abandoned. *See United States v. Doyle*, 650 F.3d 460, 470 (4th Cir. 2011) ("[A] magistrate abandons his judicial role

---

[22] The Ninth Circuit in *Crews* outlined the four circumstances in which the good faith exception does not apply:

> (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a 'rubber stamp' to the warrant application rather than as a neutral and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

502 F.3d at 1136. In any of these circumstances "reliance is *per se* unreasonable." *Id*.

when issuing a warrant based on a 'bare bones affidavit.'"); *see also United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (holding "that the good-faith exception . . . should not apply" to a bare bones affidavit when "the state magistrate could not have acted as other than a 'rubber stamp' in approving such an affidavit"). Moreover, several irregularities suggest the affidavit was never read, or if read, never fully appreciated. For starters, the affidavit post-dates the search warrant by seven days. *Compare* Exhibit A at USAO 15650, *with id.* at USAO 15656. If the dates on the documents are accepted at face value, it's impossible that the November 20, 2020 "affidavit by Sergeant Magdaleno Hernandez . . . was sworn to and subscribed before" the issuing judge on November 13, 2020. *Id*. at USAO 15646. Additionally, the search warrant authorizes the search and seizure of the "content" of "electronic communications"—a grant of authority to search a class of item even the affiant didn't even ask for. *Compare id.* at USAO 015648 ("**Communications to be searched for and seized**"), *with* USAO 015647-15848 (describing the categories of records sought but not mentioning "content").

Finally, while time pressure may be considered when determining whether the good faith exception applies to a deficient "bare bones" affidavit, *Weber*, 923 F.2d at 1346, there was no pressure expressed in the affidavit. *See United States v. Luong*, 470 F.3d 898, 904 (9th Cir. 2006) (an assessment of good faith is an objective one and limited to the four corners of the affidavit); *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (barring extrinsic evidence of facts bearing on good faith not memorialized in the affidavit). The circumstances here, though serious, weren't explained by the affiant or recorded by the issuing judge as emergent. *See* Exhibit A at USAO 015652; USAO 015653-15656. And the tower records being sought weren't in danger of destruction. The affiant personally knew that tower records are retained and available to law enforcement "between 6 months and up to 2 years depending on the carrier." *Id*. at USAO 015654. There is thus no basis to forgive the bare bones nature of this tower dump warrant, or law enforcement's decision to sidestep traditional means of investigation for a highly intrusive and expedient low-cost alternative.

**D. Total Suppression is Required of Direct and Derivative Evidence.**

There are no protocols in the warrant constraining law enforcement's review of this data, and the affiant didn't propose any. Exhibit A at USAO 015646-49. The ability of law enforcement to review and make investigative use of this data was limitless. For the following reasons, total suppression of the tower dump data is required as well as the results of later cell data search warrants targeting Mr. Spurlock and his alleged co-conspirators and any and all subsequent investigation tainted by this illegally acquired data.

First, "[t]otal suppression . . . is appropriate when a warrant is wholly lacking in particularity." *United States v. Lofstead*, 574 F. Supp. 3d 831, 845 (D. Nev. 2021) (quoting *United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005)). This is especially true in the context of a digital information. *Galpin*, 720 F.3d at 447 (holding that there is "a heightened sensitivity to the particularity requirement in the context of digital searches"). A tower dump warrant is inherently incapable of particularity since its very purpose is to indiscriminately over-seize data to search for unknown and unparticularized suspects.[23] Thus, the entirety of the data obtained through the tower dump warrant should be suppressed.

Second, as the original data set in this case, the tower dump data permeated this investigation from the beginning, rendering its tainting effect over four years unsusceptible to judicial review. Just what law enforcement did with the tower dump data is both known and unknown. Sometime between the date the tower dump warrant was sought (November 13, 2020) and the date the return was completed (November 24, 2020), Verizon sent law enforcement the requested data.[24] The warrant granted more access to private data than even

---

[23] For the same reason tower dump warrants are unsusceptible to defined search protocols, anonymization, and data minimization procedures, each of which would defeat the warrant's (illegal) purpose. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010).

[24] Notably, the compliance date on the warrant was November 19, 2020, but the affidavit post-dated November 20, 2020. Exhibit A at USAO 15656.

the affiant asked for, contained no restrictions on the data's review once received, and nothing in the warrant required return of the dumped data to the provider after its value to the investigation was exhausted. Thus, for nearly four years law enforcement had unfettered access to the private data of 1,686 users to query and consult as needed to further its investigation, eventually culminating in a CAST analysis and courtroom-ready PowerPoint presentation.

While the tower dump data was used to procure follow-on warrants for phone numbers associated with Mr. Spurlock's alleged co-conspirators, the other uses to which law enforcement put the dumped data is not ascertainable, at least not without an evidentiary hearing. Absent a hearing, total suppression should be ordered. Such a remedy is appropriate when a warrant has terms, but the executing officer flagrantly disregards them. Here, the tower dump warrant effectively had no terms. The consequent evil in both instances is the same: each results in a general search. *See United States v. Chen*, 979 F.2d 714, 716 (9th Cir. 1992) (noting that total suppression is appropriate where flagrant disregard of a warrant's terms rendered it a general search); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir.1978) (declining to remand to the district court and ordering total suppression where "it [was] not possible for the court to identify after the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant."); *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) ("[F]lagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search and thus require suppression or return of all evidence seized during the search.").

Suppression also extends beyond the tower dump data itself to all investigative results deriving from its use, to the extent its tainting effect is ascertainable. "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible

and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search." *Murray v. United States*, 487 U.S. 533, 536–37 (1988)

In each of the four follow-on warrants targeting phone numbers associated with Mr. Spurlock (775-399-8466; 760-687-8043; 406-218-8139; and 775-301-3218), the affidavit relied on the tower dump data. Exhibit B at USAO 015813; Exhibit C at USAO 015890; Exhibit D at USAO 015909; Exhibit E at USAO 015960. Moreover, each warrant built on the results of the preceding one for probable cause, and thus their probable cause statements derive from the tower dump data. The results of those warrants must be suppressed, as well as the results of subsequent investigation traceable to the fruits of those warrants.

As discussed above, after the tower dump warrant was approved 90 different search warrants were approved over the course of this investigation that incorporated and built upon the returns from the tower dump warrant. Because they all appear to rely on this original data set, the fruits from each of these warrants must be suppressed as well.

These 90 other warrants specifically include warrants relating to the cell phone data of Mr. Spurlock's alleged co-conspirators. The results of those warrants must be suppressed, as well any evidence deriving from those results. Total suppression of the tower dump data is required for the reasons already discussed. In any event, Mr. Spurlock has a reasonable expectation of privacy in his cell phone data, even if that data appears in the cell phone records of another user. Accordingly, to the extent Mr. Spurlock's phone number or other data appear in the tower records of Mr. Kohorst of Ms. Oged, it is subject to suppression since it was illegally acquired under the tower dump warrant.

Separately, the data related to Ms. Oged's phone number (406-370-0475), as acquired under the tower dump warrant, and as gathered through subsequent warrants, must be suppressed. Upon information and belief, Mr. Spurlock and Ms. Oged jointly controlled the account for 406-370-0475 and shared authority over the device. The data related to 406-370-0475 therefore must be suppressed as a matter of total suppression, but also because its

acquisition involved a direct intrusion into Mr. Spurlock's expectation of privacy in that data. *See United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006) (noting that a person has standing to challenge a Fourth Amendment intrusion if there is "'joint control' or 'common authority' over the property searched").

## III. CONCLUSION

Based on the foregoing, this tower dump warrant is unconstitutional as a categorical matter and invalid on its face. Moreover, it is overbroad and deficient in both particularity and probable cause. The good faith exception does not apply and total suppression of the tower dump data is required. Additionally, the results from the derivative use of the tower dump warrant must be suppressed, including the results of the subsequent search warrants that rely on that data, together with any evidence traceable to that data.

DATED this 12th day of March 2025

RENE L. VALLADARES
Federal Public Defender

By: */s/Christopher P. Frey*
CHRISTOPHER P. FREY
Assistant Federal Public Defender

*/s/ Kate Berry*
Kate Berry
Assistant Federal Public Defender

*/s/ Allie Wilson*
Allie Wilson
Assistant Federal Public Defender

*/s/ Richard G. Novak*
Richard G. Novak
CJA Learned Counsel