# Exhibit E

# 20-SW-76
# Search Warrant & Affidavit

EXHIBIT

# SUPERIOR COURT OF CALIFORNIA
## County of MONO

## SEARCH WARRANT
**Electronic Communications and/or Data**
**In Possession of Provider**
Penal Code §§ 1524.3; 1546 et seq.

**The People of the State of California**
**To Any Peace Officer in the Above County** Warrant No. 20-SW-76

**Order**: An affidavit by Deputy Jason Pelichowski, which was sworn to and subscribed before me on this date, has established probable cause for the issuance of this search warrant which you are ordered to execute in the manner below.

**Name and agency of Affiant** (Hereinafter "Affiant"): Deputy Jason Pelichowski, Mono County Sheriff's Office

**Name of service Provider** (Hereinafter "Provider"): TMobile Attn: Court Order Team

**Mailing address of service Provider**

T-Mobile
Attn: Court Order Team
4 Sylvan Way
Parsippany, NJ. 07054
**Fax: (973) 292-8697**

FILED
NOV 24 2020
SUPERIOR COURT OF CALIFORNIA
COUNTY OF MONO
BY:

**Type of communications and/or data to be seized:**

All records associated with mobile number **7753013218** for the dates of **05/01/2020 PST** to **11/24/2020 PST**

*If the number is not associated with a subscriber on your network you are ordered to process this request as a "Call and Text to Destination" search that is to include all calls, text, text message content, voicemails, and cell-site and sector information related to each call or text.

This request includes:

1. **Specialized Location Records:** All call, voice, text (SMS & MMS), and data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

USAO 015951

2. **Call/Text/Data Detail Records:** All records associated with the identified mobile number **7753013218**, also to include all numbers that communicate with this listed number relating to all delivered and undelivered inbound and outbound calls, text messages, and text message content to any of the above listed numbers, all voice mail, and all data connections from **05/01/2020 PST** through **11/24/2020 PST,** and to include Cell-site and sector, date, time, direction, duration, number called or text to and/or received from, and bytes up/down, information related to each call, text or data connection, all text message content, and voicemails, as well as Call to Destination/Dialed Digits search for all numbers listed above. Please preserve all cell-site and sector information related to each call, text or data connections.

3. **Electronically Stored Records:** All records associated with the identified mobile number **7753013218**, to include all stored communication or files, including voice mail, text messages, including numbers text to and received from and all related content, e-mail, digital images (e.g. pictures), contact lists, video calling, web activity (name of web site or application visited or accessed), domain accessed, data connections (to include Internet Service Providers (ISPs), Internet protocol (IP) addresses, (IP) Session data, (IP) Destination Data, bookmarks, data sessions, name of web sites and/or applications accessed), date and time when all web sites, applications, and/or third party applications were accessed and the duration of each web site, application, and/or third party application was accessed, and any other files including all cell site and sector information associated with each connection and/or record associated with the cell number identified as: **7753013218**

4. **Carrier Key** related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information.

5. **Cloud Storage**: Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, and files or documents.

6. **Cell Site List(s):** List of all cell-sites as of **November 2020** for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector. If multiple technologies (CDMA, UMTS, GSM, LTE etc.) are referenced in the records, all appropriate corresponding cell site lists will also be provided.

7. **Subscriber Records:** All information for the following mobile number **7753013218** including:

    1. All Subscriber information to include name, tax identification number (social security number or employer identification number).
    2. Physical address, mailing addresses, residential addresses, business addresses, e-mail addresses and any other address information.
    3. Credit information obtained or used by the company to grant account status.
    4. All numbers associated with account.
    5. Billing records.
    6. All payments to include method, date and time of payments, and location (store name, address, and phone number of location where payment(s) were made).
    7. All Authorized users on the associated account.
    8. Activation date and termination date of each device associated with the account and above listed number(s).
    9. Types of service subscriber utilized (e.g. A-list, AT&T Messages, friends and family).
    10. Make, model, serial number, IMEI, ESN, MEID, and MAC address associated with the above listed numbers including any and all equipment or sim card changes for the life of the account.

USAO 015952

11. All customer service and account notes.

12. Any and all number and/or account number changes prior to and after the cell number was activated.

13. Any other records and other evidence relating to phone number **7753013218**.

Such records and other evidence include correspondence and other records of contact by any person or entity about the above-referenced account(s), the content and connection logs associated with or relating to postings, communications and any other activities to or through the above referenced phone numbers, whether such records or other evidence are in electronic or other form.

**Communications to be searched for and seized**: You are hereby ordered to search the Provider's electronic communication storage equipment for the following stored electronic communications. As used herein, the term "communications" includes written, photographic, video, and audio communications, voicemail, text message content, multimedia message content and email. The term "communication" includes written, photographic, video, and audio content.

**Communications data to be searched for and seized:** You are hereby ordered to search the Provider's electronic communication storage equipment, and any physical documents on the premises, for the following stored electronic communications data: Note to Provider: Please send all requested records in electronic format to the following email address: **jasonp@monosheriff.org**

**Delayed notification order**: The affidavit herein has established sufficient reason to believe that immediate compliance with the notice requirements set forth in Penal Code § 1546,2(a) will:

☒ Endanger the life or physical safety of an individual.

☒ Result in flight from prosecution.

☒ Result in tampering or destruction of evidence.

☐ Result in intimidation of a potential witness.

☒ Seriously jeopardize an investigation.

Accordingly, pursuant to Penal Code § 1546.2(b)(1), it is hereby ordered that neither the law enforcement officer(s) who execute this warrant nor Provider shall give such notification until one of the following circumstances exist: (1) there is sufficient reason to believe that the threat cited above will not occur, or (2) the passage of 90 days from the date the warrant was executed..

**Special instructions to Affiant**

**Seal unrelated information**: Pursuant to Penal Code § 1546.1(d)(2), all information that is unrelated to the objective of the warrant shall be sealed and is not subject to further review, use, or disclosure without a court order.

**Disposition of evidence**: Pursuant to Penal Code §§ 1528(a), 1536 all communications and/or data seized pursuant to this search warrant shall be retained in Affiant's custody pending further court order.

USAO 015953

**Special instructions to Provider**

**IMEI Search Parameters:**

IT IS ORDERED the Service Provider(s)/wireless carriers, upon the direction of any law enforcement agent, shall conduct an IMEI inquiry of the corresponding Subject Telephone Number(s) IMEI(s) to determine all IMSI/cellular telephone numbers utilized with the aforementioned devices (IMEI) from the time period Thirty (30) days prior to the signing of this warrant, up through the date this warrant is signed.

Any and all related Service Provider(s)/wireless carriers shall then provide account information, subscriber information, call detail records with cell site location information, SMS history and content, data sessions with IP addresses for logins, PCMD, RTT, historical GPS, TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, and NELOS data, for the IMSI/cellular telephone numbers identified from the aforementioned IMEI inquiry for the time period starting Thirty (30) days prior to the signing of this warrant, through the date this warrant is signed.

**IMSI Search Parameters:**

IT IS ORDERED the Service Provider(s)/wireless carriers, upon the direction of any law enforcement agent, shall conduct a search of the IMSI information corresponding to Target Telephone Number(s) beginning Thirty (30) days prior to the signing of this warrant until present, to determine if that IMSI was used in any other devices.

The respective Service Provider(s)/wireless carriers shall provide IMEI history information for all devices identified to include all associated IMSI/cellular telephone numbers for those devices beginning 11/24/2020 and continuing Thirty (30) days after the signing of this warrant, as authorized.

Any and all related Service Provider(s)/wireless carriers shall then provide account information, subscriber information, call detail records with cell site location information, SMS history and content, data sessions with IP addresses for logins, PCMD, RTT, historical GPS, TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, and NELOS data, for the identified IMSI/cellular telephone numbers for a period beginning 11/24/2020 and continuing for Thirty (30) days from the signing date of this warrant, as authorized.

**Verification**: If Provider is a foreign corporation as defined in California Corporations Code § 2105, it is required under California Penal Code § 1524.2(b)(4) to "verify the authenticity of records that it produces" by means of an affidavit that complies with the requirements set forth in California Evidence Code § 1561.

**Nondisclosure Order**: Pending further order of this court, the officers, employees, and agents of Provider are hereby ordered not to disclose information to any person that would reveal, or tend to reveal, the contents of this warrant or the fact that it was issued.

**Response time**: Pursuant to Penal Code § 1524.2(b)(1), Provider has five business days within which to respond to this warrant.

Nov 24, 2020 2:20 pm [signature]

Date and time warrant issued

[signature]

Judge of the Superior Court

USAO 015954

# SUPERIOR COURT OF CALIFORNIA
## County of MONO

SUPERIOR COURT COUNTY OF MONO OF CALIFORNIA

THE GREAT SEAL OF THE STATE OF CALIFORNIA EUREKA

## SEARCH WARRANT AFFIDAVIT

CalECPA General Affidavit

Penal Code §§ 1546 et seq.

**Affiant's name and agency** Deputy Jason Pelichowski, Mono County Sheriff's Office.

**Place or thing to be searched:**

T Mobile Telecommunication Company

**Mailing address of service Provider**

**Name of service Provider** (Hereinafter "Provider"): T Mobile Attn: Court Order Team

**Mailing address of service Provider**

T-Mobile
Attn: Court Order Team
4 Sylvan Way
Parsippany, NJ. 07054
**Fax: (973) 292-8697**

FILED
NOV 24 2020
SUPERIOR COURT OF CALIFORNIA COUNTY OF MONO
BY: [signature]

**Type of communications and/or data to be seized:**

All records associated with mobile number **7753013218** for the dates of **05/01/2020 PST** to **11/24/2020 PST**

**Evidence type**: The described evidence appears to fall within the following classification(s) (Pen. Code § 1524):

- ☒ Property or things that are evidence that tends to show that a felony has been committed, or tends to show that a particular person committed a felony.
- ☒ Property or things used as a means of committing a felony.
- ☒ Property or things in the possession of a person with intent to use as a means of committing a crime, or in the possession of another to whom he may have delivered it for the purpose of concealment or preventing discovery.
- ☐ Property or things constituting evidence of sexual exploitation of a Child (Pen. Code §311.3), or possession of matter depicting sexual conduct of a person under the age of 18 years (Pen. Code § 311.11).

**Statement of Probable Cause**: Affiant declares under penalty of perjury that the following facts are true and that there is probable cause to believe, and Affiant does believe, that the designated articles, property, and persons are now in the described locations, including all rooms, buildings, and structures used in connection with the premises and buildings adjoining them, the vehicles and the persons:

I, Jason Pelichowski, I am a sworn peace officer within the meaning of California Penal Code 830. I have been employed as a California peace officer for approximately the past 4 years. I am currently employed as a

USAO 015955

Deputy Sheriff with the Mono County Sheriff's Department, California, and have been employed as such since June of 2017. Prior to this your I was a full time Peace Officer for the California Highway Patrol from, April 2016 till May 2017. I hold the rank of Deputy Sheriff and am currently assigned to patrol.

I have attended and completed the California Highway Patrol Basic Law Enforcement Academy at the California Highway Patrol Training Center. I have also attended numerous courses, which include, but are not limited to the following: Driving under the Influence, Missing Persons, Advanced Roadside Impaired Driving Enforcement, FBI Crisis Negotiator Certification. During my career I have completed approximately 1,789 hours of training, including over 24 hours of training relating specifically to drug abuse recognition. I received a 40 hour course on basic narcotic investigations presented by the academy. I have, throughout the course of my career as a part of my regular duties, investigated numerous crimes including burglary, theft, receiving and/or selling stolen property, crimes of violence, sex crimes, narcotics and illegal drug related crimes, crimes against children.

Your Affiant has participated in at least twenty (20) search warrants where illegal drugs and/or drug paraphernalia or other items of evidence related to criminal investigations were located and seized. Your Affiant has also been the primary investigator and/or assisted in the investigation of at least one hundred and fifty (150) property crime investigations, in at least fifteen (15) sex crime investigation, in at least one hundred (100) crimes of violence investigations and at least fifty (50) crimes involving the use and/or possession of illegal drugs

In the course of your Affiant's career as a law enforcement officer, your Affiant has had the opportunity to speak with numerous fellow officers who have had more experience than your Affiant in the investigation and apprehension of those involved in crimes against persons and as well as burglaries and thefts.

**PROBABLE CAUSE:**

On Monday, 11-09-2020 at approximately 0633 hrs, I was called out for a report of two deceased subjects with shell casings nearby. I arrived on scene, (lat 38.32546043, -119.31575969), further described as US Highway 395 approximately 7 miles north of Bridgeport near mile marker 84.5 at approximately 0656 hours.

Upon arrival I was briefed by Sgt. Tim Minder. Sgt. Minder advised me a Cal Trans snowplow truck driver had located the two decedents off the south bound shoulder of the highway at approximately 0615 hours while plowing the roadway. Sgt. Minder had closed US Hwy 395 in both directions prior to my arrival. I entered the crime scene and observed two decedents on the southbound dirt shoulder. I was able to see several shell casings laying on the asphalt shoulder of the roadway.

The male victim was positioned on his left side slightly twisted at the waist. He was wearing a green Carhart sweatshirt, light gray pants, and brown and black boots. His right leg was over his left and he appeared to be in full rigor. His face was covered in dried blood and I could see a large laceration under the right side of chin leading to behind his right ear. At this time, it was undetermined what the injury was caused from. On his right upper back I could see a circular blood stain with what appeared to be a hole in his sweatshirt, consistent with the decedent being shot. From the roadway I could clearly see what appeared to be a large pool of blood in the southbound lane directly across from the male victim. I could also clearly see what appeared to be drag marks from the large pool of blood to the shoulder of the road. The drag marks were even more apparent when the shoulder of the roadway had snow on it.

The female victim was positioned on her left side in a fetal position approximately five feet north of the male. She was dressed in brown wide heel boots, pink and white multi design yoga type pants and a light pink long sleeve shirt. Her right arm was draped across her body and she had a slight bend at the waist. The female victim also had a large amount of dried blood on her face and body. She had what appeared to be an injury to the right temple consistent to being shot at close range with a firearm. There was dried blood, what appeared

USAO 015956

to be a small hole and also what appeared to be stippling to the right side of her head. She also had lacerations on her back, and heavy amounts of dried blood to the front of her shirt near her breast. The area surrounding her was a mixture of snow and dirt / gravel. The area appeared to be heavily disturbed consistent with some sort of struggle. In the snow there were distinctive outlines of at least two to three different shoe impressions. Also, in the snow just off the asphalt roadway were two different sets of tire impressions, consistent with a larger tire and a smaller tire, (truck /trailer).

The entire scene was documented using drone footage from Deputy John Pelichowski. It should be noted as the day progressed and the sun came out the snow began to melt causing the shoe and tire impressions to fade away and eventually disappear. See Deputy John Pelichowskis supplemental report for further details regarding drone footage and photographs of the scene.

A canvas of the area for property later located an Iphone cell phone about a foot in front of the female victim buried under the snow. The phone was later collected for evidence. The scene was closed off and secured and a crime scene log had been started by CHP Officer Tomazin. Due to the nature of the circumstances, injuries sustained to the victims and the potential for a large crime scene I requested assistance from the San Bernardino Sheriff's Office crime lab to help process the scene. SBSO Crime technician, Chris Hermasillo arrived on scene at approximately 1630 hours and began processing the scene. All evidence, and photographs were collected by Hermasillo, (refer to his supplemental report for details).

At the conclusion of processing the crime scene the two decedents were transported to the Orange County Corner Office for autopsy by Inv. Gillespie and MCSO Deputy Salazar, (see supplemental autopsy reports for additional info).

On Tuesday 11-10-2020 at approximately 0230 hours, Investigator Gillespie and I were contacted by the California Highway patrol in regards to a possible abandoned vehicle located S/B US395 near the Van Dyke Hill area south of Bridgeport. CHP Officers advised the vehicle was unlocked, had a cell phone, keys and a wallet laying on the center console and there appeared to be blood within the vehicle. The vehicle was run through the system, came back registered to William Larson who was determined to be the male victim. The vehicle was sealed off and a request for San Bernardino Crime Lab was made to process the vehicle.
After locating the vehicle off the side of the roadway CHP was able to run the registration of the plates which came back to, William and Yesenia Larsen out of Burbank CA. Due to the circumstances CHP requested outside agency assist and contacted Burbank PD to do a welfare check on the vehicle registration address. They were advised no one answered the door at the residence which furthered their suspicious something was not right. Through investigative means the California Highway Patrol communications center in Bishop CA, and I were able to track down social media accounts of the registered owners of the vehicle. I was able to locate tentative photographs of Yesenia on an Instagram account which were later positively identified as the female victim located on the side of the road, (see CHP reports for additional information). The male subject was later identified through Calphoto as being William Larsen, husband of Yesenia. Both were confirmed through live scan at the autopsy in Orange County.

Also, on Tuesday, 11-10-2020 MCSO Investigator Art Torres began to track down and contact the victim's family and friends to gather potential information on possible suspects involved, (refer to his supplemental reports for family /friend interviews).

From the start of this investigation Deputy John Pelichowski and I conducted an extensive search for video surveillance from the Bridgeport, Walker, Coleville, and Topaz Lake communities in an attempt to locate potential suspect leads. Through this extensive search Deputies were able to track down and locate the victim vehicle traveling south bound through Bridgeport CA, on 11-08-2020, at approximately 2004 hours. The video is captured by the Ken's Sporting Good's closed captioning camera pointing to the Highway 395 corridor. Deputies were also able to locate two possible suspect vehicles that had passed south bound around the same time then went back northbound approximately 20 minutes later. Suspect vehicle number one

USAO 015957

appeared to be a black mid-size pickup truck with a cargo area cover, (tonneau cover). The second was a small dark colored sedan with no window tint on the front or back. Based off this video along with messages located in the female victim's phone at approximately 1912 hours, we believe the murders occurred between the hours of 1912 hours and 2004 hours. We believe for an unknown reason the victim pulled his vehicle over off the roadway, and was confronted by the suspect(s). We believe after the murders occurred one of the suspects drove the victim's vehicle southbound through Bridgeport. It is also thought due to Williams involvement with Marijuana distribution and sales the suspects were looking for drugs and or money in the victim vehicle, thus giving the rough delay before they're seen heading back northbound through Bridgeport.

Investigators were able to determine William and Yesenia had traveled from Burbank California to Reno Nevada on Saturday, 11-07-2020 and checked in at the Staybridge Inn Suites located at, 10559 Professional Circle, Reno Nv, 89521. We were able to confirm this through the hotel who advised the couple checked in at approximately 0400 hours Saturday, 11-07-2020. The hotel was paid in cash as per the check in confirmation sent to me by Staybridge Inn staff. We were also able to confirm through family and friend's part of the reason for the travel to Reno was for Yesenia to attend some type of Yoga conference, which after speaking with friends she did attend without William. Based off communication between William and Yesenia we were able to determine she had left the Yoga conference, traveled to the hotel or another area, picked William up and the two left south bound from Reno attending to drive back home to Burbank on Sunday, 11-08-2020.

On Wednesday, 11-10-2020, at approximately 1000 hours, the Mono County Sheriff's Office, after completing family notification, released a press release with the names of the victims as, Yesenia and William Larsen out of Burbank CA. Shortly thereafter Investigator Gillespie received a telephone call from Investigator M. Dues of the Lyon County Sheriff's Department in Nevada. He advised Investigator Gillespie he saw the press release and he had been working an ongoing investigation regarding the disappearance of, Jered Stefansky of Redding, California. Dues related in June 2020, Jared drove to Mound House, NV to make a cannabis transaction allegedly involving $400,000 set up by William. Jared presumably arrived at the above address to make the deal however from that day forward, (June 19th, 2020) he has not been heard from or seen. Jered was driving a Blue in color Nissan Versa rental car which has also not been located since June of this year. Jared's vehicle made it to a location on 17 Martin Drive in Mound House, Nevada and drove out, but if was unknown if it was Jared driving the vehicle. Dues also advised Investigator Gillespie the above address is a rental property of William Larsen.

Investigator Gillespie was able to obtain the Lyon County Sheriff's reports regarding the investigation. We learned that Cory Spurlock, a military friend of William, was possibly involved. William had recently hired Cory in his cannabis business and the meeting with Jared was to be facilitated by Cory. It was suspected that Cory along with William were responsible for the disappearance of Jared. This information is per Detective Dues as well as the family members of Jered who had been in constant contact with Detective Dues since his disappearance. Jered's mother, Sheila has since gone on to open media platforms and participated in podcast type interviews as recent as September of this year. In that podcast interview, Sheila explains the Marijuana operations William, Cory and her son Jered are involved in and states she firmly believes both William and Cory were responsible or have knowledge of her son's disappearance, (refer to Detective Dues original reports regarding Jered Stefansky).

Investigator Gillespie informed me he had been in contact with the Carson City Sheriff's Office, and was working with Detective Sam Hatley to find surveillance footage of the victim vehicle.

Detective Hatley and other investigators from the Carson City Sheriff's Office began conducting a vigilant search of video footage for the victim's vehicle through Carson City and surrounding areas. On Friday, 11-13-2020, Investigator Hatley advised he had located the victim's vehicle, (distinguished Jeep Gladiator) towing a small utility trailer on numerous different surveillance systems in town. He also advised it became quickly apparent the victims vehicle was being stalked throughout town by a black mid-size truck with a tonneau cover and a dark colored sedan, (consistent with the video footage retrieved from Ken's Sporting Good's on

USAO 015958

the night of the murder). All video footage from Carson City is on Sunday, 11-08-2020 between the hours of 1600-1845, (refer to CCSO reports for additional regarding video footage). The following is a brief outline of video footage captured throughout the Carson City area to show the driving pattern of the victims and of suspects in relation to being stalked through town, prior to the murders;

On Sunday, 11-08-2020 at approximately 1752 hours, the victim vehicle pulls up to the Max Casino located at, 900 S Carson St, Carson City, NV 89701. The overhead video surveillance clearly shows William exit the Gray Jeep and begin using some type of twine or rope to tie down the load in the back of the small utility trailer. The video also shows Yesenia exit the passenger side area of the Jeep and walk inside the Casino. As William is tying down the load in the trailer we could see the black pickup truck, which was now believed to be a newer model Chevrolet Colorado enter the parking lot and proceed to park behind a white vehicle. At this point the black truck is approximately 30-40 yards away from the victim. Around the same time, the black sedan pulls over and parks just north of the parking lot on the side of the road. An occupant exits the vehicle and begins slowly walking back and forth from a distance, ducking in between cars, and appearing to talk on the phone. It almost appears by watching the video that an unknown event was going to take place in the Max Casino parking lot.

As the subject continues to watch William who is still tying down the trailer load the black truck drives out of the parking lot, over the curb towards the area where the car is parked. The driver of the truck then turns past the car and goes out of camera view; however, brake lights are seen off the reflection of a house nearby.

A few minutes later Yesenia walks back into camera view from the Casino towards the passenger side of the Jeep. William then walks from the trailer to the driver side of the Jeep and begins to pull out of the parking lot. As the vehicle drives off camera view you can see the subject who was watching them quickly run across an open area of the parking lot towards the parked car. He gets in the car and both the truck and car are quickly seen making maneuvers around the neighborhood to get back in behind the victim's vehicle.

On a separate occasion the victim vehicle pulls into a secured storage yard located at, 333 South Carson Meadows Road, Carson City unit #'s 19,20 and 49 which were later determined to be leased by William Larsen and Cory Spurlock. The video clearly shows the victim attaching the small utility trailer to the back of his Jeep then loading the bed of the trailer with contents. Another view shows the same black Chevrolet Colorado pull into a parking lot from outside the secured storage area, appear to watch the victim for a short period of time before making a U-turn and exiting out of the parking lot. These types of surveillance are captured on numerous other occasions in the Carson City area. The two suspect vehicles are exhibiting driving behavior consistent with following / stalking the victim vehicle which includes, hard breaking, running yellow / red traffic lights to keep up, driving over curbs and making abrupt turns consistent to that of the victim vehicle. The Carson City Sheriff's Office is analyzing all video footage captured and will have an exact timeline based off those videos, (refer to CCSO reports for additional details).

After watching the available video footage Carson City Sheriff's Office was able to obtain search warrants for the above listed address and unit numbers at the storage yard the victim was at. Service of those warrants yielded further evidence William was highly involved in the transportation and sales of large amounts of Marijuana. The units contained large home-made shipping crates which sealed smaller plastic containers presumably to ship the drugs to specified locations using the disclaimer of being furniture thus explaining the heavy weights. The units also revealed fabrication equipment, sheet metal and all the tools needed to make compartments or "traps" in vehicles in which large amounts of drugs and or money could be transported and not detected. In one of the storage units there were printers, wire cables and cords appearing to be a makeshift office. There were pictures of the victims on the walls along with Yesenia's juvenile daughter.

After clearing the search warrant service investigators began discussing all known associates of William and Yesenia. The name, Bradley Kohorst continued to rise. Kohorst was believed to be a friend and former partner with William and was believed to have served in the Military together. A further look into Kohorst showed he

USAO 015959

was arrested in Kansas City back in 2010 with a large amount of Marijuana being transported. Records show he was operating a vehicle registered to William at the time of the arrest. Family and friends of William also stated he had a relationship with Kohorst and some of them were upset he, (Kohorst) had not called them regarding William's death yet.

A records review of all known associates of William who were known to have a connection with him one way or another was conducted. As the information on all associates began to come in, we noticed Kohorst had a 2017 Chevrolet Colorado registered to him with a North Carolina with a VIN # 1GCGTDEN1H1255537. Based off this vehicle information a carfax history report was done to determine the color of the vehicle. The Carfax report showed it was a black Colorado and had a service completed on it late September of this year in Missoula Montana. It should also be noted Kohorst had an updated address out of Missoula Montana and it was determined to be the same address as Cory Spurlock's last known address.

Believing the murders were directed towards specific targets and not random, along with the video surveillance and known type of illegal activities William was involved in, Investigator Gillespie was granted a search warrant on ONSTAR LLC to help determine if the Chevrolet Colorado seen stalking the victims was possibly one in the same as being registered to Kohorst.

While waiting for the data to come back on the up to date GPS locations of the requested vehicle I received the warrant data back from the Verizon cell phone towers around the same time we believed the victims were killed. I observed one of the outgoing numbers, 4062141975 made an outgoing call at approximately 2038 hours and registered on the Verizon tower outside of Bridgeport. The outgoing number did not return to a registered user and a warrant was completed at a later time. The call was received by the number, 5305219788 which came back registered through TLO to, Vanessa Rose Covin, AKA Vanessa Larsen out of Chico who was later determined to be Williams ex-wife. Around the same time this information was being investigated the warrant return for the live up to date GPS locations for the Chevrolet Colorado came back. The vehicle was currently near an address in Chico California, which was quickly determined to be Vanessa's residence, (2297 Sadie Lane # 205, Chico CA 95928.

Based off this information Lt. Clark contacted the local Chico task force to see if they could do a drive by of the residence to confirm that vehicle was parked at the above address. Agents were able to confirm the black Chevrolet Colorado was parked in front of the complex and were also able to confirm it was a Z71 model had black wheels and a hard-solid rear tonneau cover (which matched one of our suspect vehicles). Due to this new information Lt. Clark and Sgt. Hernandez traveled to the Chico area to do their own surveillance. Lt. Clark contacted Investigator Gillespie advised he had witnessed Bradley Kohorst, identified off DMV photographs get into the black Chevrolet Colorado and drive it around the Chico area, (refer to Lt. Clark . Sgt. Hernandez' supplemental report for additional.) Additionally, Vanessa was seen operating a 2007 White Ford Escape bearing CA / 6XWU746.

Based off the discovery of Kohorst vehicle being located at the ex-wife of Williams along with the unknown number calling her, (Vanessa) around the time frame of the murders and utilizing the Bridgeport Verizon cell towers, it is believed Kohorst and Vanessa may be involved or have knowledge regarding the murders.

On Thursday, 11-19-2020, at approximately 0900 hours, Investigators with the Mono County Sheriff's Office as well as the Carson City Sheriff's Office began receiving data reports back from the requested search warrants. Based off the call data records and texting history the number which is believed to be Bradley Kohorst's cell , 406-214-1975 and a number believed to be associated with Cory Spurlock / Orit Oget, (wife of Spurlock), 406-370-0475 along with a third number, 775-399-8466, (later determined to be burner phone purchased at Walmart) are geolocated in Bridgeport CA on Sunday, 11-08-2020 at approximately 2035 hours. During the above time the three numbers are in constant contact with each other. After 2035 hours, the number 775-399-8466 shuts off but is periodically turned back on. The two other numbers are geolocated heading out of the Mono County area Into the Carson City / Dayton area. The following day at approximately

USAO 015960

0930 hours, the numbers are seen heading through north east Nevada and ultimately go to the area of 4825 Monticello Place, Missoula Montana, (residence all three are associated with). Between the dates of, 11-09-2020 / 11-13-2020, the number believed to be Kohorst's, (406-214-1975) stays in the Missoula Montana area. On, 11-13-2020 that number is geolocated heading out of Montana across Idaho and eventually to Chico California, where the number is still actively pinging in and around the address, 2297 Sadie Lane, (Vanessa Rose Covin's residence). See CCSO Detective Bindley's detailed cell phone / GPS data report for additional.

Additional geolocations show the 406-370-0475 number actively pinging at the Damonte Ranch area Walmart, (155 Damonte Ranch Pkwy, Reno, NV 89521) on Sunday, 11-08-2020 at approximately 0900 hours. After learning this, Investigator Torres responded to the Damonte Ranch Walmart and was able to track down video footage of a male and female subject in the electronics area of the store purchasing a new trac-phone. After reviewing the footage and still shots it clearly shows a male subject wearing a green and black plaid long sleeve shirt, jeans, boots and a black beanie wearing a dark colored facemask along with a short, slender female wearing a dark colored jacket, dark pants, boots with a dark beanie and a dark face mask enter the Walmart at approximately 0857 hours.

From the electronics camera within the store you can see what appears to be the female subject completing the transaction to purchase the phone. On a large white piece of paper the telephone number, 775-399-8466, is written in dark writing. This number is confirmed as being one in the same pinging in Bridgeport at approximately 2035 hours, (shortly after the murders occur.) Additionally the exterior video footage from Walmart shows the same two individuals dressed exactly the same walk out through the parking lot and get into a black Chevrolet Colorado, Z71 with a hard rear cargo tonneau cover, (identical to Kohorst's vehicle).

Investigator Torres was able to collect a receipt for the cellphone purchase made and was advised by the clerk at Walmart both subjects had actually been in the same Walmart the night before, (11-07-2020) at approximately 2200 hours to buy the phone. The clerk stated they had bought the phone through the self check out system but when they realized they could not activate the phone without an in person representative they had to bring the phone back into the store for activation. Video surveillance was located from the evening of 11-07-2020 and showed footage of distinctive ring tattoos on the male subjects hands. Investigators were able to locate old social media photographs of Spurlock with the same identical tattoos on his hands which were seen in the surveillance video, (see Investigator Torres' supplemental report for additional).

Days after the murders and after evidence collected showed Cory Spurlock as a possible suspect a request was placed for Missoula Montana PD to do a drive by of the address listed at 4825 Monticello Place to look for vehicles registered to Cory Spurlock or Orit Oged. Montana PD advised there was a white Ford King Ranch truck in front of the house however there was no Black Ford F-150 bearing MT / F9339 (Marine Corps) Vin # 1FTFW1R68DFC59943. I believe that based on the above information and evidence the potential for flight if suspects become aware they're being pursued by law enforcement is high, having a GPS real time monitoring system on the above mention vehicle will help keep current locations on potential suspects involved.

On Friday, November 20th at approximately 1230 hours, Investigators from the Carson City Sheriff's Office were able to locate a recent vehicle rental from Orit Oged at the Sparks Enterprise location at, 1450 E Prater Way Ste 113, Sparks, NV 89434. The vehicle, a dark gray 2020 Hyundai Elantra bearing AZ / AYN0314 was rented on, 11-05-2020 and returned on 11-09-2020. The vehicle was later located after being re-rented, and in possession of an uninvolved individual in Reno NV. After reviewing photographs of the vehicle, it is without a doubt very similar to that of the second suspect vehicle seen in the numerous video surveillance clips stalking the victim's Jeep. The vehicle rental agreement also shows Oged paid $229.05 on a credit card ending in 2839 and paid an additional $200 in cash. Additionally, when Detective Hatley spoke with the service representative at Enterprise regarding the car rental he said the lady who picked up the car stated she was from Israel and was in the area for Burning Man, which he, (representative) found odd since it was November, (see Detective Hatley's supplemental report regarding the location and contact with Enterprise).

Investigators were also able to determine Cory Spurlock, Orit Oged and Bradley Kohorst all stayed at the Dayton RV Park, (75 E Pike St, Dayton NV, 89403) on November 5th, 2020 and checked in at approximately 0930 hours. Ring video footage was obtained from the RV Park office and clearly shows a white F-250 King Ranch style truck, (Spurlocks) towing a smaller bumper pull travel trailer, (Spurlocks) as well as the black Chevrolet Colorado Z71 with black wheels and a hard Tonneau Cover, (Kohorst's) as well as the recently discovered secondary suspect vehicle, (Hyundai Elantra) which Oged rented at the Reno Enterprise. The RV site is rented until, Monday, 11-08-2020 and is paid with cash by Oged who is also seen on the Ring video footage.

Based on the information above it is believed Bradley Kohorst, Cory Spurlock, and Orit Oged are directly involved with and/or responsible for the murders of William and Yesenia Larsen.

As a result of several search warrants of registered and unregistered cellphone numbers, Investigators were able to identify an additional burner phone (unregistered) number of Cory Spurlock **7753013218.** Additionally, Investigators from the Carson City Sheriff's Office located a rental agreement for an address in Mound House Nevada where Cory Spurlock listed the above number under his contact information

Due to the nature of the homicide, involved parties and circumstances I believe a search of the above listed cellular telephone information for item's listed in the affidavit will help provide additional evidence to the case.

I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site. Information regarding the target number was obtained from one specific cell tower location near the homicide crime scene. Further cell site information will assist in locating the suspect or suspects responsible for the homicide.

I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

USAO 015962

I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

**Specialized Location Records:**

I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – AT&T, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon & U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

**Call/Text/Data Detail Records & Electronically Stored Records:**

I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this

USAO 015963

evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

**Stored Data (Cloud Storage):**

I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

**Cell Site List(s):**

I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name, physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

**Subscriber Records:**

I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the the

USAO 015964

matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

**Burner Phones:**

I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

**Declaration**: I declare under penalty of perjury that the information contained herein and the information that is incorporated by reference is true when based on my personal knowledge. I further declare that information contained herein that was not based on my personal knowledge was received by me in the course of the matter under investigation and that I have no reason to believe that any of this information was untrue.

11/24/2020
Date

Affiant

USAO 015965

SUPERIOR COURT
COUNTY OF MONO
OF CALIFORNIA

The foregoing instrument is a full, true and correct copy of the original on file in this office.

NOV 06 2024

Attest ______________________________

The Superior Court of the State of California, in and for the County of Mono.

By ______________________________, Deputy

USAO 015966