UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

                    Plaintiff,

    v.

CORY SPURLOCK,

                  Defendant.

Case No. 3:23-cr-00022-MMD-CLB-1

ORDER

## I.    SUMMARY

Defendant Cory Spurlock was indicted for a murder-for-hire conspiracy and conspiracy to distribute marijuana. (ECF No. 1.) The fifth superseding indictment charges eight counts involving three deaths (victims J.S., W.L., and Y.L.).[1] (ECF No. 363.) Before the Court are two motions to suppress evidence, specifically: (1) Spurlock's motion to suppress tower dump data obtained in response to a warrant and the derivative use of that data (ECF No. 254);[2] and (2) Spurlock's motion to suppress evidence collected during a consent search from 27 Red Rock Drive (ECF No. 257).[3] The Court held an evidentiary hearing on the tower dump motion—along with another motion not addressed in this

---

[1]The fifth superseding indictment, returned on April 10, 2025, charges Spurlock with eight counts: (1) conspiracy to possess with intent to distribute and to distribute marijuana; (2) murder while engaged in narcotics trafficking relating to the killing of J.S.; (3) murder for hire relating to the killing of W.L.; (4) tampering with a witness by killing of W.L.; (5) stalking resulting in death relating to W.L.; (6) stalking resulting in death relating to Y.L; (7) interference with commerce by robbery; and (8) causing death through use of a firearm during and in relation to a crime of violence. (ECF No. 363.) The government also now seeks the death penalty. (*Id.*; *see also* ECF No. 365.) The motions addressed in this order were filed before the government sought the fourth and then fifth superseding indictment.

[2]The government responded (ECF No. 298), and Spurlock replied (ECF No. 338).

[3]The government responded (ECF No. 297) and Spurlock replied (ECF No. 328).

order—on April 9, 2025 (the "Hearing").[4] (ECF No. 362 (hearing minutes).) As to the motion to suppress regarding the tower dump, the Court finds that a tower dump is a search and the warrant law enforcement used to get it is a general warrant forbidden under the Fourth Amendment. That said, because the Court appears to be the first court within the Ninth Circuit to reach this conclusion and the good faith exception otherwise applies, the Court will not order any evidence suppressed. The Court will deny the motion regarding the search of 27 Red Rock Drive because Spurlock had objectively abandoned it before the challenged search occurred.

## II.    DISCUSSION

The Court addresses both motions in the order they were filed, below, beginning with the motion to suppress tower dump data.

### A.    Motion to Suppress Tower Dump Data

Spurlock moves to suppress all the evidence collected using warrant 20-SW-56, along with all the evidence collected using some 90 additional warrants that referred to 20-SW-56 or evidence collected based on it. (ECF No. 254 at 26-29.) Spurlock argues that the tower dump—further explained below, but basically records from all cell phones that connected to the cell towers closest to two locations specified in the warrant during a specified time period—is a search under the Fourth Amendment, warrant 20-SW-56 is a general warrant categorically forbidden by the Fourth Amendment, the warrant is overbroad and lacking in probable cause, and the good faith exception does not apply. (*Id.* at 11-25.) The government counters with an onion of alternative arguments: there was no Fourth Amendment search; the warrant was supported by probable cause; law enforcement relied on the warrants in good faith; the cell tower data was obtained through independently lawful means; and the relevant evidence obtained in response to the tower dump warrant would have inevitably been discovered in any event. (ECF No. 298 at 1-2.)

---

[4]In a minute order setting the Hearing, the Court specified it would not address the motion regarding the search of 27 Red Rock Drive at the Hearing. (ECF No. 326.) The Court otherwise directed the government to be prepared to present evidence on four enumerated topics at the Hearing. (*Id.*) Broadly speaking, the government's witnesses who testified at the Hearing provided information going to the four specified topics.

The Court agrees with Spurlock that a tower dump is a search and warrant 20-SW-56 is an impermissible general warrant, but finds the good faith exception applies and, alternatively, suppression is unwarranted because the requesting law enforcement officer got a warrant, and the warrant he got was not unconstitutional at the time it issued.

The Court first includes below its pertinent findings of fact and then provides its legal analysis.

## 1.    Findings of Fact[5]

On November 13, 2020, Sergeant Magdeleno Hernandez of the Mono County Sheriff's Office applied for a search warrant to the Honorable Mark Magit, Mono County Superior Court Judge.[6] (ECF No. 254-2 at 2, 5, 7.) Judge Magit granted the application that same day, assigning the warrant the identifier 20-SW-56. (*Id.* at 5.) According to his affidavit, Sergeant Hernandez was investigating the suspected homicide of two people found on the side of U.S. Highway 395 north of Bridgeport, California on the morning of November 9, 2020. (*Id.* at 9.) He and unspecified other deputies who went to investigate the bodies, later identified as W.L. and Y.L., found that they had been shot and stabbed. (*Id.* 9-10.) They also found a cell phone near the victims that the investigating officers determined belonged to one of them. (*Id.* at 9.)

Then, on November 10, 2020, a California Highway Patrol ("CHP") officer found an abandoned vehicle on the side of Highway 395, but south of Bridgeport, California. (*Id.* at 10.) A CHP officer contacted the Mono County Sheriff's Office about the car because they found blood on and in the vehicle. (*Id.*) As it was unlocked, a CHP officer also found

---

[5]Fed. R. Crim. P. 12(d) specifies, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."

[6]They both testified at the Hearing. The two other witnesses who testified at the Hearing were Jason Pelichowski, the investigator from the Mono County Sheriff's Office who analyzed the information returned in response to warrant 20-SW-56, and Kelsey Guay, Spurlock's retained expert on digital forensic evidence (ECF No. 272 (providing notice that Spurlock intended to rely on her expert testimony in this case and detailing her qualifications)), who also examined the warrant return materials and provided opinions about what those records contain. The Court also explains below its finding that Sergeant Hernandez applied for the warrant on November 13, 2020, and Judge Magit granted the application that same day, even though Sergeant Hernandez dated his affidavit November 20, 2020.

a cell phone, wallet, and keys in the vehicle. (*Id.*) Someone from the Mono County Sheriff's Office ran the car through their system and discovered it was registered to the male victim, W.L. (*Id.*) Someone from the Mono County Sheriff's Office then reviewed surveillance video and determined that W.L.'s vehicle drove through Bridgeport at approximately 8:07 p.m. on November 8, 2020. (*Id.*) Someone also involved in the investigation later noted that tire tracks found near the two bodies matched the tires on W.L.'s abandoned vehicle found south of Bridgeport. (*Id.*)

Sergeant Hernandez explained in his affidavit that all this information led him to believe that the person or people who killed W.L. and Y.L. were using cell phones around the time of the suspected crime. (*Id.*) He accordingly requested a warrant to get 'tower dump data' from cell towers around the mile markers where the bodies and the vehicle had been found (as specified by GPS coordinates) between the hours of 5 p.m. and 11 p.m. on the evening of November 8, 2020 (a window of time around the time he thought the killings occurred). (*Id.* at 10-11.) He further explained that the rural location, the time of day, and the fact that most people carry cell phones with them made it more likely that this tower dump data would lead to phone numbers associated with the person or people who killed W.L. and Y.L. (*Id.*)

///

///

///

///

///

///

///

///

///

///

///

///

4

The warrant specifically ordered Verizon and AT&T to produce the following information to Sergeant Hernandez:[7]

   a. Tower Dump/Download records from all cell-sites and their related sectors that cover the immediate area of US Highway 395 around mile marker 84.5 and US Highway 395 around mile marker 74.5 (see GPS Coordinates listed above) that would support any and all communications including; voice calls, text messages, any data connections, and any available HLR (Home Local Registry) or VLR (Visitor Local Registry) records showing subscriber equipment that were idle  but still connected to the provider's network (on but not placing a call, text, or data connection but were in the same area as referenced above connecting to the network).

   b. Records identifying the device (make and model), phone numbers associated with any communications, locations, date, times, duration of all calls, text messages, and data connections  identified in response to item "a," above.

   c. Records showing the addresses and/or map GPS coordinates of all cell sites identified as having active connections in item "a." above and maps with markings showing the location of each cell site and the theoretical wireless coverage area provided by each site, commonly called an RF footprint and/or propagation map.

   d. Any records of equipment failures, maintenance, cell site overloads, or other outages that tend to show whether any of the listed cell sites were not operating normally during the specified time period.

(*Id.* at 3.) The 'target of warrant' was listed as, "[a]ny subjects related to active homicide investigation." (*Id.* at 4.) Other investigating officers subsequently used some evidence received in response to warrant 20-SW-56 to obtain many other warrants ultimately leading to some evidence implicating Spurlock in the crimes he has since been charged with.[8] (ECF Nos. 254 at 7-10, 298 at 5-7.)

Within the Mono County Sheriff's Office, Investigator Pelichowski was the person who analyzed the information the Sheriff's Office got back from Verizon in response to warrant 20-SW-56. He accessed a working copy of the return materials provided in an Excel spreadsheet and manually examined the phone numbers listed in it, eventually connecting several of the phone numbers he found there with people of interest through other detective work. At the time, he did not have access to any software that would have helped him analyze the data. He just manually looked for phone numbers of interest in

---

[7]Only Verizon returned records in response.

[8]The government argues, and Investigator Pelichowski testified, that he and his colleagues were simultaneously pursuing various investigative techniques and lines of inquiry that they also relied on to apply for other warrants they obtained in this investigation. However, the Court does not detail these other investigations within the overall investigation in this order because the Court does not reach the government's independent source and inevitable discovery doctrine arguments.

1    the Excel sheet and ran those phone numbers through a third-party public records
2    database his department subscribed to.[9] He further testified that he has since gotten more
3    familiar with the type of data they got in response to the warrant, but at the time, this was
4    all new to him. Similarly, Sergeant Hernandez testified this was the first tower dump
5    search warrant application he had written. He consulted with Investigator Pelichowski and
6    others in the Sheriff's Office, along with an investigator from the Mono County District
7    Attorney's office, before drafting the warrant application. The investigator from the Mono
8    County District Attorney's office gave him the idea to write a tower dump warrant
9    application. Said otherwise, this was an unusual type of warrant application that they were
10   not very familiar with at the time.

11   Judge Magit also testified that this tower dump warrant application was unusual.
12   He estimated that he has granted 350-450 warrants since taking the bench in 2011, but
13   as of 2020, when he granted this warrant application, had only seen four or five tower
14   dump warrant applications. He had no specific recollection of issuing warrant 20-SW-56,
15   but refreshed his recollection about it to prepare for the Hearing and answered the
16   questions posed to him about it that he felt he could. Consistently with Sergeant
17   Hernandez and Investigator Pelichowski, Judge Magit further testified Mono County is
18   very rural, with only approximately 13,000 residents spread over a very large land area—
19   and homicides are rare. Thus, all three witnesses remembered this double homicide.
20   More generally, Judge Magit testified that he would guess he denies 10%-20% of all
21   warrant applications he receives, and of those applications that were subsequently re-

24   _____
     [9]The example Investigator Pelichowski offered involved the phone number with the
25   last four digits 1368. He testified that during the investigation leading up to obtaining the
     tower dump data, he learned that 1368 was registered to Y.L. As he looked through the
26   tower dump data on the Excel spreadsheet around the 20:00 hour time frame, he saw a
     call from 1368 to 1975, which he then learned was registered to B.K. He had learned
27   about B.K.'s relationship with the Larsens from their family. He then found on the Excel
     spreadsheet that 1975 had contacted 0475, which he learned was registered to O.O.
28   Because the tower dump data contains phone numbers but not subscriber information,
     Investigator Pelichowski used his office's separate database available to him at the time
     to see who may be associated with a particular phone number.

submitted after denial, he denied a few but probably less than 20%. He could not specifically recall if he had ever denied an application for a tower dump warrant.

Spurlock's expert Ms. Guay examined the same records Investigator Pelichowski got in response to warrant 20-SW-56 in preparation for the Hearing and clarified a few important evidentiary points for the Court. First, she demonstrated that, while Investigator Pelichowski does not appear to have done this in his investigation, from the tower dump records, she was able to determine roughly where the various phones listed in the data were and could plot them on a map if she wanted to.[10] Second, she determined that after accounting for de-duplication the tower dump records contained records—again, including rough location information—for 1686 unique phones. Third, she clarified that the wireless company users whose phones showed up in the tower dump data did not opt in to sharing their location with their wireless provider, and indeed, could not opt out from appearing in the type of records received in response to warrant 20-SW-56. She explained this is essentially because wireless network operators need to know roughly where phones are to effectively route the calls their users make. *See also Carpenter v. United States*, 585 U.S. 296, 300 (2018) (providing similar technical background about how smartphones work, and how often they connect to cell towers without any user input).

### 2.    Legal Analysis

The Court now addresses below the legal issues raised in Spurlock's motion in the order he presented them.

### a.    Fourth Amendment Search

While Sergeant Hernandez got warrant 20-SW-56 asking Verizon and AT&T for information about the phones that connected to cell towers near two miles markers on US Highway 395 during a six-hour period on November 8, 2020 (ECF No. 254-2 at 3), Spurlock nevertheless leads off in his motion by arguing that this 'tower dump' is a search

---

[10]Said otherwise, while Investigator Pelichowski did not use any location information contained in the warrant return materials he analyzed, Ms. Guay demonstrated that he could have if he had the technical ability and wanted to.

1    under the Fourth Amendment (ECF No. 254 at 11-14). The government counters it is not.

2    (ECF No. 298 at 8-11.) The Court agrees with Spurlock.

3         In *Carpenter*, 585 U.S. 296, the Supreme Court held that individuals maintain a

4    legitimate expectation of privacy in records of their physical movements as captured

5    through cell-site location information ("CSLI"), that obtaining seven days of historical CSLI

6    from a wireless provider without a warrant was a search, that accessing 127 days of

7    historical CSLI invaded the defendant's reasonable expectation of privacy, and thus the

8    government must get a warrant supported by probable cause before obtaining CSLI from

9    a wireless carrier. *See generally id.* However, the Supreme Court in *Carpenter* did "not

10   express a view on matters not before us: real-time CSLI or 'tower dumps' (a download of

11   information on all the devices that connected to a particular cell site during a particular

12   interval)." *Id.* at 316.

13        According to the parties—as confirmed by the Court's own research—neither the

14   Supreme Court nor the United States Court of Appeals for the Ninth Circuit has answered

15   the question left open by *Carpenter* and pertinent here since *Carpenter* was decided.[11]

16   So, is a 'tower dump,' like Sergeant Hernandez requested, a search? In arguing that it is,

17   Spurlock points the Court towards the United States Court of Appeals for the Fifth Circuit's

18   opinion regarding geofence warrants in *United States v. Smith*, 110 F.4th 817 (5th Cir.

19   2024) and a recent decision from a Magistrate Judge in Mississippi extending *Smith* to

20   some applications for tower dump warrants like the warrant at issue here in *In re Four*

21   *Applications for Search Warrants Seeking Info. Associated with Particular Cellular*

22   *Towers*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000 (S.D. Miss. Feb. 21, 2025) ("*Four*

23   *Applications*"). (ECF No. 254 at 11-13.) In these decisions, the Fifth Circuit found that

24   Google location history data obtained using a geofence warrant constituted a Fourth

25   Amendment search, *see Smith*, 110 F.4th at 836, and as noted, the *Four Applications*

26

27        [11]The Court again asked counsel for both sides at the Hearing and they both
     confirmed they are not aware of any binding precedent on the constitutionality of tower
28   dump warrants.

1   court extended *Smith* to tower dump warrant applications, *see generally* 2025 WL
2   603000.

3       The Court finds these two cases persuasive. To start, the government does not
4   even address *Four Applications* in its response to the motion and did not attempt to
5   meaningfully distinguish *Smith*.[12] (ECF No. 298.) And in *Four Applications*, the Magistrate
6   Judge explicitly extended *Smith* from the context of a geofence warrant to applications
7   for tower dump warrants, reasoning that the applicable warrants sought essentially the
8   same type of information at issue in *Smith* and finding that a person has a reasonable
9   expectation of privacy, "as to the record of his location at particular moments in time that
10  a tower dump would reveal[.]" *Four Applications*, 2025 WL 603000, at *5. The *Four*
11  *Applications* court went on to find that the data revealed from tower dumps was sufficiently
12  intrusive to warrant Fourth Amendment protection even if it involved less data than in
13  *Carpenter*, and rejected application of the third party doctrine because, "tower-dump
14  warrant applications do not implicate the sort of opt-in procedure that split the Fourth and
15  Fifth Circuits in the geofence cases." *Id.* at *6. Thus, *Four Applications* is factually
16  analogous, and both addresses and rejects the primary arguments the government raises
17  in response to the motion.[13] (ECF No. 298 at 8-11.)

18      The *Four Applications* court's point about the involuntary nature of the location
19  data obtained from a tower dump warrant also highlights why the Court finds *Smith* more
20  persuasive than *United States v. Chatrie*, 107 F.4th 319, 330 (4th Cir. 2024), the Fourth
21  Circuit case referred to in the quotation above. But before the Court elaborates, the Court

22

23      [12]When asked at the hearing, government counsel made nothing more than the
    obvious point that neither *Smith* nor *Four Applications* bind the Court.
24

25      [13]The government otherwise argued and reiterated at the Hearing that Spurlock
    lacks standing to challenge the tower dump warrant because many of the records
26  produced in response to it included information about other peoples' phones (ECF No.
    298 at 18), but also does not dispute that information about two phones associated with
27  Spurlock were among the records produced in response to warrant 20-SW-56. Indeed,
    Spurlock confirmed that fact through Ms. Guay at the Hearing. Spurlock has standing to
28  challenge this warrant. *See Smith*, 110 F.4th at 831 n.6 (finding that two of the three
    appellants had standing to challenge the geofence warrant because their location data
    was captured by the geofence warrant they challenged).

must note that *Chatrie* is not currently good law because the Fourth Circuit granted rehearing en banc in that case, *see* No. 22-4489, 2024 WL 4648102 (4th Cir. Nov. 1, 2024), but has not yet issued its en banc decision. *Smith* is nonetheless more persuasive than *Chatrie* because in *Smith*, the Fifth Circuit rejected the application of the third party doctrine (distinguishing *Chatrie*) for the commonsense reason that, "electronic opt-in processes are hardly informed and, in many instances, may not even be voluntary." *Smith*, 110 F.4th at 835. The Court agrees—"[a]s anyone with a smartphone can attest[.]" *Id.* And tower dump warrants are moreover distinguishable from a geofence warrant, as the *Four Applications* court observed, because people whose information would be revealed in a tower dump did not opt in to sharing their location with the wireless companies targeted by this type of warrant in the way that the user targeted in *Smith* had arguably opted in to Google location services, *see* 2025 WL 603000 at *6. Defense expert witness Ms. Guay confirmed this at the Hearing, stating in response to questions from the Court and Spurlock's counsel that cell phone users cannot opt out of sharing their location with cell towers (nor can they opt in), both generally so they have service, and specifically whenever they make a call or send a text message. Cell phones are pinging nearby towers whenever they are turned on, regardless of any settings their users select. Thus, even if *Chatrie* was good law, its reliance on Google users' decisions to opt-in to location sharing renders it distinguishable. *See Chatrie*, 107 F.4th at 331 ("Chatrie voluntarily exposed his location information to Google by opting in to Location History[.]").

In addition, the Court also finds persuasive *Smith*'s second reason for distinguishing *Chatrie*: "[w]hile it is true that geofences tend to be limited temporally, the potential intrusiveness of even a snapshot of precise location data should not be understated." *Smith*, 110 F.4th at 833. Like the *Smith* court, the Court will not understate the potential intrusiveness of the location data at issue here. Sergeant Hernandez and Investigator Pelichowski got location data on over 1600 people who neither consented nor were likely even aware that their location was being tracked as they moved through the area specified in the warrant application during the time also specified in it.

For these same reasons, the Court rejects the government's unpersuasive argument that the records obtained using warrant 20-SW-56 do not constitute a Fourth Amendment search because they are less invasive than the records at issue in *Carpenter*. (ECF No. 298 at 8-11.) The Court will instead follow *Smith* as extended to tower dumps in *Four Applications*. And the non-binding cases the government relies on in this section of its response do not convince the Court otherwise. *United States v. Adkinson*, 916 F.3d 605, 610 (7th Cir. 2019) is a private party search exception case. There, someone was robbing some T-Mobile stores in a similar way, so T-Mobile dumped its own towers and then turned the results over to law enforcement. *See id.* at 608. Here, of course, Sergeant Hernandez got a warrant asking Verizon and AT&T for this information. And *United States v. Hammond*, 996 F.3d 374, 387-92 (7th Cir. 2021) dealt with real-time CSLI, not tower dump data like the data at issue here. Moreover, the Court agrees with Spurlock (ECF No. 338 at 3-4) that *Hammond* is against the weight of authority. *See, e.g.*, *United States v. Broderick*, No. 5:22-CR-00251-EJD-1, 2024 WL 295293, at *6 (N.D. Cal. Jan. 25, 2024) ("many courts in this District and across the country have found that [*Carpenter*'s] reasoning applies to real-time CSLI."), *appeal dismissed*, No. 24-1002, 2024 WL 2559466 (9th Cir. Feb. 29, 2024). The Court accordingly rejects as unpersuasive the government's argument that because *Hammond* found real-time CSLI not subject to the Fourth Amendment, tower dump data is not either. Finally, the government cites *Sanchez v. Los Angeles Dep't of Transportation*, 39 F.4th 548, 560 (9th Cir. 2022) (ECF No. 298 at 10), but the pertinent section of that opinion turns on the fact that the plaintiff "knowingly and voluntarily disclosed location data to the e-scooter operators[.]" *Sanchez*, 39 F.4th at 559. Indeed, *Sanchez* specifically distinguished the rental e-scooters at issue there from the cell phones at issue here and in *Carpenter* because a cell phone reveals "location information 'by dint of its operation, without any affirmative act on the part of the user[.]'" *See id.* (citing *Carpenter*).

///

///

11

1    In sum, the Court finds that the tower dump performed in response to warrant 20-

2   SW-56 is a Fourth Amendment search. *See Smith*, 110 F.4th at 836 ("law enforcement in

3   this case *did* conduct a search when it sought Location History data from Google").

4                              **b.    General Warrant**

5    As mentioned, Spurlock proceeds to argue that warrant 20-SW-56 is a

6   constitutionally forbidden general warrant or 'writ of assistance' because it, "seeks access

7   to a vast array of private cellular phone data of a potentially unlimited number of people

8   to identify a criminal suspect the police don't yet know about." (ECF No. 254 at 15.) And

9   indeed, *Smith* reached a conclusion consistent with Spurlock's argument, holding that

10  "geofence warrants are general warrants categorically prohibited by the Fourth

11  Amendment." 110 F.4th at 838. The government counters that warrant 20-SW-56 was not

12  a general warrant because Sergeant Hernandez's affidavit established probable cause

13  and the warrant was sufficiently particularized. (ECF No. 298 at 14.)

14   But *Smith* also arose from an investigation where investigators obtained a warrant,

15  and the Court has similar concerns with warrant 20-SW-56 to those that the *Smith* court

16  expressed about the warrant there. Most notably, geofence warrants "*never* include a

17  specific user to be identified, only a temporal and geographic location where any given

18  user *may* turn up post-search." *Smith*, 110 F.4th at 837 (emphasis in original). Similarly,

19  here, the subject of warrant 20-SW-56 is, "[a]ny subjects related to active homicide

20  investigation[.]" (ECF No. 254-2 at 4.) Moreover, it is uncontested that "the private data

21  of 1,686 users were captured in [the] tower dump warrant." (ECF No. 338 at 5.) And while

22  the government argues that the "requested data was confined in date, time, and location"

23  (ECF No. 298 at 13), "[a] general warrant cannot be saved simply by arguing that, after

24  the search has been performed, the information received was narrowly tailored to the

25  crime being investigated." *Smith*, 110 F.4th at 837.

26   Taken together, the Court agrees with Spurlock that these characteristics of

27  warrant application 20-SW-56 render it equivalent to a request for "access to an entire

28  haystack because it may contain a needle." *Four Applications*, 2025 WL 603000, at *8.

1    The Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power[,]'"

2    and aims to "place obstacles in the way of a too permeating police surveillance."

3    *Carpenter*, 585 U.S. at 305 (citations omitted). A warrant that authorizes the search of

4    anyone who was in a particular area during a particular time range is too permeating

5    police surveillance. In sum, "the tower-dump search warrant[ at issue here is] materially

6    indistinguishable from the geofence search warrant foreclosed by *Smith*." *Id.* Warrant 20-

7    SW-56 is a "general warrant[] categorically prohibited by the Fourth Amendment." *Smith*,

8    110 F.4th at 838.[14]

9                **c.    Good Faith Exception**

10    Having determined that warrant 20-SW-56 is an unconstitutional general warrant,

11    the Court "must address separately the question of whether exclusion is an appropriate

12    remedy." *United States v. Elmore*, 917 F.3d 1068, 1076 (9th Cir. 2019). And while

13    suppression is generally unwarranted where a search warrant exists, "[t]he existence of

14    a search warrant does not automatically preclude application of the exclusionary rule[.]"

15    *Id.* In situations like this one, where Sergeant Hernandez got a warrant, the Court may

16    suppress evidence if: (1) the issuing judge was misled; (2) the issuing judge acted as

17    merely a rubber stamp; (3) the affidavit was so lacking in probable cause that it was

18    unreasonable for the issuing judge to have found it; or (4) the warrant was so facially

---

21    [14]Spurlock's counsel allowed at the Hearing that a tower dump warrant could
22    conceivably be constitutional in a situation where the police are investigating serial
robberies or acts of vandalism and the police have other evidence that the suspect had a
23    phone at each of the robbery or vandalism locations, so the police could have probable
cause for a tower dump warrant that would allow them to see if any of the same phones
24    were present at each of the robbery or vandalism locations at each of the times they
happened, and then use that information to focus in on one phone. Said otherwise, a
25    tower dump warrant might be constitutional in the sort of situation addressed in *United States v. Foster*, No. 3:21-CR-00114-SLG, 2023 WL 155442, at *1 (D. Alaska Jan. 11,
26    2023) (assuming without deciding, however, "that the Government conducted a Fourth
Amendment search when it acquired [the defendants] cell site tower data."). However,
27    the context here is different. This is a warrant that resulted in the dump of a single cell
tower following some crimes that were committed simultaneously, in the same spot. The
28    Court indeed agrees with Spurlock that warrant 20-SW-56 "is equivalent to […] allowing
law enforcement to search the bags of everyone in the radius of a theft." (ECF No. 254 at
15-16.)

1   deficient that executing officers could not have reasonably presumed it was valid. *See*

2   *United States v. Leon*, 468 U.S. 897, 918, 923 (1984).

3         Spurlock argues that Judge Magit acted merely as a rubber stamp and the affidavit

4   was so lacking in probable cause that it was unreasonable for Judge Magit to have found

5   it. (ECF Nos. 254 at 23-25, 298 at 16-17 (summarizing and addressing Spurlock's

6   argument).) The government counters that Judge Magit did not act as a rubber stamp

7   because the date discrepancy is easily explained as a mistake on Sergeant Hernandez's

8   part when dating his affidavit, and there was at least arguable probable cause for issuing

9   the warrant. (*Id.*) The Court agrees with the government.

10        To start, the Court heard testimony from both Sergeant Hernandez and Judge

11   Magit at the Hearing, and left the Hearing convinced that the date discrepancy was a

12   simple mistake. Judge Magit testified that, while he did not specifically recall this warrant

13   until he was contacted about it by the government in connection with the Hearing, he

14   believed the correct date of the warrant was November 13, 2020 for three reasons: (1) he

15   signed and dated it on November 13, 2020; (2) the clerk of his court also date stamped

16   the order November 13, 2020, consistent with his practice of forwarding an approved

17   warrant to be filed; and (3) in the body of the warrant, it asked for production of the data

18   on November 19, 2020, which would not make sense if the warrant was not issued until

19   November 20, 2020. He otherwise stated that law enforcement may not post-date

20   warrants.[15] The Court finds this testimony credible. Similarly, Sergeant Hernandez

21   testified that he wrote the wrong date by accident when he signed his affidavit. To

22   corroborate that he made a simple mistake, he stated that the clerk of court stamped the

23   warrant November 13, 2020, and he wrote a supplemental narrative explaining his

24   mistake that included the correct date. (*See also* ECF No. 298-1 (the supplemental

25   narrative he referred to).) The Court also found Sergeant Hernandez's testimony that he

26   simply made a mistake credible. The Court accordingly finds that the date of November

27

28      [15]And the Court rejects any suggestion that Judge Magit authorized the warrant without swearing in Sergeant Hernandez or reviewing his affidavit either in person or remotely. Indeed, Judge Magit confirmed that was not his practice.

20, 2020, next to Sergeant Hernandez's signature in the application was a simple mistake. (ECF No. 254-2 at 12.) The correct date is November 13, 2020. (*Id.* at 2, 5, 7.) And for these reasons, this date discrepancy does not indicate that Judge Magit 'rubber-stamped' the warrant application.

The Court also heard from Judge Magit about the practices he would have followed before granting warrant 20-SW-56 and is convinced he did not rubber-stamp it for the reasons he provided at the Hearing as well.[16] Judge Magit specifically noted the rural location where the two bodies were found and the time of day in retroactively confirming his conclusion that there was probable cause supporting issuance of the warrant. He similarly testified that the warrant was limited both in terms of time and location, which led him to find it was sufficiently particularized. Judge Magit also noted that while issuing tower dump warrants was unusual at the time he granted this application (he believes he had granted less than five at that time), so too was it unusual for local police to find evidence of a double homicide on the side of a rural highway in the county where he sits as a judge, implying that this extraordinary warrant was justified by extraordinary circumstances. More generally, Judge Magit testified that he never signed a warrant without an affidavit, or without first agreeing the requesting officer had established probable cause. And he otherwise testified that he would guess he denies about 20% of the warrant applications that come before him. Indeed, beyond not acting as a rubber stamp, Judge Magit's testimony also goes to the third and fourth reasons for potential application of the good faith exception: the warrant affidavit arguably contained probable cause and was not so facially deficient that no reasonable officer could execute it.

///

---

[16]Spurlock also argued at the Hearing that the fact Judge Magit authorized the inclusion of a request for 'content' in the warrant further indicated he had rubber-stamped it, but Judge Magit otherwise testified he had no specific recollection of granting this warrant application. The Court is accordingly unable to determine why Judge Magit left those references to 'content' in the warrant, much less that he included them out of carelessness. The same goes for Judge Magit's failure to note the error in the date of Sergeant Hernandez's signature. The Court cannot find such failure adequately supports a finding that Judge Magit did not conduct an independent review of the warrant application.

And Judge Magit's testimony is consistent with the government's argument that there was at least arguable probable cause for issuing the warrant in the warrant application itself, so suppression is not warranted. Specifically, the warrant application noted clear indicia that a crime had been committed; dead bodies that had been shot and stabbed, with shell casings nearby. (ECF No. 254-2 at 9.) Moreover, Judge Magit testified that the warrant does limit how much data is collected in scope because, given the time limitation and the remoteness of the area, there would likely be a relatively small amount of data returned in response to it. The fact that the data returned from the warrant turned out to be more voluminous than he apparently expected does not undermine the fact that Judge Magit deliberated and found probable cause before issuing the warrant. Officer Hernandez further noted in the affidavit that the killings appeared to have taken place at night in a rural area, along with the fact that investigators found cell phones near the victims and in their car found on the other side of Bridgeport, which also had blood in it. (*Id.* at 9-11.) He otherwise noted that most people carry cell phones now, linking this to the fact that cell phones were found near the bodies and in the abandoned vehicle using the word "[a]dditionally." (*Id.*; *see also id.* at 11.) He thus (at least arguably) reasonably inferred that whoever killed the deceased victims may have used cell phones, and because of the time and location, finding out who was calling each other in a six hour window around the time and near the location of the suspected killings would help him find who may have done it. (*Id.*) The Court accordingly finds there was at least arguable probable cause such that the good faith exception applies, and suppression is not warranted. And as noted, the Court does not find that Judge Magit merely rubber-stamped the application either.

### d. Whether Suppression is Otherwise Warranted

The Court otherwise notes a reluctance to suppress evidence when courts declare novel investigative techniques unconstitutional. *See, e.g.*, *Smith*, 110 F.4th at 840 ("[W]e cannot fault law enforcement's actions considering the novelty of the technique and the dearth of court precedent to follow."); *Elmore*, 917 F.3d at 1078 ("This is particularly true

1    in light of the fact that in 2012, no circuit court had yet held the Fourth Amendment

2    applicable to CSLI data."). And the Court appears to be the first court within the Ninth

3    Circuit to declare tower dump warrants unconstitutional general warrants. Even *Smith*,

4    which does not bind the Court, was not decided until 2024. *See generally* 110 F.4th 817.

5    Moreover, *Smith* is the first circuit decision finding geofence warrants unconstitutional.

6    This being the case, neither Sergeant Hernandez nor Judge Magit can reasonably have

7    been expected to refrain from seeking the warrant, or to refrain from issuing it, back in

8    2020. For this additional, alternative reason, the Court declines to suppress any evidence

9    obtained in response to warrant 20-SW-56.

10       And because the Court declines to suppress any evidence returned from warrant

11   20-SW-56, the Court also declines to suppress any evidence returned from the

12   approximately 90 (according to Spurlock) other warrants that may have relied at least in

13   part on evidence obtained in response to warrant 20-SW-56.[17] In sum, the Court will deny

14   Spurlock's motion to suppress tower dump data.

### B.    Motion to Suppress Evidence from 27 Red Rock Drive

16       Spurlock also moves to suppress any evidence collected from a warehouse he

17   was renting, which he identifies as 29 Red Rock Drive in his motion (ECF No. 257 at 1),

18   though the government clarifies in response that the correct address is 27 Red Rock Drive

19   (ECF No. 297 at 1 n.1).[18] The Court will refer to it as 27 Red Rock Drive in this order

20   because that is the correct address.

21       Spurlock's landlords' daughter, H.M., who he corresponded with regarding the

22   lease and other details after moving out, gave law enforcement permission to search the

23   warehouse after she determined Spurlock had moved out. (ECF No. 257 at 3.) Spurlock

24   argues for the suppression of the evidence gathered during this search because he was

25

26       [17]For purposes of this order, the Court need not—and does not—make this finding.
     But as Investigator Pelichowksi testified, the tower dump data was a starting point for he
27   and his colleagues to obtain cell data, which they then built upon to obtain more useful
     information.

28       [18]Spurlock further confirms in reply that 27 Red Rock Drive is the correct address.
     (ECF No. 328 at 1 n.1.)

1   living in the warehouse, so it was his residence entitled to Fourth Amendment protection,

2   and H.M. lacked both actual and apparent authority to consent to the search, rendering

3   the search unconstitutional. (*Id.* at 4-5.) The government counters that the evidence

4   shows Spurlock had already moved out, and his lease had been terminated, at the time

5   of the search, and that H.M. had both actual and apparent authority to consent to the

6   search. (ECF No. 297 at 2.) Because the Court agrees with the government that Spurlock

7   lacked a privacy interest in 27 Red Rock Drive at the time of the search—as even he

8   appeared to understand the lease had ended and he had moved out—and as further

9   explained below, the Court will deny the motion to suppress without addressing the actual

10  or apparent authority arguments.

### 3.    Findings of Fact

12          On June 4, 2020, Spurlock signed a one-year lease with Hans and Velveth Marty

13  for about 3000 square feet of warehouse space at 27 Red Rock Road in Mound House,

14  Nevada. (ECF No. 297-1 at 3, 12.) The lease specifies that Spurlock was going to use

15  the warehouse for a furniture restoration business, and not anything else unless he got

16  the Marty's written consent, and the other use was lawful. (*Id.* at 3.) H.M. is the Marty's

17  daughter, and she lived with them in a house right next to the warehouse during the times

18  pertinent to this motion. (ECF No. 257 at 2, 297 at 2-3.) H.M. also corresponded with

19  Spurlock by email regarding the lease, including sending him a signed copy of the lease

20  on June 6, 2020. (ECF No. 297-2 at 2.)

21          On June 19, 2020, H.M. again corresponded with Spurlock by email to let him know

22  that they (she and her parents) could not let him keep an R.V. outside the warehouse.

23  (*Id.* at 3.)

24          H.M. also took notes about Spurlock and his associates who used the warehouse.

25  (ECF No. 297-3.) On June 23, she noted a fight between Spurlock, W.L., and others,

26  which concluded in the evening with W.L. apparently moving out. (*Id.* at 3-4.) As part of

27  that fight, she noted, "[w]e agreed to let [Spurlock] break the lease without paying for the

28  remainder of the term." *Id.* at 3. On July 2, movers and later W.L. came back to gather

1   some more things from the warehouse. (*Id.* at 4.) On July 3, some men arrived in a semi

2   truck from Brand X and removed more things from the warehouse with a forklift. (*Id.*) They

3   left the lights on, and H.M. went into the warehouse that night to turn the lights off, finding

4   a 'mostly empty shop.' (*Id.*) On July 4, H.M. called W.L., and W.L confirmed he was done

5   moving out. (*Id.*)

6          This prompted H.M. to email Spurlock, telling him that W.L. moved out, but some

7   things had been left behind, and the warehouse sustained some damage she intended to

8   charge him for. (*Id.*; *see also* ECF No. 297-4 at 2-3.) She attached pictures of some of

9   the damage and items left behind to the email she sent Spurlock. (*Id.* at 2-6.) Spurlock

10   wrote back to her on July 5, 2020:

11
      Have Hans call me as soon as possible. I'm wondering if this series of emails means you were trying to deduct the minor
12   cost of repairs out of the $4950 (July's rent paid in advance/security deposit/last months rent) and then the remainder will
      be returned to me? That's not what we agreed on upon our last conversation, do I'm confused. I'll speak to him seeing as
13   my contract is with him and his legal spouse.

14   (*Id.* at 7.)

15          Spurlock followed up on that email on July 11, 2020, writing:

16
      Just following up with you. I have not received any response, so I'm wondering if I might need to inform my attorney that
17   this is escalating. If I am mistaken (and I sincerely hope I am), please just send me a signed copy of an AMICABLE lease
      termination, and we can conclude our interaction. I hope to hear from Hans and/or receive said termination by Monday
18   evening. Thanks for your time.

19   (*Id.*)

20          The government otherwise alleges that Spurlock told W.L. over Signal in late June

21   or early July 2020:

22          I would go get those tubs full of your shit from the truck if I were you. They're
            outside and there are a lot of fucking crackheads. Those people have the
23          keys to the shop and you can talk to them about getting all your tools down.
            I terminated the lease. It's done. Don't ever fucking contact me again.
24

25   (ECF No. 302 at 4.)

26          On July 14, 2020, H.M. sent an email to Carson City Detective Sam Hatley inviting

27   him to come search the warehouse and collect any evidence from it before she and her

28   parents moved forward with leasing it to someone else. (ECF Nos. 297 at 3, 297-5 at 2.)

She mentioned in that email that a private investigator had come to visit her the day before about a missing person, that she had noticed strange things happening while Spurlock had leased the warehouse, and concluded the email by offering to assist law enforcement in their investigation. (*Id.*) This is the email that led to the consent search Spurlock objects to in his motion to suppress. (ECF No. 297 at 3.)

### 4.    Legal Analysis

"[T]he demonstration of a legitimate expectation of privacy 'is a threshold standing requirement, and analysis cannot proceed further without its establishment.'" *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (quoting *United States v. Cruz-Jimenez*, 894 F.2d 1, 5 (1st Cir. 1990)). "Where a defendant depends on a 'reasonable expectation of privacy,' two elements must be met: (1) that he had 'an actual (subjective) expectation of privacy,' and (2) that his subjective expectation is 'objectively reasonable'—i.e., that it is an expectation 'that society is prepared to recognize as 'reasonable.'" *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022) (citation omitted). People who voluntarily abandon property lack standing to complain of its search or seizure, and whether they have abandoned property presents a factual question focusing on the person's words, acts, or other objective indications that the person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure. *See id.* at 686.

Spurlock had voluntarily abandoned the warehouse at 27 Red Rock Road by the time H.M. gave police permission to search it. After witnessing an argument between Spurlock and W.L. (and others), H.M had the impression from Spurlock and W.L. that they were moving out, and she and her parents even told Spurlock he could break the lease without penalty. (ECF No. 297-3.) W.L. confirmed to H.M. that he had moved out by July 4, 2020. (*Id.* at 4.) H.M. emailed Spurlock that same day, and he emailed her back on July 5, 2020, objecting that she was going to deduct money from an amount he had paid that he himself characterized as "last months [sic] rent." (ECF No. 297-4 at 7.) Spurlock sent H.M. another email on July 11, 2020, following up on his apparent request

1   to get his whole security deposit back, requesting an 'amicable' lease termination. (*Id.*)

2   There is no evidence that H.M saw Spurlock on the property after June 23, 2020. And the

3   government otherwise alleges that Spurlock told W.L. on Signal sometime in late June or

4   early July that he had "terminated the lease." (ECF No. 302 at 4.)

5         Taken together, this evidence establishes that Spurlock both subjectively believed

6   that he had terminated the lease on 27 Red Rock Road sometime before July 14, 2020,

7   and that he had objectively abandoned 27 Red Rock Road as well.[19] Because he had

8   abandoned the property before H.M. even invited law enforcement officers to come

9   search the premises, Spurlock lacks standing to challenge the search that eventually

10  occurred. *See Fisher*, 56 F.4th at 685-88 (affirming denial of motion to suppress because

11  the defendants had voluntarily abandoned some digital devices containing unlawful

12  content in an attic crawl space when they sold the house that the police later discovered

13  the digital devices in after the purchaser of the house gave them permission to search it).

14  The Court will accordingly deny Spurlock's motion to suppress evidence collected from

15  27 Red Rock Drive.

16  **III.    CONCLUSION**

17        The Court notes that the parties made several arguments and cited to several

18  cases not discussed above. The Court has reviewed these arguments and cases and

19  determines that they do not warrant discussion as they do not affect the outcome of the

20  motions before the Court.

21

22        [19]Spurlock argues in reply that he had not surrendered his rights under the lease
because the lease provided that a surrender would only be effective if the landlords sent
23  him a written acceptance of his surrender, but they never did. (ECF No. 328 at 2-5.)
However, the Court finds this argument unpersuasive because it is overly formalistic and
24  presents only one indicium factoring into an objective assessment of whether Spurlock
had objectively abandoned the property outweighed by the other indicia described herein
25  leading the Court to conclude that Spurlock had abandoned the property by the time H.M.
consented to a search. Indeed, Spurlock relies on *United States v. Sledge*, 650 F.2d 1075,
26  1080 (9th Cir. 1981) for the proposition that, "[i]f one who has abandoned property from
all outward appearances in fact has retained a subjective expectation of privacy, then a
27  search of the property is nevertheless valid if that expectation is intrinsically unreasonable
or not otherwise entitled to protection." *Id.* (*See also* ECF No. 328 at 3.) But here, Spurlock
28  had subjectively abandoned the property as well. (ECF No. 302 at 4 ("I terminated the
lease.").) *Sledge* is accordingly inapplicable.

1    It is further ordered that Spurlock's motion to suppress tower dump data (ECF No.

2    254) is denied.

3    It is further ordered that Spurlock's motion to suppress evidence from 27 Red Rock

4    Drive (ECF No. 257) is denied.

5    DATED THIS 11th Day of April 2025.

6

7    _____
     MIRANDA M. DU
8    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22