UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cr-00022-MMD-CLB-1 |
| Plaintiff, | ORDER |
| v. | |
| CORY SPURLOCK, | |
| Defendant. | |

## I.    SUMMARY

In July 2024, the government filed a notice informing Defendant Cory Spurlock that the United States would *not* seek the death penalty against him. (ECF No. 138 ("July 2024 No-Seek Notice").) In April 2025—almost eight months after its formal no-seek decision, and just 12 days before Spurlock's firmly-set trial was scheduled to commence—the government reversed course, filing a new notice informing Spurlock that it now intends to pursue the death penalty after all. (ECF No. 365 ("Death Notice").) The government's wholesale reversal at the eleventh hour comes about two years after a federal grand jury returned the original indictment in this case, and more than four years after Spurlock's initial arrest in April 2021 on related California state charges. Spurlock has never waived time under the Speedy Trial Act. There have been no significant case-related investigatory developments since the government's July 2024 No-Seek Notice. Indeed, by the end of July 2024, the government had already charged Spurlock for the murders of all three alleged victims in this case, based on substantially the same evidence in its possession today.

///

///

///

Defendant now moves to strike the United States' notice of intent to seek the death penalty. (ECF No. 374 ("Motion").)[1] The government falls far short of justifying its attempt to seek death on the eve of trial, years into this case. The government had ample opportunity to exercise discretion in determining whether to pursue capital punishment. It formally notified the Court and Defendant it would not so do in advance of a notice deadline to which it consented. The government may not now unilaterally derail the course of proceedings with regard to this matter of clear procedural and constitutional weight. As further explained below, the government has violated the Court's orders, its statutory obligations under the Federal Death Penalty Act, and Defendant's rights to due process and a speedy trial. The government leaves the Court with no option other than to strike the Death Notice. For these reasons, the Court grants the Motion.

## II.    BACKGROUND

### A.    Initial Arrest and Indictment

Spurlock was arrested in April 2021 on California state charges related to the deaths of W.L. and Y.L. in Bridgeport, California. In a criminal complaint filed in Mono County Superior Court, Spurlock was charged, alongside two co-defendants, with two counts of first-degree murder and one count of conspiracy. (ECF No. 93.)[2] Defendant remained in state custody until his transfer to federal custody in connection with the instant case; he has thus been in continuous custody since his 2021 arrest.

---

[1]The Court directed expedited briefing and continued trial from April 22, 2025, to June 3, 2035, in order to address the Motion, finding the time excludable under 18 U.S.C. § 3161(h)(1)(D) but noting that the continuance was predicated wholly on the government's new Death Notice. (ECF No. 381.) The government responded to the Motion (ECF Nos. 393 (sealed), 403 (corrected), 405 (redacted)) and Spurlock replied (ECF No. 409).

[2]In the California criminal complaint submitted in April 2021, charges were filed against Spurlock and two other individuals, B.K. and O.O. (ECF Nos. 93 at 3, 355 at 2 n. 4.) The complaint also charged Spurlock with special circumstances under Cal. Penal Code Section 190.2, which provides for a potential death sentence for first degree murder where special circumstances are identified. No preliminary hearings were conducted in the Mono County Superior Court. (ECF No. 93 at 4.)

1    In May 2022, the United States Attorney's Office opened an investigation into

2    Defendant and others for possible violations of federal law. (ECF Nos. 139 at 12, 320 at

3    2.)

4    On May 11, 2023, a grand jury returned the original indictment in this case,

5    charging Defendant with murder-for-hire conspiracy related to the November 2020 death

6    of W.L. under 18 U.S.C. § 1958(a) (count 1) and conspiracy to distribute marijuana under

7    21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (count 2). (ECF No. 1.) Count 1 was death

8    eligible. Spurlock was arrested on a federal warrant on May 15, 2023. (ECF No. 5.) At the

9    initial appearance held the next day, the government moved for detention, and Defendant

10   submitted to detention. (ECF No. 6.) The Magistrate Judge granted detention pending

11   trial.[3] (*Id.*) Trial was scheduled for July 25, 2023. (*Id.*)

12   On July 5, 2023, following briefing on the government's motion for appointment of

13   a conflicts attorney regarding the Federal Public Defender's Office's representation of

14   Spurlock, District Judge Anne Traum recused herself from this matter and the case was

15   reassigned to this Court. (ECF Nos. 37, 38.) At a July 19, 2023, status conference, the

16   Court continued the trial to February 6, 2024, over Defendant's objection. (ECF No. 47.)[4]

17   On August 7, 2023, the Court denied the government's motion for appointment of

18   a conflicts attorney (ECF Nos. 70, 71.) On August 8, 2023, Richard G. Novak, who had

19   previously represented Defendant in state court, was appointed as Learned Counsel.

20   (ECF No. 69.)

21   ///

22

23   [3]The Court later denied Defendant's motion to review the detention order. (ECF

24   No. 174.)

25   [4]This first continuance was necessary for the Court to resolve the motion for
     appointment of conflict counsel. (ECF No. 47.) In resolving that motion following an
26   evidentiary hearing, the Court rejected any suggestion that the government had no basis
     to bring the motion and ultimately denied the motion. (ECF Nos. 70, 71.) Even before
27   resolution of the motion, at the July 19, 2023, status conference, it was obvious that a
     continuance was necessary, given the imminent trial date and the fact that very little had
28   occurred in the case in terms of discovery or the defense team's trial preparation. (ECF
     No. 47.)

1

## B.    Setting of Death Notice Deadline

On November 30, 2023—six months after the original indictment, which had only charged conduct related to the death of W.L.—the government filed the first superseding indictment, charging seven counts related to the deaths of both W.L. and Y.L., and adding a robbery charge related to J.S.[5] (ECF No. 84.) The superseding indictment did not charge Spurlock with J.S.'s homicide. Two counts related to W.L. (counts 1 and 5) were death eligible.

In a December 18, 2023, status report, Defendant informed the Court that state proceedings "were delayed because of the complexity of the discovery, because of changes in counsel, and because of the need for the defendants to conduct comprehensive defense investigations, including mitigation investigations." (ECF No. 93 at 4.)

On January 9, 2024, the Court held a status conference at which the parties discussed continuing the February 6, 2024, trial date and setting a timeline for compliance with the Department of Justice's ("DOJ") capital case review process, given the death-eligible charges. (ECF No. 97 (status conference minutes); 132 (status conference transcript).) The government informed the Court that its investigation regarding the death of J.S. was ongoing and would potentially lead to a second superseding indictment. (ECF No. 132 at 5.) It was understood that a second superseding indictment could include another death-eligible charge related to J.S.'s killing. The government represented that it

---

[5]The first superseding indictment charged Spurlock with seven counts, including (1) conspiracy to commit murder for hire resulting in the death of W.L., in violation of 18 U.S.C. § 1958(a); (2) stalking resulting in the death of W.L., in violation of 18 U.S.C. §§ 2261A(1)(A)(i) and 2261(b)(1); (3) stalking resulting in the death of Y.L., in violation of 18 U.S.C. §§ 2261A(1)(A)(i) and 2261(b)(1); (4) Hobbs Act robbery of W.L., in violation of 18 U.S.C. § 1951; (5) use of a firearm during the crime charged in Count 4, causing the death of W.L., in violation of 18 U.S.C. § 924(c), (j)(1); (6) Hobbs Act robbery of J.S. in June 2020, in violation of 18 U.S.C. § 1951; and (7) conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841, 846. (ECF No. 84.)

would not pursue an expedited no-seek decision under Department of Justice's protocols for death-eligible charges.[6] (*Id.* at 5, 13.)

Although the parties had begun preliminary discussions regarding when to begin death penalty procedures and mitigation presentations at the local and national levels, defense counsel did not believe they should proceed with a mitigation presentation without knowing the final scope of the death-eligible charges. (*Id.* at 5.) When asked whether the defense's position was unreasonable, government counsel replied that it was "[not] unreasonable at all," but that having a trial date in February was unrealistic. (*Id.* at 6.) Although government counsel expressed hesitance to provide a timeline as to when they expected to file a second superseding indictment, citing budget issues and the need to hire an expert to support a charge related to the killing of J.S., they ultimately stated that the government hoped to be able to supersede by March 2024. (*Id.* at 7 ("[The government is] hopeful by March we will be in a position where we will be proceeding on a charging document that would be the final charging document.").) The Court acknowledged the complexity of the charges, and the fact that much of the delay related to the state case was unrelated to the federal case, but shared defense counsel's concerns about continuing trial without a realistic timeline in place. (*Id.* at 7-8.) The Court stated:

> [G]iven the prior procedural history, Mr. Spurlock has been in custody for a long time, and so we're looking at continuing further delay without any realistic trial date. My concern is that at some point I'm not going to be able to continue the trial, and I will just have to force the parties to proceed to trial.

(*Id.* at 7-8.) Spurlock's counsel emphasized that Spurlock himself declined to stipulate to any continuance of the trial date. (*Id.* at 9.) Nevertheless, citing the "Sixth Amendment responsibility to represent [Defendant] in a . . . complete and thoughtful, careful way," as well as the value of having a final charging document, defense counsel proposed a

---

[6]The government asserts that Defendant did not qualify for the expedited process. (ECF No. 139 at 14.)

1  timeline under which they would prepare to make a mitigation presentation to the local

2  United States Attorney on approximately April 1, 2024. (*Id.* at 10-11.) Emphasizing that

3  they did not want to rush the Attorney General's decision on the case, defense counsel

4  further proposed setting a deadline for the government's decision on whether or not to

5  pursue capital punishment for September 1, 2024. (*Id.*) Finally, the defense suggested a

6  new trial date around December 1, 2024, roughly 90 days after the deadline for the

7  government's capital punishment decision, with the assumption that this date would apply

8  only to a noncapital trial. Counsel highlighted that a capital trial would be different from a

9  noncapital trial in numerous significant ways, including because of the additional penalty

10  phase, and would take significant additional judicial resources. (*Id.* at 12.)

11         Weighing the complex nature of the case with Defendant's rights, the Court set a

12  timeline generally consistent with the defense's suggestions, with minor modifications.

13  (*Id.* at 15-22.) The government generally agreed that the timeline was reasonable.

14  Specifically, the Court stated its expectation that the defense would present its mitigation

15  to the local U.S. Attorney in April 2024. Government counsel did not object. (*Id.* at 15 ("I

16  believe . . . we can get something done in the beginning of April."). Next, the Court set a

17  deadline for the government to give notice by August 16, 2024, as to whether it would

18  seek the death penalty against Defendant. (*Id.* at 21 ("I'm going to set a deadline for the

19  government to make a decision on whether to seek the death penalty by August 16th").)

20  Government counsel did not object. (*See id.* at 15-16 ("[We] don't necessarily have a

21  problem with the [defense's proposed Labor Day] deadline for the Attorney General").)[7]

22  Finally, over Defendant's objection and after making necessary findings under the Speedy

23  Trial Act, the Court continued the trial date from February 6, 2024, to November 5, 2024,

24  assuming a noncapital trial. (*Id.* at 21.) Again, government counsel did not object. (*Id.* at

25  17 ("[a November trial date] would be fine with the government").

26

27

28  _____

[7]The Court further set a status conference for August 19, 2024, following the notice deadline. (*Id.* at 21.)

In finding that the continuance was in the interests of justice, the Court found that "even if the government doesn't need the time, [Defendant's] attorneys need the time to make sure that they prepare to argue . . . that the government should not ask for the death penalty, and then to prepare for the trial itself, to really represent [Defendant] effectively." (*Id.* at 19.) The Court also reiterated its reluctance to permit further unnecessary delays: "I'm prepared to address any issues in this case as quickly as I can so that we have the firm trial date, particularly given my concern about how long Mr. Spurlock has been in custody, and my reluctance to keep continuing the trial into 2025." (*Id.* at 18.)

The Court issued minutes in line with its oral ruling at the January 2024 Status conference, directing that "[t]he Government has until 8/15/2024 to decide whether to seek the death penalty in this case." (ECF No. 97.)

### C.    July 2024 No-Seek Notice

The defense submitted a written mitigation presentation to the government on April 3, 2024, and presented in person to United States Attorney for the District of Nevada, Jason Frierson, on April 9, 2024. (ECF Nos. 374, 403.) Based on the government's representation, the mitigation packet included a 12-page letter, a 19-page preliminary expert report, and a 12-page preliminary psychosocial history report. (ECF No. 403 at 10.) Under DOJ capital case protocols, it is understood that a recommendation from the United States Attorney's Office was submitted to the Attorney General for a final decision. *See* U.S. Dept. of Justice, Justice Manual, §§ 9-10-090, 130.

Although the government had represented that it "hoped" to file any second superseding indictment by March 2024, the summer of 2024 began before the government superseded. On July 2, 2024, Defendant filed a motion to sever counts contained in the first superseding indictment (returned in November 2023) (ECF No. 126.)

On July 11, 2024, the government filed its second superseding indictment. (ECF No. 127.) For the first time, the second superseding indictment charged the murder of J.S. while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A), replacing the Hobbs Act robbery charge related to J.S. included in the first superseding

indictment. (*Id.* at 2-3.) This new count was death eligible. In all other respects, the second superseding indictment was substantively similar to the first superseding indictment. The parties contest the reasons for the government's timing in superseding: Defendant argues that the government was attempting to avoid severance (ECF No. 374 at 16), but the government emphasizes that the second superseding indictment was filed after Spurlock's co-conspirator signed a cooperation agreement with the government on July 8, 2024, making the individual available as a potential witness (ECF No. 403 at 11).

On August 14, 2024, the Court granted severance of counts 1-2 from counts 3-7, finding that the second superseding indictment, as well as the earlier superseding indictment, failed to properly join those counts. (ECF No. 146.)

On July 31, 2024, before the Court's August 16, 2026, deadline, the government timely filed a formal notice of intent *not* to seek the death penalty. (ECF No. 138 ("The Department of Justice has directed United States Attorney Jason Frierson not to seek the death penalty against the defendant in the above-captioned case.").)

On August 14, 2024, Mr. Novak filed a motion to withdraw as learned counsel (ECF No. 145) and the Court granted that motion (ECF No. 146).

**D.    August 19, 2024, Status Conference**

At an August 19, 2024, status conference, the Court addressed the November 5, 2024, trial date. (ECF Nos. 150 (status conference minutes); 183 (status conference transcript).) Defense counsel expressed concern that the second superseding indictment was filed several months later than the government had estimated and argued that the government had disclosed "a barrage of new information that is both complex and voluminous." (ECF No. 183 at 5-6.) Spurlock's counsel acknowledged that given these developments, as well as the expected timing of pretrial motions and the need to be "realistic with respect to provide competent counsel to Mr. Spurlock going forward," the November trial date was untenable for the defense. (*Id.*)

For their part, government counsel noted the "unprecedented" amount of discovery and stated its intention to cure severance by filing a third superseding indictment. (*Id.* at

14-15.) Government counsel also expressed that they were "in the process of going back to all the jurisdictions to make sure that we have absolutely everything," that "discovery [was] ongoing," and that this was not a "run-of-the mill case" in terms of the charges and the experts needed. (*Id.* at 16-17.)

In short, it was clear to the Court that neither defense counsel nor the government would be prepared to proceed to trial on November 5. (*Id.* at 27 (accepting counsels' representation that "neither side is really prepared for trial" and recognizing that defense counsel, in particular, needed more time in order to provide effective assistance).) Defense counsel proposed a new trial date in mid- to-late March, and the government did not object. (*Id.* at 17 ("We have no objection to a trial date in mid to late March . . . considering the nature and the complexity of the case, and the discovery, the government believes that the mid to late March date is appropriate.").) The parties agreed to meet and confer about discovery on a rolling basis, and declined the involvement of a magistrate judge. The Court also noted that the case was moving relatively quickly. (*Id.* at 10.)

Over Spurlock's strong objection, the Court made findings under the Speedy Trial Act and reluctantly continued trial a third time, to April 22, 2025. (*Id.* at 30-31.) In doing so, the Court emphasized that it was "balanc[ing the right to speedy trial] with the need for [Defendant] to really have effective assistance of counsel, and for the case to meaningfully proceed to trial." (*Id.* at 10.)[8] The Court stressed, however, that this April trial date was firm. (*Id.* 31 ("I expect this to be a firm trial date, given the fact that I'm continuing trial for about five months.").)

In setting the new schedule, the Court emphasized the government's notice of intent not to seek the death penalty and communicated to Spurlock that there would be no further delays, stating: "I think it's understandable that you are frustrated, but we are now at the point where the government has elected not to seek death, and so the case

---

[8]At the time of the August 2024 status conference, counts 1 and 2 were severed from the remaining counts. Counsel for Spurlock requested a three-month interval between the severed portions of the trial. (*Id.* at 32.)

1    will proceed with the Counts as charged, without the significant potential penalty." (*Id.* at

2    27). The Court then set pretrial motion deadlines for March 7, 2025. (*Id.* at 31-32.)

3           **E.**    **Third and Fourth Superseding Indictments**

4          On September 12, 2024, the government returned the third superseding

5    indictment, charging Defendant with eight counts and attempting to cure severance.[9]

6    (ECF No. 160.) Counts 1 and 2 – charging Spurlock with marijuana trafficking and the

7    killing of J.S. while engaged in marijuana trafficking – remained substantively the same

8    as in the second superseding indictment, and the W.L. counts changed numbering but

9    also remained substantively unchanged. The third superseding indictment's sole

10   significant substantive change was the addition of count 4, charging Spurlock with

11   tampering with a witness by killing in violation of 18 U.S.C. § 1512(a)(1)(C). (ECF No. 160

12   at 4.) This charge is death-eligible. (ECF No. 403 at 14.) In response to Defendant's

13   motion to dismiss count 4, the government subsequently obtained the fourth superseding

14   indictment, which charges the same eight counts as the third superseding indictment, but

15   with a one-word addition to count 4. (ECF No. 342.) Despite this one-word change, the

16   third superseding indictment included essentially the final charges expected to proceed

17   to trial.[10]

18

19

---

20         [9]The third superseding indictment charges Defendant with (1) conspiracy to
21   possess with intent to distribute and to distribute marijuana between November 2019 and
    June 2020; (2) murder while engaged in narcotics trafficking relating to the killing of J.S.
22   between November 2019 and June 2020; (3) murder for hire relating to the killing of W.L.
    between October 2020 and March 2021; (4) tampering with a witness by killing of W.L.
23   on or about November 2020; (5) stalking resulting in death relating to W.L. between
    October and November 2020; (6) stalking resulting in death relating to the killing of Y.L
24   between October and November 2020; (7) interference with commerce by robbery in
    November 2020; and (8) causing death through use of a firearm during and in relation to
25   a crime of violence in November 2020. (ECF No. 160.)

26         [10]The Court denied Defendant's motion to dismiss count 4 and found that the
    government was permitted to proceed on the fourth superseding indictment, returned on
27   April 3, 2025, given that the one-word addition of the word "federal" to count 4 cured a
    simple omission in the previous indictment and did not significantly expand the scope of
28   the charges. (ECF No. 385.) The Court also denied Defendant's renewed motion to sever.
    (*Id.*)

1     Throughout the fall of 2024 and early 2025, by all appearances, the parties

2   prepared for what was understood to be a complex non-capital trial with a firm April trial

3   date. As the April trial date approached, the government's discovery productions

4   increased significantly.[11] (ECF Nos. 374, 320 at 14-16.)

5        **F.    Department of Justice Memorandum & Reconsideration**

6        On February 5, 2025, Attorney General Pamela Bondi issued a "Memorandum Re:

7   Reviving the Federal Death Penalty and Lifting of Moratorium on Federal Executions,"

8   implementing Executive Order 14164, entitled "Restoring the Death Penalty and

9   Protecting Public Safety." (ECF No. 190-1 ("DOJ Memo").) The DOJ Memo suspended

10  the current version of DOJ death protocols, and directed a review of all no-seek decisions

11  in cases that are not yet tried or resolved that were charged during the previous

12  administration between January 20, 2021, and January 19, 2025. (*Id.*)

13       On the day the DOJ Memo was issued—less than three months before the April

14  trial date in this case—the government informed the defense team of the Memo over

15  email and requested a call regarding the Department of Justice' plans to reconsider its

16  no-seek decision. (ECF Nos. 253 at 17, 403 at 14.)

17       On February 7, 2025, the defense filed a motion to reappoint learned counsel, in

18  which they informed the Court of the Attorney General's Memo, stating the "Memo is an

19  attempt to rescind the Department of Justice's previous determination that 'imposition of

20  the death penalty is no longer a legal possibility,' and constitutes a formal announcement

21  that Mr. Spurlock 'may face a possible death sentence.'" (ECF No. 190 at 3 (quoting ECF

22  No. 138 (July 2024 No-Seek Notice).) In its response, the government stated it did not

23  oppose the motion, but provided no further details about its reconsideration. (ECF No.

24  191.) Finding good cause, the Court reappointed learned counsel. (ECF No. 192.)

25       The government invited the defense to submit a new mitigation presentation, and

26  the defense provided a revised submission on February 13, 2025. (ECF No. 374 at 19.)

27  _____

28  [11]In fact, in opposing Defendant's motion to dismiss for government delay, the
    government represented at the end of March 2025 that discovery "is nearly complete."
    (ECF No. 320 at 16.)

The government further invited the defense to make an in-person presentation to the Capital Case Review Committee in Washington, D.C. On March 10, 2025, the defense presented to the Committee. (*Id.*)

While awaiting DOJ's determination, defense counsel maintained that they intended to "proceed expeditiously" with the April non-capital setting. (*Id.*) On February 20 and 21, 2025, the government filed numerous expert notices. On February 24, 2025, Defendant filed a motion to compel discovery of 20 items (ECF No. 232), and on February 25, 2025, he filed a motion to strike all 32 of the government's expert notices (ECF No. 233). On March 12, 2025, Defendant filed nine dispositive pretrial motions (ECF Nos. 243, 244, 254, 255, 256, 257, 258, 263, 264), a renewed motion to sever (ECF No. 244), and numerous *Daubert* and other in limine motions. Spurlock also filed nine expert notices. (ECF Nos. 266, 267, 268, 269, 270, 271, 272, 273, 345.) On March 26, 2025, Defendant filed a motion for pretrial disclosure deadline of all known inculpatory evidence (ECF No. 287.)

At a hearing on March 27, 2025, the Court granted Defendant's motion to compel in part, directing the government to provide access to nine disputed items of evidence (ECF Nos. 307, 400.)

At the March 27 hearing, Counsel for the government told the Court, "One of the things that the Court I think is aware of, is that this case is being—it's going through the death penalty procedure again. The update that I had this morning is that the packet is with the Office of Attorney General as of yesterday. So I just wanted to let the Court know that is still pending out there." (ECF No. 400 at 47.) She also indicated that the government would be seeking an extension for rebuttal notices "because of the ongoing death penalty procedure": "Defense has not produced certain records because they don't want to provide them to the government until there is finality in that decision, which we understand, but that also makes it impossible for us to notice a rebuttal expert if we don't know what the records are." (*Id.* at 48.) The Court responded, "As for the process the DOJ is going through, that, to me, is an independent process. I'm proceeding with the

1 | trial, and we'll see what will come of that if the posture is different…These are novel issues
2 | that you may have to litigate depending on that decision." (*Id.*)

3 |      On April 1, 2025, the Court scheduled for the following week an evidentiary hearing
4 | on Spurlock's motion to suppress cell tower data and oral argument on Spurlock's motion
5 | to dismiss for government delay. (ECF No. 326.)

6 |      On April 3, 2025, the government filed its fourth superseding indictment (ECF No.
7 | 342), which, as previously noted, differed from the third superseding indictment only in
8 | that one additional word, "federal," was added to Count 4, in response to arguments
9 | raised in Defendant's motion to dismiss that count.

10 |      **G.**    **April 2025 Death Notice Reversing July 2024 No-Seek Decision**

11 |      On April 4, 2025, the government filed a motion to continue trial, in which it noted
12 | that on that date, "the government was authorized by the Department of Justice to advise
13 | this Court of its intent to seek the death penalty." (ECF No. 346 at 9.) The government
14 | requested a continuance "to give the parties sufficient time to prepare for a capital trial
15 | and litigate any and all necessary issues" (*id.* at 1) but did not provide any specification
16 | as to the length of the delay it wanted the Court to impose. Defendant responded, arguing
17 | that there was no legal basis for the request because the government had not filed a
18 | notice under Section 3953 nor been given permission to do so. (ECF No. 353.) Defendant
19 | also indicated that if the government were to attempt to file a new notice, the defense
20 | would immediately move to strike the notice. (*Id.*) The Court agreed that the government
21 | lacked a legal basis for a continuance because no new notice had yet been filed, denying
22 | the government's motion on April 7, 2025. (ECF No 357.)

23 |      On April 9, 2025, the Court held an evidentiary hearing on Defendant's motion to
24 | suppress and oral argument on his motion to dismiss for government delay. (ECF No.
25 | 362.) At that hearing, the government informed the Court that it believed a fifth
26 | superseding indictment and notice of intent to seek the death penalty would be filed the
27 | following day. (*Id.*)

28 |

On Thursday, April 10, 2025—twelve days before the trial set to begin on Tuesday, April 22, 2025—the government filed a fifth superseding indictment, adding statutory aggravating factor findings under 18 U.S.C. §§ 3591 and 3592. (ECF No. 363.) Other than the aggravator allegations, the charges in the fifth superseding indictment remained unchanged from those in the fourth superseding indictment.

Shortly thereafter, the government filed a notice of its intent to seek the death penalty, reversing its July 2024 decision and listing five statutory aggravating factors and three non-statutory aggravators.  (ECF No. 365.)

On the same day, the government filed a second motion to continue trial (ECF No. 366.) Defendant opposed. (ECF No 371.) The government argued that the notice "calls for additional time for both parties to prepare for trial given the capital nature of the case," that a continuance would allow all necessary pre-trial capital litigation to be completed, and that only 14 of 70 days have elapsed which have not been excludable under the Speedy Trial Act. (ECF No. 366.) Like in its previous motion for a continuance, the government provided no specification as to the ultimate length of delay it believed appropriate for preparations for a capital trial, but stated "[i]f the Court is not inclined to grant a continuance of trial longer than 30 days, the government requests that the Court grant a continuance of approximately one month so that the anticipated litigation regarding this notice can be fully briefed and argued without interfering with the parties' ability to prepare for trial." (*Id.* at 2 n. 1.) In requesting this interim continuance, however, the government further acknowledged that "many facets of the trial" – including selection of a death-qualified jury, jury instructions, motions in limine, the length of trial, and additional sentencing phase expert notices and witnesses – would be impacted if it proceeded as a capital trial. (*Id.*)

At the time the new notice was filed, Defendant's dispositive motions were fully briefed, and the Court had informed the parties they would be resolved before trial. (ECF No. 392 at 93-94.) Jury summons for a non-capital trial had been issued. (ECF No. 384 at 19-20.)

### H.    Motion to Strike & Continuance of Trial to June 3, 2025

On April 14, 2025, Defendant filed a motion to strike the government's notice of intent to seek the death penalty and requested expedited briefing. (ECF No. 374.)

The Court held a status conference the next day, April 15, 2025, at which it addressed the government's new motion to continue trial, in light of the notice and the motion to strike.[12] (ECF Nos. 380, 381, 384.) Spurlock himself objected to any further continuance. The Court asked the government to clarify how long a continuance it was seeking. Government counsel first represented that "for this initial foray" the government was only asking for a "brief" continuance of around 30 days sufficient for full briefing and resolution of the motion to strike, but that "if the Court does not strike the notice…then the defense would, rightfully, ask for more time." (ECF No. 384 at 4-5.) The following exchange occurred:

> THE COURT: [T]he government filed a Motion to Continue Trial. I thought the basis was because of the Notice to Seek the Death Penalty, which the government believes then warrants a continuance of trial. But now what I'm hearing is you're only asking for a continuance to allow me time to resolve the Motion to Strike the notice. You not saying a continuance is needed because of the Notice to Seek Death?

> GOV. COUNSEL: I'm sorry, Your Honor. I, clearly, misunderstand you. Yes, the government believes that a continuance of this trial is needed because once the notice to seek the penalty is filed, it changes the complexity of the trial going forward. For example, to seek a jury in this type of case, we have to send out a death penalty questionnaire. Each side gets 20 strikes. So, the pool has to be much, much larger. And because there is a potential penalty phase, there is also additional preparation that needs to be made for that both on the government's side as well as the defendant's side.

> THE COURT: So how much time is needed when you file your motion, without the Motion to Strike on file, and you ask for a continuance? The motion didn't indicate how much time. How much of a continuance does the government thinks it needs to properly prosecute a now death -- a case where a notice to seek has been issued?

[12]The Court informed Defendant at the hearing that it planned to resolve the outstanding dispositive motions in an omnibus order that week, consistent with prior representations to counsel, and that no delays in the trial date were required for the Court to address those motions. (ECF No. 384 at 4.) The Court also extended the deadline for trial documents, set for the day of the hearing, in light of the continuance. (*Id.*) On April 18, 2025, the Court issued an order denying Defendants' motions to dismiss (ECF No. 385.)

1    GOV. COUNSEL: 90 days.

2    (*Id.* at 5-6.) Defense counsel also acknowledged that a death penalty case "would be a

3    completely different case on a completely different timeline." (*Id.* at 26.)

4    The Court ultimately determined that it was wholly impossible to proceed with the

5    April 22, 2025, trial date given the need to resolve the issue of the propriety of the Death

6    Notice and the motion to strike. For myriad reasons, the trial could not go forward the

7    following week given the Notice. Even on the most basic level, the Court noted that the

8    Clerk requires *at least* three weeks to issue jury summons; the existing summons would

9    be inadequate for a capital trial. After discussing the parties' and the Court's schedules

10   and the difficulties of finding another trial date given the uncertainty, the Court reluctantly

11   continued trial for roughly six weeks, to June 3, 2025, but set that date only for a non-

12   capital trial, given both parties' representations that this would be insufficient time to

13   prepare for a capital trial. (*Id.*)

14   The Court found the time for the continuance excludable under the Speedy Trial

15   Act, given the need to resolve the motion to strike as a pretrial motion. (*Id.* at 27-28.) But

16   the Court noted that it agreed with Defendant that this final continuance was predicated

17   solely on the government's Death Notice underlying Defendant's timely-filed motion to

18   strike. The Court also emphasized that the short length of the continuance reflects only

19   the time needed to resolve the motion to strike and to re-issue jury summons. (*Id.*)

20   The Court set an expedited briefing schedule for the motion to strike. The

21   government filed its opposition on April 22, 2025 (ECF No. 403) and Spurlock replied on

22   April 29, 2025 (ECF No. 409).

23   **III.    DISCUSSION**

24   Spurlock moves to strike the government's notice of intent to seek death, citing

25   numerous grounds and subgrounds. (ECF No. 374.) The Court grants the Motion on three

26   overarching bases, each of which is independently sufficient. First, the government's

27   Death Notice severely violates the Court's order setting a deadline to declare intent to

28   seek death and is further barred by the principals of judicial estoppel. Second, the Death

Notice violates the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3593, because the government never sought leave to amend its July 2024 No-Seek Notice and does not have good cause to do so, and because the government filed the Death Notice unreasonably close to the firmly-set trial date. Third, the filing of the Death Notice at this late stage in the proceedings violates Spurlock's Sixth Amendment rights. Given the strength of each of these grounds for striking the notice, the Court does not reach Defendant's other arguments for relief.

### A.    Violation of the Court's Orders

Spurlock first argues that the Death Notice should be stricken because it violates the Court's order (ECF Nos. 97, 132) setting an August 2024 deadline for the government to formally determine whether or not it intended to pursue the death penalty. (ECF No. 374 at 20-24.) He further argues that the principals of judicial estoppel preclude the government from seeking death now. (*Id.* at 24-28.) The Court agrees that the government's second notice – submitted on the eve of trial, contradicting a prior timely-filed no-seek notice, filed eight months after a carefully-calibrated deadline to which it never objected or asked to extend – fundamentally violates the letter and the spirit of core orders issued by this Court to ensure the orderly administration of justice. The government's opposition to the Motion effectively concedes the Court's authority, and its counter-focus on prosecutorial discretion is inapposite; the government does not have the discretion to render every deadline reasonably imposed upon it meaningless.

### 1.    Authority to set notice deadline

The Court has inherent authority to manage cases and courtroom matters, including by ensuring obedience to orders, to "effectuat[] the speedy and orderly administration of justice." *United States v. W.R. Grace*, 526 F.3d 499, 508-09 (9th Cir. 2008) (en banc). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *cf.* Fed. R. Crim. P. 2 (providing that the rules of criminal procedure are "to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay"). "There

is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly." *W.R. Grace*, 526 at 508-09.

In line with the mandate to effectuate the orderly administration of justice, district courts managing complex cases with death-eligible charges regularly set deadlines by which the government must provide notice of intent to seek the capital punishment—as the government is statutorily required to do "a reasonable time before trial" under the FDPA. As Defendant highlights, setting a notice deadline with input from government and defense counsel is the recommended practice set out in the United States Courts' *Guide to Judicial Policy* for district courts around the country.[13] *See* U.S. Courts, Criminal Justice Act Guidelines, Guide to Judiciary Policy, Vol. 7 Defender Services, Part A: Guidelines for Administering the CJA and Related Statutes, Ch. 6 § 670 (Jan. 2025) ("Within a reasonable period of time after appointment of counsel under 18 U.S.C. § 3005, and only after consultation with counsel for the government and for the defendant… the court should establish a schedule for resolution of whether the government will seek the death penalty" including dates for "filing of a notice under 18 U.S.C. § 3593(a) that the government will seek the death penalty, or notification to the court and the defendant that it will not").

---

[13] *See, e.g.*, *United States v. Rivas-Moreiera*, No. 1:22-CR-27, 2023 WL 11960650, at *1 (E.D. Tex. Oct. 7, 2023) ("[T]he court has the inherent power to manage its own docket, including the timing of the Government's filing of its notice of intent to seek the death penalty under 18 U.S.C. § 3593(a).") (citing cases); *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013) (Thapar, J.) ("[S]uch a deadline simultaneously acts as a backstop guaranteeing capital defendants a reasonably speedy process."); *United States v. Colon-Miranda*, 985 F. Supp. 36, 40 (D.P.R. 1997) (denying the government's request to seek the death penalty because the court "will not permit the government's confusion, vacillation or strategy to delay unnecessarily this trial or unduly prejudice the defendants").

Setting a death-notice deadline is standard practice for good reason: the deadline is integral to the court's ability to manage its docket and to determine other pretrial matters without protracted uncertainty, as well as to ensure that defendants' rights are protected. *See W.R. Grace*, 526 at 508-09. "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). And a capital trial is thus fundamentally different from a non-capital trial. Because the death penalty implicates unique procedural and constitutional requirements, including a separate penalty trial phase, the government's decision to pursue capital punishment triggers resource-intensive processes in practically every arena of trial preparation – from appointment of counsel to motion practice to jury selection to qualification of experts.

In addition, a capital trial imposes particularly meaningful ethical duties on defense counsel and imparts related obligations on the courts. The Court must, for example, appoint counsel with sufficient experience, knowledge, and resources to meet those duties. *See* 18 U.S.C. §§ 3005, 3599 (providing for defendants' entitlement to learned counsel in capital cases). *See also* U.S. Courts, Guide to Judiciary Policy at § 620.10.10(b) ("[I]f necessary for adequate representation, more than two attorneys may be appointed to represent a defendant in a capital case."); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. 2003) ("ABA Guidelines"), Guidelines 10.4 (construction of defense team), 10.7 (investigations related to guilt and penalty phases), 10.9.1 (duty to explore a plea negotiation), 10.11 (early preparation of the penalty phase). The Ninth Circuit implicitly recognized the core need for certainty in administering and monitoring these ethical obligations when it addressed the impact of an "*irrevocable decision* not to pursue the death penalty" the right to second counsel under 18 U.S.C. § 3005. *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (holding that a defendant has no right to second counsel under 18 U.S.C. § 3005 once the government provides notice of its "irrevocable [no-seek] decision").

The government has been well aware of the additional burdens of a capital trial throughout this case. (*See, e.g.*, ECF Nos. 366 (government's motion to continue) (noting that a capital trial involves many unique issues related to, *inter alia*, selection of a death-qualified jury, jury instructions, motions in limine, the length of trial, and sentencing phase expert notices and witnesses); 384 at 4-6 (April 2025 status conference) (noting that seeking capital punishment "changes the complexity of the trial going forward" and citing as examples; 400 at 47 (March 27, 2025 status conference) (commenting on the impact of the timing of a death notice on pretrial deadlines).)

The government does not appear to dispute the Court's underlying authority to *set* a death notice deadline, so much as to argue that the Court cannot or should not enforce the death notice deadline already set. Indeed, the government concedes that the Court's "own guidelines do suggest setting a [notice] deadline." (ECF No. 403 at 20.) And as Defendant notes, the government "neither cites a single case [holding that the district courts are without this authority] nor attempts to distinguish the several illustrative cases [discussing and applying death notice deadlines] cited by [Defendant]." (ECF No. 409 at 8.) Instead, the government argues that the Court's discretion to manage its own docket is "not without bounds" and that "[r]igid orders, or even deadlines, regarding death penalty and DOJ death penalty protocol would infringe on the legitimate exercise of prosecutorial discretion." (ECF No. 403 at 18.) For numerous reasons detailed below, the government's arguments here are unpersuasive.

First, the government's argument that the Court should exercise caution in enforcing "rigid," "speculative," and "inflexible" death notice deadlines is made largely irrelevant by the fact that the deadline in this case simply was not unduly rigid, speculative, or inflexible– not to mention the fact that the magnitude of the government's noncompliance, many *months* after the set deadline, bowls over any debates about unreasonable rigidity on the margins. At the January 2024 status conference, the government was given ample opportunity to provide input on the timeline for completion of the capital case review process and ultimately did not object when the Court set the

August 16, 2024, deadline. (ECF Nos. 132 at 21 (oral ruling setting deadline, after defense counsel explicitly discussed the Court's authority under *W.R. Grace* and government counsel did not object); 97 (hearing minutes providing that "[t]he Government has until 8/15/2024 to decide whether to seek the death penalty in this case"); 132 at 15-16 ("[W]ith the mitigation presentation, I believe, with working with our U.S. Attorney's schedule, that we can get something done in the beginning of April . . . [the government] d[oesn't] necessarily have a problem with the [defense's proposed] deadline for the Attorney General" to complete review of the death eligible counts).)

In setting the August 2024 deadline, the Court considered (1) the amount of time needed for the defense to prepare and present mitigation to the local U.S. Attorney and, if necessary, to the Capital Case Review Committee; (2) the government's representations that it estimated filing a second superseding indictment including additional possible death-eligible charges related to J.S., by March 2024 (although it ultimately did not do so until July 2024)[14]; (3) the amount of time needed after a determination on the death penalty to allow the parties to effectively prepare for trial, given that a capital trial would likely necessitate a further continuance; and (4) the need to balance Defendant's Speedy Trial Act rights (and his personal objection to any continuances) with his counsel's obligation to provide competent representation. (ECF No. 132.) Government counsel also highlighted that it was an election year, and that this weighed against unnecessary delays to the capital review process because "if we start going past [September 1]" for the capital review process, "there can be turnover, and that can be problematic." (*Id.* at 16.)

In short, the notice deadline was calibrated to respect the government's process and avoid rushing or delaying it, while also protecting Defendant's rights, given his already lengthy period of pretrial incarceration. The August 2024 deadline was roughly 15 months

---

[14]Counsel for the government acknowledged that the defense's hesitation to schedule its presentation of mitigation until additional charges related to the death of J.S. were finalized was "not unreasonable at all." (*Id.* at 16.)

after the case was indicted, more than two years after the government began investigating the case, and more than three years after Spurlock came into California custody related to two of the alleged murders. In setting the deadline and continuing trial to November 2024 over Defendant's personal objection, the Court explicitly warned the parties that it intended to avoid a situation where stand-in trial dates were continued indefinitely. (*Id.* at 7-8.)

Indeed, the government *met* the Court's August deadline when it formally filed its no-seek notice on July 31, 2024.[15] (ECF No. 138.) And the Court took this no-seek notice into account at the status conference on August 19, 2024 – which had been explicitly scheduled the previous January with the notice deadline in mind (ECF No. 132 at 21) – in reluctantly continuing trial for an additional five months, to April 22, 2025, again over Defendant's strong personal objection. (ECF No. 183.)[16] The Court emphasized repeatedly that the April 2025 trial date was firm. (*Id.* at 22 ("I want [the next trial date] to be a true and firm trial date.").

Against this background, and in the midst of pretrial disclosures and deadlines, the government unilaterally threw the proceedings into uncertainty by indicating plans to reconsider its no-seek notice two months before trial, and by formally asserting a 180 degree change in course less than two *weeks* before trial. The government never requested that the Court extend the notice deadline or provide a new deadline. It never filed a status report or requested a status conference on the issue.[17] And it never otherwise requested relief from the deadline under the theory that the deadline was

---

[15]The defense also complied with the schedule established at the January 2024 status conference, submitting a written mitigation presentation to the U.S. Attorney for this District on April 3, 2024, and presenting in person on April 9, 2024.

[16]The Court conveyed to Spurlock that while his frustration at the additional delay was understandable, the Court was willing to allow additional delay because "we are now at the point where the government has elected not to seek death, and so the case will proceed with the Counts as charged, without the significant potential penalty." (*Id.* at 27.)

[17]At the January 2024 status conference, the Court explicitly invited the parties to request a status conference if the need arose to ensure efficient case management. (ECF No. 132 at 21.)

1   improper in concept or because of its rigidity. Indeed, it was defense counsel who

2   informed the Court, via their motion to reappoint learned counsel filed on February 7,

3   2025, that the government had reached out to discuss reconsideration of the death

4   penalty. The government's assertion that the Court has been inflexible rings hollow where

5   the government has never so much as asked for flexibility.

6       The Court thus agrees with Defendant that the government "intentionally

7   relinquished or abandoned" any challenge to the August 2024 deadline, or at least

8   forfeited any objection, by failing to timely raise it. *See United States v. Kaplan*, 836 F.3d

9   1199, 1216 (9th Cir. 2016). *See also, e.g.*, *United States v. Trujillo*, 713 F.3d 1003, 1005

10  (9th Cir. 2013) ("Any non-jurisdictional challenges . . . were waived by the government

11  when it failed to object."); *United States v. Berry*, 624 F.3d 1031, 1039 (9th Cir. 2010)

12  (similar).

13      The government further insists that the Court is precluded from interfering with

14  DOJ's internal processes. (ECF No. 403 at 19.) But the Court has not sought to impose

15  deadlines on the timing of inter-agency deliberations – and Spurlock has never asked it

16  to do so.[18] Rather, the Court set a date by which the government was required to inform

17  the Court as to the outcome of the deliberations. The government's obligation to provide

18  notice, here, is rooted in its responsibilities *in this judicial forum* when it intends to seek

19  the most severe punishment; notice is not merely a "matter of grace" extended through

20  the DOJ's own protocols. *See* 18 U.S.C. § 3593(a) (providing that the government is

21  statutorily required to sign and file a notice "*with the court*") (emphasis added). Indeed,

22  the government cites various cases which address the distinct question of whether the

23  DOJ's protocols *themselves* create independent enforceable rights; these cases broadly

24  *support* the Court's authority over a death notice deadline itself. For example, in *United*

25

26          [18]Spurlock did not ask the Court to intervene even, for example, when the DOJ
27  invited the defense to present mitigating evidence in Washington, D.C., in March 2025.
    The defense notes that, while it "has consistently maintained that the government has no
28  authority to reconsider its decision not to seek death… counsel's duty is to protect Mr.
    Spurlock's life and thus presented to DOJ mitigating reasons why a death penalty
    prosecution should not be authorized." (ECF No. 409 at 12 n. 7.)

*States v. Tsarnaev*, the district court expressly noted that the government's notification under 18 U.S.C. § 3593(a) is an "event" in a case under the court's management authority – and that the court may require the government to "speed up their internal preparations so as to meet established deadlines." No. 13-10200-GAO, 2013 WL 5701582, *2 (D. Mass. Oct. 18, 2013) (declining a defendant's request for the district court to extend the Department of Justice's internal deadline for the presentation of mitigation evidence, but expressly contrasting the court's inherent scheduling authority over "the pace of pending cases"). *See also United States v. Hardrick*, No. CRIM.A. 10-202, 2011 WL 2516340, at *2 (E.D. La. June 22, 2011) (addressing the deadline to present mitigation evidence and finding that the United States Attorneys' Manual does not create independent substantive or procedural rights, but implicitly recognizing the court's power to set a deadline for the DOJ's decision on whether or not to seek the death penalty); *Nichols v. Reno*, 931 F. Supp. 748, 752 (D. Colo. 1996), *aff'd*, 124 F.3d 1376 (10th Cir. 1997) (finding that the government had discretion to file a notice seeking death as "soon as he believed that there was sufficient evidence" without following DOJ protocol); *In re United States*, 197 F.3d 310, 312 (8th Cir. 1999) (addressing a district court's power to compel testimony in relation to the protocol set out in the DOJ's manual requiring the Attorney General to make a final decertification decision).

Even after the government indicated that it would reevaluate its no-seek decision, the Court did not intervene in any related internal DOJ matters (such as the DOJ's scheduled mitigation presentation in March 2025), but has instead taken care to address only the matters presented to the Court when those issues are ripe for review.[19] Because neither the Court nor the defense has interfered in internal DOJ processes, the

---

[19]At the March 27, 2025, status conference, the government explicitly noted that the case was going through the death penalty procedure for a second time and informed the Court that "the packet is with the Office of the Attorney General as of yesterday." (ECF No. 384.) The Court acknowledged that it had no role in the Attorney General's process:

> As for the process the DOJ is going through, that, to me, is an independent process. I'm proceeding with the trial, and we'll see what will come of that if the posture is different. I don't know what's going to happen. These are novel issues that you may have to litigate depending on that decision. (*Id.*)

government's argument that striking the notice might deter the development of policies like the DOJ's death penalty protocol or even cause DOJ to abandon it altogether is a mere distraction from the actual proceedings here.

The Court is similarly unpersuaded by the government's insinuation that enforcement of the deadline would encroach on the government's authority to revise initial charging decisions. (ECF No. 403 at 19.) It is, of course, usually true that an initial decision should not freeze future conduct in the exercise of prosecutorial discretion. *See United States v. Goodwin*, 457 U.S. 368, 382 (1982) (finding no "actual evidence of vindictiveness" which precluded the government from pursuing a felony charge based on the same incident as previously-pending misdemeanor charges). But here, the record is clear that the Court has consistently respected the government's discretion to update its course. The government filed four superseding indictments prior to its latest indictment adding aggravating factor allegations; over repeated challenges by the defense, the Court permitted the government to supersede to correct improperly joined claims, to correct omissions in charging documents, and to add death-eligible charges multiple years into the case. And, it bears repeating, the Court did not interfere with the government's penalty decision itself or the process for reaching that decision. The Court simply set a reasonable deadline regarding an important issue and expected compliance with that deadline.

### 2.    Authority to enforce deadline by striking Death Notice

In light of these circumstances, striking the notice is not only within the Court's authority, it is ultimately the only remedy which affords appropriate weight to that authority. A continuance would not, as the government contends, cure its violation. To the contrary, it would effectively reward the violation and render the notice deadline powerless to serve its well-founded purposes.

Again, the government does not contest the fundamental principle that courts can enforce their own orders. (ECF No. 403 at 14.) And indeed, the Court's authority to do so here finds direct support in the clear reasoning outlined in *W.R. Grace*, where the Ninth Circuit, sitting *en banc,* emphasized that district courts may both "issue *and enforce*"

1    pretrial orders. *See* 526 F.3d. at 503. There, the Ninth Circuit held that the district court

2    did not abuse its discretion by limiting the government's presentation of witnesses and

3    expert reports at trial based on its failure to comply with the district court's order requiring

4    a final list one year before trial, when the government failed to raise a timely objection to

5    that deadline and, in fact, filed the required documents by the deadline. *W.R. Grace*, 526

6    F.3d. at 512-16. The district court did not abuse its discretion in refusing to let the

7    government present an omitted witness. *See id*. Analogously, the proper remedy here is

8    to strike the death notice. *See, e.g.*, *United States v. Rosado-Rosario*, No. 97-049 (JAF),

9    1998 WL 28273, at *3 (D.P.R. Jan. 15, 1998) (explaining "[t]he government failed to

10   comply with [the deadline]" by filing a late death notice; stating "[n]oncompliance with local

11   rules, as well as noncompliance with court orders, will, therefore, not be tolerated").

12        The government attempts to distinguish *W.R. Grace* on the basis that it involved

13   more "mundane" matters of judicial management "inside the courtroom," whereas the

14   death notice at issue is more directly tied to prosecutorial discretion writ large. But this

15   distinction distracts from the actual purpose and function of the notice deadline. In *W.R.*

16   *Grace*, the Ninth Circuit found that the district court's authority to strike stemmed from its

17   reasonable belief that "the deadline [to provide final witness lists] would bring the

18   necessary focus and organization to ready the case for trial." 526 F.3d. at 513. Here, the

19   government's timely disclosure of intent to seek death is *especially vital* to this pretrial

20   focus and organization.

21        Finally, the government resorts to several slippery-slope arguments to suggest that

22   the Court's enforcement of rigid notification deadlines could encourage prosecutors to

23   seek death in all death-eligible cases to keep their options open, resulting in "wasted time,

24   effort, and resources on the part of defense counsel and the judiciary itself." (ECF No.

25   403 at 21.) Aside from the fact that this hypothetical has no relationship to this case—

26   where an overly-rigid deadline is not at issue at all – it also, tellingly, presumes the very

27   risk the government otherwise disclaims, namely the risk that prosecutors may attempt to

28   use the timing of capital review decisions as a tool for strategical advantage, regardless

to the resources squandered, unless there are clear parameters within the forum. In essence, the government suggests that the Court should permit prosecutors to waste time and judicial resources in *this* case because of the possibility that prosecutors will act strategically to waste time and judicial resources in hypothetical future cases.

At the same time, if the Court takes the government's preferred path and declines to strike the Death Notice while continuing trial, there is no need to resort to the imagination to see clear costs to defendants and courts. Many of those costs have at least partially materialized here. Based on the assurances of the July No-Seek Notice, for example, learned counsel withdrew from this case. (ECF Nos. 145, 148.) The defense's mitigation investigation ceased. Defense counsel budgeted their expenditures and time for a non-capital case. Meanwhile, the Court arranged its calendar to account for a non-capital trial and reviewed motions involving Defendant's trial rights with the July No-Seek Notice in mind. The jury coordinator prepared to summon the appropriate (smaller) number of jurors for a non-capital trial in accordance with the District's jury plan. When the government began its attempt to reverse course in the spring of 2025, defense counsel was required to rapidly adapt its pretrial preparations to facilitate the reappointment of learned counsel and to prepare a second mitigation presentation—without benefitting from the interim months as time for further investigation. The Court was forced to return to already-resolved timeline questions, while decisions made regarding Spurlock's due process rights under settled circumstances are at risk of misinterpretation in a different, entirely unexpected context. By the time the government filed its fifth superseding indictment and the Death Notice – indeed, by the time the government filed its motion to continue on April 4, 2025, given *any* affirmative indication as to the Attorney General's new decision – it was far too late to coordinate jury summons for a capital trial and the jury summons already sent had to be cancelled.

In short, the broad risks of last-minute uncertainty are apparent from the harm already done to these proceedings. And as Defendant notes, taken to its logical conclusion, the government's position would mean that defense counsel and the Court

would have to continue to treat every single capital-eligible case as a death case, regardless of an earlier representation that the government would not seek death, lest the government attempt to reverse its decision at the last minute. That system would be unworkable and contradictory. It would clash, for example, with the premise set out by the Ninth Circuit in *Waggoner*, that a defendant may be stripped of learned counsel once an "irrevocable" no-seek notice is filed, leaving in limbo when and how district courts should address questions of defendants' entitlement to learned counsel. *See Waggoner*, 339 F.3d at 918.

In arguing that a continuance is the proper remedy, the government also seems to imply here and elsewhere that, after the government informed the defense of its intent to reconsider the no-seek notice in February 2025, the defense somehow conceded the government's authority to proceed with the reconsideration (or at least confirmed notice) by moving to reappoint learned counsel and presenting mitigation with the Capital Case Section, while failing to request a "new deadline for any death penalty determination." (ECF No. 403 at 25.) But the defense's actions after February 7, 2025, were reasonable given the case's posture. In the face of sudden instability regarding the government's intentions and recognizing that the death penalty issue would potentially spur new litigation involving novel legal and factual issues, defense counsel understandably sought to reengage learned counsel. And defense counsel presented mitigation to the Capital Case Section in March – complying with the government's process—before the government had indicated any formal reversal in its final decision to this Court, when a second no-seek decision could, presumably, have left the posture of the case untouched. The government's insinuation that Defendant should have requested a new notice deadline is nonsensical, first because it is not Defendant's responsibility to facilitate an extension of the government's deadline, and second, because the defense maintains that the government is not entitled to one. Rather than making requests of the Court directly and giving the Court the opportunity to decline them, the government tries to shift the burden to Defendant.

1    The government similarly implies that the Court could have acted when, "aware of

2    this development [in February], granted the motion [for reappointment of learned counsel]

3    and did not provide a new deadline for any updated notice." (ECF No. 403 at 25.) But

4    again, the government took no action to update the Court as to any change to the standing

5    No-Seek Notice by status report and made no related requests of the Court until April.

6    The Court has simply addressed the issues before it without engaging in premature

7    analysis of unbriefed issues which had yet to materialize.

8    In short, the Court has the authority to set and enforce a reasonable death notice

9    deadline and will hold the government to the deadline it consented to here.

10    ### 3.    Judicial estoppel

11    The Court also finds—as a standalone basis for the use of discretion to strike the

12    Death Notice—that the principals of judicial estoppel preclude the government from

13    reversing its formal, timely-filed July No-Seek notice, especially where no case-related

14    developments occurred following the July Notice to bear on the reversal decision.

15    The doctrine of judicial estoppel is intended "to protect the integrity of the judicial

16    process," by "prohibiting parties from deliberately changing positions according to the

17    exigencies of the moment" and "playing fast and loose" with the courts. *New Hampshire*

18    *v. Maine*, 532 U.S. 742, 742-43, 749-51 (2001) (emphasizing that "where a party assumes

19    a certain position in a legal proceeding, and succeeds in maintaining that position, he may

20    not thereafter, simply because his interests have changed, assume a contrary position,

21    especially if it be to the prejudice of the party who has acquiesced in the position formerly

22    taken by him"). While "the circumstances under which judicial estoppel may appropriately

23    be invoked are not reducible to any general formulation," and are subject to the Court's

24    discretion, both Defendant and the government apply the three guiding factors set out by

25    the Supreme Court in *New Hampshire*, 532 U.S. at 742-43.[20] First, "a party's later position

26    _____

27    [20]As the government notes, there are two competing views of judicial estoppel,
neither of which appears to have been expressly adopted by the Ninth Circuit. "Under the
majority view, judicial estoppel does not apply unless the assertion inconsistent with the

28    claim made in the subsequent litigation "was adopted in some manner by the court in the

must be clearly inconsistent with its earlier position." *Id.* at 743. Second, courts "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* And third, courts ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* Each of these factors supports the application of judicial estoppel here.

As for the first prong, the government does not appear to dispute that its April Death Notice is "clearly inconsistent" with its earlier no-seek decision. (ECF No. 403 at 22-23).

As for the second prong, the government argues that the "Court has not been 'persuaded' by the government's prior notice not to seek the death penalty" and has "not 'adopted' the government's position regarding the death penalty in any meaningful way, particularly given the Court's continued ability to postpone trial for as long as necessary for Spurlock to adequately prepare for a capital trial." (*Id.* at 23.) The notion that the Court has not meaningfully relied on the no-seek notice because it can simply postpone trial at the government's whim shows tangible disregard for both the record and for the practical responsibilities of the Court—including the responsibilities of court staff and jury administrators. In setting the firm April 2025 trial date in August 2024, the Court *specifically* emphasized its reliance on the July 2024 No-Seek Notice in facilitating the progression of the case and in holistically evaluating the impact of any further continuance on Defendant's rights, after repeatedly cautioning that it would not set "stand-in" trial dates. (ECF No. 183.) The government emphasizes that when the Court set the April trial date, "it was [the setting for] a severed trial based on a different charging instrument."

---

prior litigation." Under the minority view, judicial estoppel can apply even when a party was unsuccessful in asserting its position in the prior judicial proceeding, "if the court determines that the alleged offending party engaged in 'fast and loose' behavior which undermined the integrity of the court." *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993). Here, however, the government was "successful" in asserting its no-seek decision, so this split is ultimately not determinative.

(ECF No. 403 at 22-23.) But that does nothing to change the fact that the Court expected the trial date to be firm. The Court has also adopted and relied on the July 2024 No-Seek Notice in other explicit and implicit ways, many of which the Court has already discussed, throughout the eight months since that decision, including by clearing its calendar, facilitating the withdrawal of learned counsel, addressing pretrial timing and motions with a scheduled non-capital trial in mind, and assuring Spurlock himself that he could trust the finality of the no-seek notice.

Turning to the third prong, the Court finds that the government would clearly "receive an unfair benefit" or "impose an unfair detriment" if not estopped. As Defendant notes, the government provides no real response to the arguments that "the defense would have litigated differently, interviewed witnesses differently, prioritized witnesses differently, approached and hired experts differently—had it not been informed the case was not capital" (ECF No. 409 at 18.) Preparation for a non-capital trial cannot be simply imported into a capital case, with its combined guilt and penalty phases. *See* ABA Guidelines, Guideline 10.10.1 (Trial Preparation Overall) (noting that when the government seeks capital punishment, defense "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies"). In order to present an "integrated defense theory" in a capital case, it is "critical" that such a theory be formulated "well before trial" and reinforced "during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." *Id.*

The government maintains that a continuance would cure any unfair advantage. But regardless of the impact of an another continuance on Spurlock's rights under the Speedy Trial Act per se, there is no real question that an additional delay would cause some degree of additional prejudice against him – because of the added pursuit of capital punishment itself, the impact of a no-seek notice on defense preparation, and simply the fact a delay would extend Defendant's time in pretrial custody. The Court's previous analyses of prejudice in these proceedings are wholly consistent with the finding of

1   prejudice here.[21] (*See* ECF No. 385 (noting, in the context of post-indictment delay, that

2   the protracted anxiety and concern caused by extended pretrial detention was

3   prejudicial). "Spurlock will never be in the position he was eight months ago" no matter

4   the length of any continuance: At many junctures, the capital or non-capital nature of a

5   trial may lead the defense to make decisions which are mutually exclusive to those which

6   would be made if the posture were different. (ECF No. 409 at 19.) *See, e.g.*, ABA

7   Guidelines 10.4, 10.5, 10.11.

8       Here, when the government filed its July No-Seek Notice, it led learned counsel to

9   withdraw and the defense to cease its capital-trial-focused aggravating factor and

10  mitigation investigations. By the time the government suddenly asked the defense to

11  prepare new mitigation for potential reversal of its no-seek decision, Spurlock had spent

12  multiple additional months in pretrial detention *without the real opportunity to continue his*

13  *mitigation investigation* or to integrate that investigation into his broader strategy, without

14  the benefit of learned counsel, and without advice from counsel related to continued

15  exposure to capital punishment. *See* ABA Guidelines, Guideline 10.4 (defense team

16  constructions), 10.5 (investigation requirements), 10.11 (preparation for penalty phase).

17  And relying on the no-seek notice, the defense made choices about how to handle

18  evidence, made representations about the scope of witness testimony, and made

19  representations to Spurlock about the progression of his case. *See* ABA Guidelines,

20  Guideline 10.9.1 (defense obligations to explore a plea agreement). The Court will not

21  _____

22      [21]The government argues (in requesting an opportunity to respond to any *ex parte*
    explanations of prejudice by Defendant) that Spurlock's alleged prejudice should be

23  "accorded great scrutiny" in light of the Court's previous evaluation of claims of prejudice
    throughout these proceedings. (ECF No. 403 at 23 n. 14). But in addressing post-

24  indictment delay, the Court has been explicit that it did not consider the new death notice
    because at the time the underlying motion was filed, the trial was still set for April 22,

25  2025, and the prospect of a new death notice had not yet been the source of any delay.
    (ECF No. 385 at 15 n. 16.) The Court also ultimately found, in evaluating the prejudice

26  factor under *Barker v. Wingo*, 407 U.S. 514, 530 (1972), that it was "obvious" that
    Defendant suffered prejudice as a result of his pretrial detention and the resulting anxiety

27  and concern, and that this factor weighed toward Defendant. In evaluating only *pre*-
    indictment delay, the Court found that Defendant had not shown "actual, non-speculative

28  prejudice" based on his discussions of lost witnesses, but again, the death notice was not
    relevant to this analysis. The Court's previous findings on prejudice are thus wholly
    consistent with finding non-speculative prejudice under the new circumstances.

1    speculate about the extent to which defense counsel or Spurlock himself would have

2    made different decisions if the government had timely disclosed its intention to seek the

3    death penalty. But neither will the Court ignore that a case on a capital track would have

4    involved material differences in defense preparations which cannot be recreated by

5    merely further continuing proceedings.

6         In arguing that Spurlock faces no prejudice here, the government seems to accuse

7    defense counsel of failing to continue simultaneous preparations for both capital- and

8    non-capital trials as a precaution. The government discounts, for instance, the fact that

9    Spurlock stopped his investigation into aggravating factors after the no-seek notice by

10   insisting that Spurlock "*has* presumably, prepared for trial and that would necessarily

11   require investigation into the aggravating factors" because those "overlap significantly

12   with any defense or defense investigation as to the charges in the current indictment [filed

13   contemporaneously with the April Notice]." (ECF No. 403 at 23-24.) But it is obvious that

14   a defense investigation in a non-capital case which incidentally involves potential

15   aggravating factors is not equivalent to the more resource-intensive investigation in a

16   capital case where specified aggravating factors have been noticed. And evidence

17   relevant to aggravating factor allegations may in fact be irrelevant, inadmissible, or

18   prejudicial at a non-capital trial to establish guilt.[22] The government further discounts the

19   fact that Spurlock ceased his mitigation investigation by suggesting that defense counsel

20   should have completed its mitigation review a year ago, by the time of its April 2024

21   presentation to the U.S. Attorney, and then accuses defense counsel of "believe[ing]

22   mitigation is somehow irrelevant at any other stage of a non-capital prosecution, such as

23   sentencing." (*Id.*) But of course, mitigation for a non-capital sentencing in front of a judge

24

25

_____

26   [22]As Defendant notes, this argument also misunderstands the permissible scope
     of a non-capital trial. (ECF No, 409 at 20.) For example, the government noticed, as an
27   aggravating factor allegation, that Spurlock "committed the offense in an especially
     heinous, cruel, and depraved manner in that it involved torture or serious physical abuse
28   to W.L. (Counts Three, Four, and Eight)." (ECF No. 365 at 3.) But much of the evidence
     supporting this allegation would not be admissible to prove guilt in a non-capital trial. The
     same is true about the noticed victim-impact aggravator.

1    is not the same as for the penalty phase of a capital trial, and a sound decision about

2    when and how to investigate mitigation for the former might be unsound for the latter.

3            The government further concludes that because "Spurlock has known for months

4    (since February [when the DOJ Memo was issued]) that the capital case protocol was

5    being reviewed," his "ignorance of the facts, evidence, and potential for capital

6    punishment remains drastically overstated." (*Id.* at 24.) But knowing that the government

7    *might* attempt to seek capital punishment is the starting posture of *any* case with death-

8    eligible charges. That is not enough. The benefits and detriments of the government's

9    reversed position are skewed to prejudice Defendant.

10           Finally, relying primarily on Third Circuit caselaw, the government argues that

11    estoppel is only appropriate when the government acts in "legitimate bad faith." (ECF No.

12    403 at 17.) *See Johnson v. State, Oregon Dep't of Hum. Res., Rehab. Div.*, 141 F.3d

13    1361, 1369 (9th Cir. 1998) ("Judicial estoppel applies when a party's position is

14    'tantamount to a knowing misrepresentation to or even fraud on the court.'") (quoting *Ryan*

15    *Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d Cir.1996)).

16    The Court declines to impute an artificially strict bad-faith requirement to the extent the

17    government asks it to adopt nonbinding interpretations from other circuits, especially

18    given the strength of other factors weighing towards estoppel here. *See New Hampshire*,

19    532 U.S. at 742-43 (permitting courts to consider relevant factors per discretion).

20           Moreover, even to the extent a party to be estopped "must have behaved in a

21    manner somehow culpable," as the government argues, the Court cannot divorce its

22    analysis of culpability from the singularly high stakes here, where the government seeks

23    to pursue the death penalty. *See Woodson*, 428 U.S. 280, 305 (1976) (emphasizing that

24    the death penalty is qualitatively different from even life imprisonment). When discussions

25    of bad faith have appeared in civil contexts involving estoppel, they have generally

26    centered on the actions of non-governmental litigants. Courts have interpreted bad faith

27    to mean "playing fast and loose with the courts"; the essential distinction is between

28    positions which are incompatible based "only on inadvertence or mistake" and positions

34

1  "so inconsistent that they amount to an affront to the court." *See Johnson*, 141 F.3d at

2  1369. *See also Ryan Operations G.P.*, 81 F.3d at 362-63 (finding no basis to conclude

3  that plaintiff deliberately asserted inconsistent positions in bankruptcy proceedings in

4  order to gain advantage, but comparing this to other circumstances in which a bankruptcy

5  litigant's affirmative duty to disclose, combined with a motive to conceal, worked "in

6  opposition to preservation of the integrity of the judicial system").

7       The government insists it has not engaged in bad faith because it has not

8  deliberately manipulated the Court or acted with intent to deceive, but only changed

9  position in accordance with new DOJ directives under a new administration. The Court

10  need not and does not reach a finding of misconduct in this narrow sense. But the fact

11  remains that the government decided—certainly not by inadvertence or accident—to

12  reverse course on an issue of critical importance, involving Spurlock's life, less than two

13  weeks before trial, with full knowledge that the reversal would have a chaotic impact on

14  the progression of this case and would make it impossible to proceed to trial on the

15  scheduled date. Under the circumstances, this is certainly tantamount to playing "fast and

16  loose" with the Court's orders in particular and the judicial process in general; the

17  government's good faith is cold comfort.

18       **B.    Violations of the FDPA, 18 U.S.C. § 3593**

19       Spurlock next argues that the government's April Death Notice violates the

20  requirements set out in the Federal Death Penalty Act, 18 U.S.C. § 3593, for two distinct

21  reasons. (ECF No. 374 at 29-36.) First, he asserts, the statute does not authorize the

22  government to reverse a no-seek decision, and even if the statute does permit reversal

23  of a no-seek notice, it would at minimum require a showing of "good cause," which the

24  government does not establish here. (*Id.* at 29-33.) Second, he contends that the timing

25  of the April Notice is not "reasonable." (*Id.* at 33-36.) The Court agrees with Spurlock on

26  both grounds.

27

28

Under 18 U.S.C. § 3593(a), when the government makes the decision to pursue death, it must file a notice with the Court meeting multiple requirements. The statute first provides:

> If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice.

18 U.S.C. § 3593(a). Next, the statute makes clear that the government's notice must:

> (1) stat[e] that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

> (2) set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

*Id*. The statute then provides examples of "factors for which notice is provided under this subsection" and states, "[t]he court may permit the attorney for the government to amend the notice upon a showing of good cause." *Id*. The statute makes no reference to *no-seek* notices; although it includes a clause on amendment, the statute is silent on the possibility of amending a no-seek notice to become a death notice. *See* 18 U.S.C. § 3593(a)(1) (defining the contents of a notice "that the government *will* seek the sentence of death") (emphasis added).

### 1.    Amendment of July 2024 No-Seek Notice

Spurlock first argues that the government's April Death Notice violates Section 3593(a) because the statute only permits amendment of a notice of intent to *seek death*, and only when the amendment specifically concerns the aggravating factors set out in accordance with subsection (a)(2) and there is a showing of good cause. He further argues that if the statute is read to allow amendment of no-seek notice such that it becomes a death notice, it must require good cause at a bare minimum. (ECF Nos. 374, 409 at 29.) The government, meanwhile, takes the position that "the FDPA does not require or pertain to" no-seek notices in any respect, or "impose any burden or prohibition

36

1    related to such a notice," so the government may change its position regarding the death

2    penalty with or without good cause. (ECF No. 403 at 26-27.)

3         To start, the Court agrees with Defendant that the FDPA must be read either to

4    prohibit withdrawal of a no-seek notice altogether or to require good cause to do so.

5    Reading the statute to allow reversal of a no-seek notice *without* good cause, as the

6    government proposes, would run contrary to the fundamental principles of statutory

7    construction and public policy. Under that reading, the government would be required to

8    show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but

9    would be at total liberty to modify its representations in the far more significant manner—

10   where a defendant's rights and a court's resources are most at stake—by deciding at any

11   time, for any reason, to seek the death penalty, after formally declaring the opposite. This

12   interpretation is nonsensical for many reasons, including because reversal of a no-seek

13   decision involves the noticing of *many* new aggravating factors, which are clearly the

14   central subject of 18 U.S.C. § 3593(a)(2)'s good cause requirement. A reversal of a no-

15   seek decision spurs more radical structural changes to the proceedings than any other

16   type of amendment. *See Waggoner*, 339 F.3d at 918 (discussing a no-seek notice as

17   generally "irrevocable" as a premise for determining the scope of a capital defendant's

18   expanded representation rights). In short, the government's approach would "render

19   meaningless a statute designed to give courts and defendants reasonable notice of the

20   government's death decision." (ECF No. 409 at 21.)

21        Thus, at a minimum, Section 3593(a) requires the government to make a showing

22   of good cause why, under the facts and circumstances of the case, it should be permitted

23   to amend a no-seek notice. Because, as described below, the government has failed to

24   meet this minimum possible requirement, the Court need not decide as a matter of

25   statutory interpretation whether Section 3593 prohibits reversal of a no-seek decision

26   *altogether*.[23]

27   _____

28        [23]The Court does not address the parties' dispute over whether amendment is
     permitted only to the noticed aggravators set out in subsection (a)(2) or as to the notice

Section 3593(a) does not provide further guidance on the meaning of good cause, and there is no binding Ninth Circuit authority on point. Nevertheless, the Court agrees with the reasoning in *United States v. Cuong Gia Le*, 316 F. Supp. 2d 343, 348-49 (E.D. Va. 2004), where a district court addressed the government's attempt to amend a death notice by adding aggravators and explained that "[o]n principal . . . it is clear that § 3593(a) good cause must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained. Here, as in other legal contexts, absent reasonable diligence, there can be no good cause." This focus is consistent with the meaning of good cause as applied to other federal rules and statutes, including in the Ninth Circuit. *See id.* (citing *In re Sheehan*, 253 F.3d 507, 514 (9th Cir.2001) (stating that "at minimum," good cause under Rule 4(m) "means excusable neglect"); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992) (stating that good cause under Rule 16(b) "primarily considers the diligence of the party seeking the amendment" and if the party "was not diligent, the inquiry should end")). *See also, e.g.*, *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) (finding good cause where "[a]t least one of the instances of violence added to the notice occurred after the filing of the original notice"); *United States v. McCluskey*, No. CR 10-2734 JCH, 2013 WL 12330139, at *2 n. 1, 5 (D.N.M. May 28, 2013) (not reported) (declining to apply the "due diligence" standard of good cause from *Cuong Gia Le* where the government amended of aggravators a significant amount of time before trial, distinguishing *Cuong Gia Le* based on "[t]he nature, seriousness, and number of new allegations" in that case). Where amendment is of a no-seek notice to seek death, the Court finds consideration of the government's diligence is particularly relevant and thus an appropriate part of the analysis.

---

as a whole, because even the most generous reading to the government – that the amendment clause applies to the notice as a whole – ends the question in Spurlock's favor.

1    The government, for its part, proposes "[a] definition of good cause which

2    emphasizes the good faith of the government and any resulting prejudice to the defendant

3    is sufficient to protect the defendant's and the public's interest in adequate notice." (ECF

4    No. 403 at 27 (quoting *United States v. Pretlow*, 770 F.Supp. 239, 242 (D.N.J.1991).) *See*

5    *also United States v. Cuff*, 38 F.Supp.2d 282, 285 (S.D.N.Y. 1999) (requiring a showing

6    of "unlawful or improper motive in the government's charging decisions"). As Spurlock

7    notes, however, the government's cited cases are several decades old and improperly

8    collapse the standards for amendment and for reasonable notice under Section 3593.

9    (ECF No. 409 at 25.) The Court thus declines to apply the government's standard.[24]

10    Here, to start, the government never sought leave to amend. *See, e.g., McCluskey*,

11    2013 WL 12330139. But even if the government had sought leave, it has not shown good

12    cause; the April Death Notice does not reflect "diligence" in "uncovering [] new

13    information." *Cuong Gia Le*, 316 F. Supp. 2d at 348-49. The essential facts supporting

14    the current charges and aggravators have been known to the government since the

15    original indictment. More importantly, all three homicides charged in this case had been

16    charged prior to the no seek decision, in the second superseding indictment filed on July

17    11, 2024. (ECF No. 127.) The government argues that there can "be no finding of

18    improper motive" or "deliberate delay," because the "substantively final charging

19    document" – the third superseding indictment (ECF No. 160) – was not filed until

20    September 12, 2024, and added an additional death-eligible count. (ECF No. 403 at 28-

21    29.) The government further emphasizes that the April 2024 mitigation presentation "was

22    made before another death-eligible murder was charged." (*Id.*) But this does not change

23    the fact that "[n]one of the modifications to the indictment after the no-seek decision were

24    to add charges corresponding to an entirely new set of criminal allegations. All relevant

25    information regarding the government's death decision was known at the time the

26

27    [24]Even under the government's definitions, however, it is appropriate to weigh
      prejudice resulting to Defendant in addition to the government's good faith. *See Pretlow*,

28    770 F.Supp. at 242. And as already discussed, there is significant prejudice to Spurlock
      militating against a finding of good cause, regardless of the government's insistence that
      its motives were pure.

1    government submitted its notice of intent not to seek death." (ECF No. 374 at 32.) Indeed,

2    the government made no indication of any substantively new information or investigation

3    causing it to revisit its no-seek decision for more than four months after the third

4    superseding indictment was filed in the fall of 2024—only stating its intent to reconsider

5    on the date the DOJ Memo was issued. Moreover, the fact that the capital case review

6    process was completed before the government superseded largely reflected that the

7    government was slower to supersede than it anticipated.[25]

8        In sum, to the extent the government attempts to superimpose a post-hoc case-

9    development related argument for good cause, this rings hollow. *See Cuong Gia Le*, 316

10   F. Supp. 2d at 348-49. Accordingly, the Court finds that the government has violated the

11   FDPA by attempting to reverse its formal no-seek decision without leave to amend, and

12   without showing good cause to amend—even assuming, without deciding, that the FDPA

13   allows amendment of a no-seek notice to seek death for good cause.

14            **2.    Timing of Death Notice**

15       The April 10, 2025, Death Notice also violates the statutory requirement that the

16   government file a notice of intent to seek the death penalty "a reasonable time before the

17   trial." 18 U.S.C. § 3593(a). Indeed, the April Death Notice is so clearly untimely that few

18   courts have had occasion to apply § 3593(a) in comparable circumstances; striking the

19   notice is merited.

20            **a.    Time between Death Notice and trial**

21       The government filed its notice of intent to seek death, listing statutory aggravators,

22   on April 10, 2025. (ECF No. 365.) Trial was set for April 22, 2025—12 days later.

23

24

25       [25]It is also worth noting that the reason the defense's mitigation presentation
26   occurred before the substantively final charging document was filed, and the reason the
     third superseding indictment was filed after the July 2024 No-Seek notice, was primarily
27   because the government took months longer than it represented it expected at the
     January 2024 status conference to supersede, and improperly joined counts when it did.
28   (ECF No 97.) It was no secret the government would likely add charges related to the
     murder of J.S. Thus, the Court will not credit "new charging developments" after the no-
     seek notice when they were really only delayed developments.

To the extent the government implies the defense was effectively on notice of its intent to seek death *before* April 10, 2025, and that additional time preceding the notice should be incorporated into a reasonableness analysis as a result, that argument is uncompelling. The government cannot satisfy its burden to file a formal death notice complying with Section 3593(a) by equivocations or vague references to future filings. A proper notice must formally lay out circumstances and aggravators believed to justify the imposition of capital punishment. *See* 18 U.S.C. § 3593(a). The government's statement to the defense that reversal was a "possibility" in February 2025 did not amount to notice because it provided no certainty as to the government's new position whatsoever. Tellingly, at the March 27, 2025, status conference, government counsel indicated they had called DOJ and learned that Spurlock's case had arrived at the Attorney General's desk for a decision "as of yesterday [March 26, 2025]," but that they did not yet know what the Attorney General's decision would be (ECF No. 400 at 47).

Nor did the government give "notice," within the meaning of Section 3593(a), on April 4, 2025, when it originally moved to continue trial and stated the Attorney General had "authorized government counsel to inform the Court" of its *plans* to file a notice of intent to seek death, without filing a death notice itself. (ECF No. 346.) At that time, Spurlock had not yet been indicted for aggravators under 18 U.S.C. §§ 3591 and 3592; these were only included in the fifth superseding indictment submitted five days later, contemporaneously with the notice including the information required by the FDPA. The defense, in responding to the motion to continue, also made clear its position was that the government had no basis for the request, as the government had "not filed a notice to seek death under 18 U.S.C. § 3593 nor has this Court given it permission to do so" (ECF No. 353), and the Court denied the request for a continuance (ECF No. 357). Although the government asserts "[t]he notice to seek was not a surprise [and] did not come out of thin air," the government cannot distance itself from the pivotal date on which it actually filed its notice.

Similarly, to the extent the government implies that the April 22, 2025, trial date was not firm so the Court could simply continue trial to rescue the late Death Notice, the record belies that contention. The Court made clear that it expected the April trial date to be firm. The defense timely met every pretrial deadline and filed nine pretrial motions[26] (ECF Nos. 243, 244, 254, 255, 256, 257, 258, 263, 264), nine expert notices (ECF Nos. 266, 267, 268, 269, 270, 271, 272, 273, 345), and three *Daubert* challenges (ECF Nos. 321, 322, 323.) The Court repeatedly reaffirmed its intention to resolve the pending motions before the trial date, and has done so.[27] Elsewhere in its response, the government insinuates broadly that the defense's motions serve as a means of severing or delaying counts for trial, for a "fishing expedition for grand jury transcripts," or "for an avenue to avoid the potential capital punishment of which Spurlock had already been placed on notice on February 7." (ECF No. 403 at 15.) But the Court cannot conclude that any of these pretrial motions were filed for the purpose of delay, rather than standard defense practice, especially when the Court has given the government multiple opportunities to correct improperly joined counts. In short, there is no reason to believe that the defense was unprepared to go forward with a non-capital trial on April 22.

### b.    Untimeliness

While there is no brightline test or consensus among the circuits regarding what constitutes reasonable notice, no judicial authority supports a finding that the April Death Notice here was reasonable.

---

[26]The pretrial motion deadline was continued by one week, from March 5 to March 12, to accommodate the defense team's mitigation presentation in Washington, D.C., on March 10. (ECF No. 235.)

[27]The government notes in a footnote, without context, that draft joint trial documents had been sent to the defense and "[t]he government never received a response." (ECF No. 403 at 17.) But these documents were due on April 15—after the motion to strike was filed. And after the government inquired about the deadline for the documents at the April 15, 2025, status conference, the Court continued the deadline to May 20, 2025. (ECF No. 384 at 24.) Similarly, the motion to sever count 4, was related to the motion to dismiss Count 4, and cannot reasonably be interpreted as an attempt by the defense to delay trial.

1    Two Circuits—the Fourth and Eleventh Circuits—have established guiding

2 approaches to objective reasonableness under Section 3593, identifying overlapping but

3 distinct factors to consider in assessing the timing of a death notice.

4    In *United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003) (Luttig, J.), the Fourth

5 Circuit evaluated a death notice filed roughly six weeks before the scheduled trial date,

6 setting out four relevant, non-exhaustive factors: "(1) the nature of the charges presented

7 in the indictment; (2) the nature of the aggravating factors provided in the Death Notice;

8 (3) the period of time remaining before trial, measured at the instant the Death Notice was

9 filed and irrespective of the filing's effects; and . . . (4) the status of discovery in the

10 proceedings." *Id.* at 737.[28] With regard to the third factor, the court concluded the time

11 between the filing of the notice and the trial should be measured *without considering any*

12 *further continuance* spurred by the late-filed notice. *See id.* at 739. "[I]f a trial date is

13 continued because the filing of the Death Notice is too close to the trial date, the Death

14 Notice is per se unreasonable." *United States v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D.

15 Va. 2004).[29] *See also Cuong Gia Le*, 316 F. Supp. 2d 343 (finding 94 days' notice

16 unreasonable); *United States v. Hatten*, 276 F. Supp. 2d 574, 579 (S.D.W. Va. 2003)

17 (finding 36 days' notice unreasonable).

18    Several years later, in *United States v. Wilk*, 452 F.3d 1208 (11th Cir. 2006), the

19 Eleventh Circuit considered *Ferebe* and adopted a modified formulation of the relevant

20 factors. The *Wilk* court provided that, in considering the totality of the circumstances, a

21 district court should evaluate at least "(1) what transpired in the case before the formal

22 Death Notice was filed; (2) the period of time remaining for trial after the Death Notice

23

24    [28]*See also id.* at 735 (noting evidence that the government typically files a death notice an average of 8.4 months before trial).

25    [29] After finding that "[t]he record d[id] not clearly reveal whether, at the instant the
26 Death Notice was filed, a [firm rather than merely placeholder] date existed on which
Ferebe's trial was set to begin," the *Ferebe* court remanded for the district court to clarify
27 whether it had established a firm trial date and, if so, to apply the objective
reasonableness standard. 332 F.3d at 740. On remand, the district court calculated that
28 the trial was firmly scheduled to begin 39 days after the filing of the death notice, and held
that this was "not enough time for Ferebe to have prepared his death defense." *United
States v. Ferebe*, No. L-97-0329, 2005 WL 1429261, at *8 (D.Md. June 16, 2005).

was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." *Id.* at 1221. With regard to the amount of time before trial, whereas the Fourth Circuit test assesses reasonableness based on the *current* trial date when a notice is filed "irrespective of the filing's effects," the Eleventh Circuit concluded that a court need not limit its analysis to the currently-scheduled trial date. *See id.* at 1223. Reasoning that in many cases, "[c]ontinuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice," the court found that "even if the district court continued the trial . . . wholly or in part to remedy a Death Notice that would otherwise be untimely without a continuance or to remove any issue about its timeliness, the district court acted properly." *Id.* at 1223-24. *See also id.* at 1225 (concluding, after accounting for the continued trial date, that six months was reasonable notice).

In a 2009 unpublished decision, the Ninth Circuit applied the Eleventh Circuit's approach. *See United States v. Williams*, 318 F. App'x 571, 572 (9th Cir. 2009) ("We agree with the [reasoning in *Wilk*] which held that in assessing reasonableness, a court is not limited to the interval between the time the notice was filed and the trial date at the time of that filing, irrespective of any trial continuances."). In *Williams*, the government filed a death notice 75 days before a scheduled trial. *See id.* The defendants then "stipulated to waive time under the Speedy Trial Act," after which the court continued trial for roughly six months. *Id.* The Ninth Circuit ultimately found that the notice was reasonable, considering the ten-month interval between the death notice and the continued trial date. *See id.* at 572-73 (citing *Wilk*, 452 F.3d at 1222-23). The court emphasized, however, that there was "no concern . . . about any conflict between the right to a speedy trial and the right to reasonable notice under section 3593," because defendants had waived time "before the district court continued the trial date." *Id.* at 573.

Here, as a foundational matter, there is little debate that a defendant cannot prepare for a capital trial with only 12 days of notice. The government acknowledged as much by requesting a continuance of the trial date contemporaneously with its Death Notice. (ECF No. 366.) Spurlock contends that the Court should apply the approach in *Ferebe* (considering only the April 22 trial date) and the government contends that the Court should instead apply *Wilk* and *Williams* (permitting consideration of the brief continuation to June 3). But the bulk of the factors are substantially the same across both approaches, and the Court has no difficulty concluding the April Notice is untimely under either. Because the April Notice is so clearly untimely even under the more lenient approach, the Court will focus its analysis on each of the six factors set out in *Wilk*.[30]

Under the first *Wilk* factor, the Court considers "what transpired in the case before the formal Death Notice was filed." 452 F.3d at 1221. Here, the government's only argument amounts to a vague summary of developments in the case over the last year. The government states it "continued to investigate charges . . . and filed superseding indictments that built upon each other as the investigation progressed," and that Spurlock was then "informed that the Department of Justice was reevaluating prior decisions." (ECF No. 403 at 29.) But again, the government has not identified any investigative developments which materialized after the no-seek decision, let alone any which would justify a reconsideration. *See Hatten*, 276 F. Supp. at 578 (considering that "[n]othing occurred in the procedural development of the case to impede the Government's review and decision as to the factors it would assert to justify the death penalty"). Between July 2024 and early February 2025, the government was silent on any plan to reconsider its no-seek notice, maintaining that silence for multiple months after the substantively-final charging document was filed and only breaking it hours after the DOJ Memo was issued.

---

[30]The Court notes, however, that it is not convinced the Ninth Circuit's ruling in *Williams* affirmatively suggests the *Wilk* approach must be applied here, given the distinct factual circumstances underlying that brief unreported decision.

The mere existence of the no-seek notice also distinguishes this case from *Wilk*, where "from the start, all parties knew [it] was a likely death penalty case," and the defense had begun to prepare a death defense months before the notice was filed, including by hiring mitigation experts and engaging in discussions about death-qualifying a jury. *Wilk*, 452 F.3d at 1222. And importantly, in *Wilk*, the statutory aggravating factors listed in the death notice were the same as those disclosed in a superseding indictment four months earlier, whereas here, no aggravating factors were included in any charging documents preceding the fifth superseding indictment, filed the same day as the April Death Notice. This factor weighs strongly toward Spurlock.

The second *Wilk* factor is "the period of time remaining for trial after the Death Notice was filed," taking into account post-death notice continuances. *See* 452 F.3d at 1221. The Court has now continued the trial from April 22, 2025, to June 3, 2025, and has made clear that this continuance is *solely* due to "defendant's motion to strike notice of intent to seek death penalty—which was . . . predicated on the notice of intent to seek death penalty filed about 10 days before trial." (ECF No. 381.) The brief continuance reflects the time needed to resolve the motion to strike on an expedited schedule, as well as the minimum time needed to reissue jury summons (three weeks). Spurlock maintains that the Court should decline to consider the additional continuance. (ECF No. 409 at 29 (citing *Ferebe*, 332 F.3d at 737); *Ponder*, 347 F. Supp. 2d at 267 ("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable."); *Cuong Gia Le*, 316 F. Supp. 2d at 352).) Considering the unique posture of this case, the Court agrees with Spurlock that it need not consider this additional time. As further addressed below, the circumstances here are fundamentally different from those in *Williams* and other similar cases, where incorporating a continuance into an analysis of reasonableness aligns with a defendant's speedy trial rights.

Nevertheless, even if the Court considers the period between the April 10 notice and the new trial date of June 3, as the government proposes, this amounts to only 54

days of notice. That is still grossly insufficient, for substantially the same reasons 12 days of notice is insufficient. Indeed, the government fails to cite to any case suggesting even 54 days would be sufficient notice, especially where there are complex charges. This factor again weighs toward Defendant.

The third *Wilk* factor is "the status of discovery and motions in the proceedings." 452 F.3d at 1221. In *Wilk*, this factor weighed against the defendant because the defense had yet to disclose extensive discovery on the eve of the originally-scheduled trial; the circuit court then concluded that, "six months was …enough time" to complete remaining pretrial discovery and motions considering the continued trial date. *Id.* at 1218, 1225. Here, the government states only that by the time the Death Notice was filed, Spurlock had "received practically all discovery" but that pretrial motions were still outstanding. (ECF No. 403 at 29-30.) But the government has presented no compelling argument to suggest that defendant was unprepared to proceed to trial on April 22. The Court was prepared to resolve all pretrial motions before trial. And even considering the June 3 trial date, that date would leave insufficient time to address any capital-trial related pretrial motions. Thus, this factor also favors Spurlock.

The three remaining *Wilk* factors are "the nature of the charges in the indictment, "the nature of the aggravating factors claimed to support the death penalty," and the "anticipated nature of the defense, if known." *Id.* at 1221. The government asserts that these prongs "all blend together such that Spurlock remained reasonably on notice at the time of filing." (ECF No. 403 at 30.) But these factors neither blend together nor suggest that Spurlock was adequately on notice. As for the nature of the charges, this case is complex: it involves an eight-count indictment charging three homicides, a drug distribution conspiracy, and a Hobbs Act robbery. The short notice is even more clearly unreasonable taking this complexity into account. As for the five aggravating factors, the Court notes once again that aggravator allegations were indicted for the first time less than two weeks before trial, simultaneously with the Death Notice. And while the Court

1  will not speculate about the nature of Spurlock's defense, it again notes his reliance on

2  the no-seek decision as an interruption to his ability to prepare a capital defense.

3      Moreover, as Spurlock notes, under both *Ferebe* and *Wilk*, the Court may properly

4  consider additional factors bearing on reasonableness. *See, e.g.*, *Wilk*, 452 F.3d at 1221

5  (stating courts "must consider the totality of the circumstances"). Here, the government's

6  disavowal of its no-seek decision sets this case doubly apart. *United States v. Colon-*

7  *Miranda*, 985 F. Supp. 31 (D.P.R. 1997) is persuasive in this respect. *See also United*

8  *States v. Colon-Miranda*, 985 F. Supp. 36 (D.P.R. 1997) (reaffirming ruling). In *Colon-*

9  *Miranda*, a district court similarly addressed the reversal of a no-seek decision. There, the

10  government filed a death notice, withdrew it after 15 days, then invited the defense to

11  present to the capital case review committee and attempted to revive the case's death

12  penalty status shortly before trial.[31] *See* 985 F. Supp. At 32. The district court refused to

13  allow the government to seek death, emphasizing, "[i]t is frankly impossible that, in the

14  span of three weeks, an adequate defense could be simultaneously mounted to face both

15  the hearing before the Attorney General and the immediately subsequent trial." *Id.* at 34.

16  On the whole, the government's actions created "an uncomfortable, rushed procedural

17  scenario that offends traditional notions of fair play, preventing [the defense] from

18  effectively representing their clients." *Id.* at 35. Similarly, here the Court is "not

19  sympathetic to the government's sudden change of mind regarding such a serious

20  matter." *Id.*

21      In sum, the balance of enumerated and other relevant factors clearly demonstrates

22  that the April Death Notice was untimely.

23              **c.    Inadequacy of continuance**

24      The government also argues, once again, that a continuance would cure its

25  violation of Section 3593 and make its April Death Notice timely. (ECF No. 403 at 30-31.)

26

27      [31]The government's attempts to distinguish *Colon-Miranda* on the basis that in that

28  case, the government acted with more "ambivalence" and defendants had no access to
learned counsel, are unpersuasive. The fact that a DOJ memo motivated the shift does
not change that its effect within this case is profound ambivalence.

For support, the government points to *Williams*, where the Ninth Circuit based its finding of reasonableness on the ten-month interval between the government's death notice and the continued trial date, rather than the 75-day interval between the notice and the trial date when it was filed. (*Id.* (citing *Williams*, 318 F. App'x at 573).) But in *Williams*, defendants waived their speedy trial rights *before* trial was continued. *See* 318 F. App'x at 572-73. There, the Ninth Circuit emphasized that by continuing trial, "the district judge sought to ensure that the Defendants' rights under section 3593 were protected," and thus acted in service of "[t]he obvious intent of section 3593(a) to ensure that both parties, especially the defendant, have adequate time to prepare for a capital trial." *Id.* at 573. This aligns with the core reasoning in *Wilk*, where the Eleventh Circuit noted that continuing a trial date after a death notice "in order to make sure defense counsel has adequate preparation time" should be "commended" because doing so "does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice." 452 F.3d at 1223-24. And in *Wilk*, as noted, the defense had treated the case as a de facto death case since day one. *See id.* In other words, the *Williams* and *Wilk* courts recognized that a continuance may *vindicate* a defendant's rights, and an approach which sets a formulaic "outer limit" of reasonableness at the trial date when the notice is filed could fail to account for this and create perverse incentives. *See Wilk*, 452 F.3d at 1222 (rejecting idea of an "outer limit").

Here, by contrast, a further continuance would in no way vindicate Spurlock's rights. Unlike the *Williams* defendants, Spurlock has not waived time. Under these circumstances, the sole effect of a continuance would be to legitimize the government's otherwise egregiously untimely filing. If a continuance were a proper remedy here, it would be a proper remedy *whenever* a notice of death is untimely. That is not the result contemplated in *Wilk* and *Williams* (and regardless, although those courts caution against setting an outer limit neither of those cases *require* the Court to consider the continued trial date).

49

1    The other nonbinding cases the government cites to support that a continuance

2    may sometimes be preferable to striking a notice—including the only case involving as

3    little as 12-days notice—are also easily distinguishable. *See, e.g.*, *United States v.*

4    *McGriff*, 427 F. Supp. 2d 253 (E.D.N.Y. 2006) (discussing Defendant's late-submitted

5    mitigation as a primary reason for the postponement)[32]; *United States v. Pepin*, 367 F.

6    Supp. 2d 315, 319 (E.D.N.Y. 2005) (finding "[t]he course of action taken by the parties

7    established that the [scheduled] trial date was impracticable" independent of the death

8    notice).

9    The Court's concerns here are, however, similar to those raised in *Colon-Miranda*.

10   In *Colon-Miranda*, the district court emphasized that if it granted the government's

11   eleventh-hour request for a continuance in conjunction with a belated death notice, the

12   government would effectively employ "the court as an arm of the prosecution." 985 F.

13   Supp. 31 at 32. As the district court made clear, in these circumstances, a continuance is

14   "offensive to the notions of [fair play] and due process," which "are particularly keen when

15   the ultimate sanction is death." *Colon-Miranda* 985 F. Supp. 36 at 38-39 (reaffirming

16   ruling). A continuance would similarly offend principals of basic fairness here.

17   Finally, it is notable that the government has been repeatedly evasive about how

18   long a continuance it believes will ultimately be required if the case goes forward as a

19   capital case. (*See* ECF Nos. 346 (requesting to continue trial before filing the Death

20   Notice "to give the parties sufficient time to prepare" but providing no specification as to

21   the length of the delay requested); 366 (requesting to continue trial on the date the Death

22

23   [32]In *McGriff*, the government also noticed its intent to seek death 12 days before a
     firmly set trial. *See id*. The district court "had no difficulty concluding that 12 days is
24   not…objectively reasonable," doubting that such a short period would "ever be adequate
     notice in even the most straightforward homicide prosecution," let alone in a complex
25   case. *Id*. The court then concluded that the proper remedy for the untimely notice was
     severance and a continuance, largely because the delayed notice could be explained by
26   ongoing investigation into McGriff's role as a leader of a criminal enterprise and because
     McGriff "[wa]s responsible for a good portion of the time it took the U.S. Attorney to make
27   her recommendations" as a result of his own delays in submitting mitigation. *Id*. The
     district court also considered the "relatively reasonable period of time it subsequently took
28   the Government to reach its decision." *Id*. The court noted that these circumstances made
     McGriff's position unique among his co-defendants, "whose circumstances might very
     possibly have tipped the balance in favor of striking" a death notice. *Id*.

1    Notice was filed and asking for a brief 30-day continuance to resolve the pending Motion

2    but providing no specification as to a longer future continuance).) At the April 15, 2025,

3    status conference, when pressed, government counsel represented, at first, that they

4    could be prepared to proceed with a capital trial on June 3, but that they expected

5    Defendant to request a further continuance. But when asked directly, "How much of a

6    continuance does the government think it needs to properly prosecute a [death case]?"

7    government counsel replied that they would need "90 days." (ECF No. 384 at 4-6.) It

8    seems from these vague representations that the government has wished to avoid

9    responsibility for any continuance—signaling its intention to wait until the defense is

10   forced to request a postponement, over Spurlock's personal objection. At the same time,

11   the government now asserts that a continuance of undetermined length is a full solution

12   to an untimely notice. Where the government has not been forthcoming about its own

13   position and where there is a clear underlying violation of Section 3593, the Court will not

14   use its discretion to grant a continuance.

15         **C.    Violation of Spurlock's Sixth Amendment Rights**

16         The Court also finds that seeking death now violates Spurlock's Sixth Amendment

17   speedy trial and due process rights. As the Court has discussed at length, in filing the

18   Death Notice less than two weeks before trial, the government has also sought to continue

19   trial. The government has also acknowledged that both parties would likely need at least

20   90 days to prepare. (ECF No. 384.) While the Court has already addressed delays

21   *preceding* the Death Notice and has declined to impose the drastic remedy of dismissing

22   the indictment for government delay (ECF No. 385), the Court has also made clear that it

23   will take seriously any further burdens to Spurlock's Sixth Amendment rights. Now faced

24   with the narrower question of the Death Notice's impact on Spurlock's rights, the Court

25   concludes that a further continuance to allow the government to proceed with a capital

26   trial would be significant in length, and most importantly, in extreme degree of prejudice.

27   Striking the Death Notice—a less drastic remedy than dismissal of the case—is

28

1   appropriate. *See United States v. Lopez-Matias*, 522 F.3d 150, 154 n.9 (1st Cir. 2008)

2   ("Dismissal of the Notice is not as extreme as dismissal of an indictment.").

3       To determine whether the government's request to continue the trial date to

4   prepare to seek Spurlock's death violates his Sixth Amendment right to a speedy trial, the

5   Court considers four factors: (1) the length of the delay, (2) the reason for the delay, (3)

6   the defendant's assertion of his right, and (4) prejudice to the defendant. *See Barker v.

7   Wingo*, 407 U.S. 514, 530 (1972).[33]

8       First, as to the length of the delay—which is a threshold issue—the Court considers

9   "whether the time from indictment to trial crossed the line dividing ordinary from

10  'presumptively prejudicial,'" which is normally considered to be approximately a year. *See

11  United States v. King,* 483 F.3d 969, 976 (9th Cir. 2007). Considering only the delays up

12  to the April 22, 2025, trial date, the Court has previously found that this factor weighed

13  towards the government, given the complexity of the case, despite the length of time

14  Spurlock has spent in custody. A further extended delay for a capital trial would, however,

15  significantly weaken the already tenuous degree to which this factor favors the

16  government.

17      The second factor—the reason for the delay—weighs strongly towards Defendant

18  when contemplating a capital-trial delay. The responsibility for the untimely Death Notice,

19  filed twelve days before trial, falls entirely on the government. Here, the government

20  largely refers to the Court's previous rulings on discovery and superseding indictment

21  delays, without providing any arguments pertinent to the current posture of the case. The

22  government insists it "need not charge every possible crime at the outset of a case," that

23  "[t]he government provided valid reasons for its decision to supersed[e] three times . . .

24  including the year it took to supersede to add charges relating to J.S.'s death," and that

25  "this Court already declined to find the government's handling of the discovery process to

26

27      [33]In applying the *Barker* factors to deny Defendant's motion to dismiss for
    government delay, the Court made clear that its ruling was cabined to the arguments
28  asserted in the underlying dismissal motion, filed when trial was still set for April 22, 2025,
    and the April Death Notice had not yet been filed.

be the reason for the continuances of trial up to April 22, 2025." (ECF No. 403.) But again, the issue now before the Court is not the state of discovery before the continuance to April 22, 2025. It is the case's death penalty status and the additional litigation related to that status. Moreover, in denying the motion to dismiss for government delay, while the Court ultimately found that discovery delays were not the reason for the continuance to April 2025, it also stated that it "agrees with Defendant that the chaotic disclosure of significant discovery close to trial is concerning, particularly to the extent it puts Spurlock in a Catch 22 position: defense counsel may effectively face a choice between advocating for Defendant's speedy trial rights and being prepared for trial, while in the meantime the government is positioned to disclaim responsibility." (ECF No. 385.) The Court's concern about the government's chaotic decisions, and the Catch 22 position imposed on the defense, are even more acute now.

The government also argues that "while the continuance may have been prompted by the government's notice of intent to seek and Spurlock's instant motion, the Court originally proposed a delay of one week" and that "Spurlock's attorney requested adequate time to fully brief the instant motion," such that "Spurlock therefore accounted for at least a portion of the six-week delay." That is an extremely strained reading of the record. Government counsel also expressed the need to have time to respond to the Motion when the Court proposed a shortened schedule, and the Court ultimately set the June 3 trial date based on the need for full briefing, the need to reissue jury summons, and the Court and the parties' respective schedules. That Defendant wished to thoroughly address an issue of such gravity certainly does not absolve the government of responsibility in causing delay.

As the government acknowledges, the Court has already found that the third and fourth *Barker* factors—Defendant's assertion of his speedy trial rights and prejudice— weigh in Spurlock's favor, even without considering the death notice. (ECF No. 385.) Spurlock has consistently asserted his speedy trial rights. The significance of his repeated invocation of his rights is particularly meaningful now, when the government's late-filed

notice depends on a further continuance. As for the prejudice factor, the Court has recognized prejudice stemming the length of time Spurlock has been in custody (four years in total since his arrest, and two in federal custody) during which he has faced cognizable "anxiety and concern." (*Id.*) If the government precedes with a capital trial now, that prejudice will become extreme. Not only has Spurlock been detained for an extensive period, but he has now been told that the United States would not pursue death against him, and then that it would, in a dizzying manner. This constitutes far worse than average "anxiety and concern." Spurlock's life is, quite literally, in the balance. And of course, Spurlock faces prejudice in other ways identified throughout this order. "The defense has spent eight months preparing for a trial that is fundamentally different in nature than the trial that will occur if the death notice stands." (ECF No. 374 at 38.)

In sum, the *Barker* factors weigh in Spurlock's favor with regard to any late-stage capital-trial-related delay. Allowing the Death Notice to stand would violate Spurlock's Sixth Amendment rights, and striking the notice is also merited on that basis alone. Because the Court has made strong findings on each of Spurlock's first three grounds for striking the Death Notice, it does not reach the other grounds.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion to strike the United States' notice of intent to seek the death penalty (ECF Nos. 374) is granted.

The Clerk of Court is further directed to strike the government's notice of intent to seek the death penalty (ECF No. 365).

It is further ordered that Defendant's motion for leave to file excess pages (ECF No. 408) is granted.

///

It is further ordered that Spurlock's non-capital trial will proceed on June 3, 2025.

DATED THIS 9th Day of May 2025.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE