UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br>v.<br><br>CORY SPURLOCK,<br><br>                    Defendant. | Case No. 3:23-cr-00022-MMD-CLB-1<br><br>ORDER |

**I.      SUMMARY**

Defendant Cory Spurlock was indicted on eight counts. Following a jury trial, the jury entered a verdict of guilty on seven counts and deadlocked on one count (count two).[1] (ECF No. 714.) Defendant filed a motion for judgment of acquittal, or, in the alternative, for a new trial. (ECF No. 719 ("Motion").)[2] For the reasons discussed below, the Court denies the Motion.

**II.     RELEVANT BACKGROUND**

The bodies of Will Larsen ("Larsen" or "W.L.") and Yesenia Larsen ("Y.L.") were found on the side of U.S. Highway 395, north of Bridgeport, California in November 2020. A body, later identified to be of Jered Stefansky (J.S.), who was reported missing in June 2020, was discovered in Pershing County, Nevada in March 2021. Defendant was indicted on charges involving all three killings allegedly arising in part from marijuana trafficking that involved a location in Mound House, Nevada. The Fifth Superseding Indictment charged Defendant with eight counts: (1) conspiracy to possess with intent to distribute and to distribute marijuana between November 2019 and June 2020; (2) murder

---

[1] The Court subsequently granted the government's motion to dismiss count two. (ECF No. 722.)

[2] The government responded (ECF No. 726) and Defendant replied (ECF No.728).

while engaged in narcotics trafficking relating to the killing of J.S. between November 2019 and June 2020; (3) murder for hire conspiracy relating to the killing of W.L. between October 2020 and March 2021; (4) tampering with a witness by killing of W.L. on or about November 2020; (5) stalking resulting in death relating to W.L. between October and November 2020; (6) stalking resulting in death relating to the killing of Y.L. between October and November 2020; (7) interference with commerce by robbery in November 2020; and (8) causing death of W.L. through use of a firearm during and in relation to a crime of violence in November 2020. (ECF No. 363 (Fifth Superseding Criminal Indictment); ECF No. 470 (striking special findings in the Indictment).) On the third day of deliberations, the jury returned a verdict of guilty on counts one, three, four, five, six, seven and eight; the jury deadlocked on count two. (ECF No. 714.)

Defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) ("Rule 29 Motion") after the government's case in chief. (ECF No. 683.) The Court heard argument and orally denied the motion. (ECF No. 688.) Defendant subsequently renewed the motion at the close of the defense's case and again after the government's rebuttal. (ECF Nos. 700, 711.) The Court denied the motions. (*Id.*)

**III.   DISCUSSION**

The Court reviews Defendant's post-verdict motion for judgment of acquittal renewing his earlier Rule 29 Motion under a sufficiency of the evidence standard. *See United States v. Gonzalez*, 528 F.3d 1207, 1211 (9th Cir. 2008). A criminal defendant's challenge to the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979). *Jackson* requires a court, upon such a motion, to construe the evidence "in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). When "'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"

*United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson*, 443 U.S. at 326).

Citing to the correct standard, Defendant then repeatedly grounds his arguments on how the government relied primarily on two cooperating witnesses (B.K. and O.O.), whose testimony lacked credibility and should be disregarded. (ECF No. 719 at 17, 19, 21-22.) But "it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). Moreover, when considering conflicting inferences, the Court "must presume . . . that the trier of fact resolved any conflicts in favor of the prosecution." *Nevils*, 598 F.3d at 1164 (internal quotation marks omitted). As further discussed below, Defendant essentially asks the Court to construe the evidence in the light most favorable to him and asks the Court to resolve any conflicting inferences in his favor.

The Court offers one glaring example here. In connection with his discussion of the element of fear essential to count five and of Spurlock's commission of the criminal acts, Defendant separately discussed and discounted B.K. and O.O.'s testimony. Defendant noted that B.K. testified about what Spurlock recounted to him and pointed to the absence of mention of any threats to Larsen. (ECF No. 719 at 19-20.) But the part of B.K.'s testimony relevant to support an inference of fear is that Spurlock said that he shot Larsen, but that did not put him down; he tried again but the gun jammed so he used a knife to stab him.[3] This testimony coupled with O.O.'s testimony—that when she got out of the vehicle, she saw Larsen, who "looked startled" and had a "nervous laugh"—when construed in the light most favorable to the prosecution, could allow a rational trier of fact to find Larsen experienced fear of being stalked before his death. In his reply brief, Defendant argues that O.O.'s testimony as to Larsen's nervous laugh could not evidence fear because Spurlock had his hands in his pocket and Larsen was shot when he turned

---

[3] Dr. Knight's testimony as to Larsen's cause of death—multiple gunshot wounds and sharp force injuries—is consistent with B.K.'s testimony as to how Spurlock recounted his killing of Larsen.

toward the driver's seat. (ECF No. 728 at 9.) But presuming any conflicting inferences must be resolved in the government's favor, a rational juror could find that Larsen's nervous laugh was evidence of fear seconds before his death even if he did not see Spurlock with a firearm, given the circumstances of the encounter. Spurlock and Larsen experienced a falling out during the course of their marijuana trafficking operation months earlier, and Larsen and his wife were driving home from Reno on a remote stretch of U.S. Highway 395 on a dark November evening when the vehicle behind them flashed their headlights to suggest there was an issue with the trailer. After he pulled over, Larsen encountered Spurlock who had no apparent reason to be there. Under these circumstances, a rational trier of fact could find that Larsen experienced fear even if Spurlock did not make any explicit threats and even if the first gunshot was fired when Larsen was not looking at Spurlock.

Defendant generally argues the government fails to satisfy its burden to establish the elements of all counts.[4] (ECF No. 719 at 2.) Defendant argues in the alternative that the Court should order a new trial because the government presented insufficient or weak evidence. For the same reasons that the Court rejects Defendant's arguments in support of a judgment of acquittal, the Court finds this is not an "exceptional" case[5] and declines to exercise its discretion to order a new trial based on Defendant's contentions as to "serious problems with the government's case." (ECF No. 719 at 28.)

The Court will first address Defendant's argument as to count one and counts three through eight in turn below. The Court will then address Defendant's argument as to venue.

---

[4]As noted, the jury deadlocked on count two (ECF No. 714) and the Court subsequently granted the government's motion to dismiss count two (ECF No. 722). The Court declines to address Defendant's renewed arguments as to count two even though dismissal is without prejudice because this count is no longer before the Court.

[5]Although determining whether to grant a motion for a new trial is left to the district court's discretion, "it should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (citation and internal quotation marks omitted).

### A. Count One: Marijuana Distribution Conspiracy

Defendant argues that the government failed to establish the existence of the underlying marijuana distribution conspiracy, that Defendant joined the conspiracy before May 2020, and that the weight of the cannabis equaled or exceeded 1,000 kilograms. (ECF No. 719 at 3-4.) The Court addressed the second argument in its oral ruling denying the Rule 29 Motion and will briefly reiterate its ruling here.

Count one charged Defendant with conspiracy to possess with intent to distribute and to distribute marijuana between November 2019 and June 2020. (ECF No. 363 at 2.) Defendant focused on O.O.'s testimony that she did not see cannabis when she was at the Mound House location. (ECF No. 719 at 3.) But as the government points out, they offered extensive evidence at trial as to the existence of a marijuana distribution conspiracy involving Larsen dating before November 2019, including testimony from B.K. and O.O. (ECF No. 726 at 4-5.) In addition, Sheila Sharpe testified as to the marijuana distribution conspiracy with Larsen, and how her son J.S., who went missing after he drove to the Carson City area in Nevada to pick up drug money, was involved in that conspiracy. She even testified that she allowed J.S. to store marijuana at her house twice. Moreover, Sharpe testified that after J.S. disappeared, Jay, another individual involved in the drug trafficking conspiracy, told her about over $100,000.00 in J.S.'s safe that she retrieved and gave to another individual involved in the drug trafficking organization. On cross-examination of Tom Green, defense counsel inquired how he knew from Sharpe that J.S. was going to Mound House, Nevada to pick up drug money and how unusual it was for him to meet a drug trafficker like Larsen before he was arrested.[6] The evidence of the existence of the underlying marijuana distribution conspiracy involving Larsen and others is simply too extensive to recount.

---

[6]Indeed, in arguing that Larsen "would have been unwilling" to speak to federal law enforcement as to count four, Defendant points out that "Larsen was running an illegal large-scale cannabis trafficking business involving significant quantities of cannabis and cash." (ECF No. 719 at 16.)

5

As for when Spurlock joined the conspiracy, the government recounted evidence presented through O.O. and B.K.'s testimony to establish that Defendant joined the conspiracy by at least December 2019, including B.K.'s testimony that Defendant told him he was going into business with Larsen in 2019, O.O.'s testimony about using a furniture restoration business with the name of "Albright" as a front for the marijuana distribution business, and the government's evidence of shipping receipts with the same business name from at least December 2019. (ECF No. 726 at 4-5.) Defendant argues in his reply brief that O.O. and B.K. "were entirely lacking in credibility such that no reasonable juror could rely on them to find Mr. Spurlock guilty beyond a reasonable doubt." (ECF No. 728 at 2.) Again, however, the Court cannot determine witness credibility in considering Defendant's Motion. *See Alarcon-Simi*, 300 F.3d at 1176; s*ee also Nevils*, 598 F.3d at 1164 (a court cannot "usurp the role of the finder of fact" in resolving conflicting inferences).

As for evidence of the drug weight being equal to or in excess of 1,000 kilograms, in denying Defendant's Rule 29 Motion, the Court recounted both methods that the government offered through the testimony of DEA Special Agent Wilkinson and that a rational jury could find the government established drug weight beyond a reasonable doubt. The government's response summarized this evidence. (ECF No. 726 at 7.) Viewed in the light most favorable to the government, this evidence could support a rational juror's finding that the government has established the requisite drug weight beyond a reasonable doubt.

### B. Count Three: Murder for Hire

Defendant argues the government failed to offer evidence of an agreement to commit murder-for-hire, that there was insufficient consideration, and there was no interstate nexus. (ECF No. 719 at 11-15.) The government responds that viewed in the light most favorable to the government, any rational juror could find that the evidence supports these elements beyond a reasonable doubt. (ECF No. 726 at 9-12.)

There is no dispute that the government is required to establish "a clear mutual agreement between the solicitor and the hitman of payment in exchange for murder." *United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019). In denying Defendant's Rule 29 Motion, the Court recited evidence from which a rational juror could find B.K. implicitly agreed to commit murder-for-hire. While Defendant argues there is no support in the case law that evidence of an agreement or acceptance of an agreement could be implicit or inferred (ECF No. 719 at 13), Defendant fails to offer any authority to support his argument that B.K. must expressly state his acceptance of the agreement. As Defendant points out, B.K. testified that in October 2020 Spurlock asked him to help in the killing of Larsen and stated that "the monetary value was worth it" but B.K. did not agree. (ECF No. 719 at 11 (citing B.K. Tr. Vol. 1 at 32-33).) According to Defendant, B.K. did not change his mind, and he testified that he tried to persuade Spurlock not to kill Larsen. (ECF No. 719 at 11-12.) But Defendant's argument is based on a construction of the evidence in the light most favorable to him. For example, Defendant points to B.K.'s testimony that he did not want to kill Larsen and while they were following the Larsens around the Reno-Carson City area, he was hoping that Spurlock would not. (ECF No. 719 at 12.) But Defendant ignores B.K.'s testimony that when Spurlock called him while he was on his road trip with Amanda Camacho[7] and said he needed B.K.'s help, B.K. "said okay." B.K. testified he knew what that meant (i.e., what he was agreeing to)—come to Reno to help Spurlock follow the Larsens—knowing that Spurlock's plan was to kill Larsen and Y.L. if necessary. Thus, the jury could find B.K. changed his mind from when he initially indicated that he did not agree with Spurlock to kill Larsen. Moreover, the jury could view this evidence and B.K.'s testimony as to their actions and find that B.K. agreed to help Spurlock kill Larsen.

---

[7] Amanda Camacho had testified that when they were discussing their road trip, Spurlock said B.K. needed to stay close for "recon" because they were looking for somebody. On cross-examination, she testified that Spurlock said that he needed B.K. to help with something, but it was B.K. who said it was for "recon."

The following evidence, when viewed in the light most favorable to the prosecution, could lead a rational juror to find that B.K. accepted Spurlock's offer to assist in the killing of Larsen in exchange for a split of the money that they expected would be found on Larsen: B.K. was on a road trip with Camacho in Salt Lake City when Spurlock called him to come to Reno and B.K. understood that the purpose of joining Spurlock was to follow Larsen and kill Larsen; B.K. purchased a firearm in Salt Lake City as Spurlock directed; B.K. met up with Spurlock and O.O. in Reno and joined them in surreptitiously following the Larsens around Reno and when they left Nevada; and after B.K. saw Larsen's limp body and saw Spurlock stab at something on the ground, B.K. followed Spurlock's instruction to find O.O. and met up with them back at their R.V. in Dayton, Nevada.

As for consideration, Defendant argues that whether Larsen had money on him was speculative and further argues in his reply that the government had not shown a thing of pecuniary value was promised because what Defendant "offered" B.K. was "a cut of speculative money." (ECF No. 728 at 7.) The government counters that while the drug proceeds had not yet been obtained, the promise of payment was clear. (ECF No. 726 at 10.) The jury was instructed that Defendant "must have clearly understood he would give or receive the thing of pecuniary value in exchange for the murderous act." (ECF No. 706 (Jury Instructions) at 28.) See Phillips, 929 F3d at 1124 ("The words 'as consideration for' do not strictly import contract law, but instead require a clear mutual agreement between the solicitor and hitman of payment in exchange for murder.") (quoting United States v. Chong, 419 F.3d 1076, 1081-82 (9th Cir. 2005).)

B.K. testified that Spurlock said they would be locating Larsen at the time of year when they anticipated Larsen would have a substantial amount of drug money on him.[8]

---

[8] Defendant repeatedly points to the wide gap between what B.K. testified they expected to find on Larsen (potentially a million dollars) and what Spurlock later told B.K. he found (around $1,000) to argue that any pecuniary value promised was speculative. (ECF No. 719 at 14; ECF No. 728 at 11.) But a rational juror could find this element was satisfied based on Defendant telling B.K. what he expected to find on Larsen from his experience with Larsen and promising to share they money. That the promise of pecuniary gain was less than expected does not preclude a rational juror from finding there nevertheless was a clear understanding of a promise of pecuniary gain.  In other

8

Spurlock offered a 60-40 split with B.K. getting 60%. Given B.K.'s testimony about their relationship and dealings with Larsen, their belief that Larsen would have a substantial sum of money with him was not pure speculation. In fact, B.K. testified that while they were following the Larsens, they observed Larsen participating in a drug sale outside the hotel in Reno where the Larsens were staying.[9] Viewing these evidence in the light most favorable to the government, a rational trier of fact could find that Spurlock clearly understood he had promised to share a substantial sum of money and that the expected value of that promise was not speculative.

The interstate nexus argument is premised on the Court agreeing with Defendant's argument that there was no agreement, which the Court rejected. The government pointed to evidence of a phone call that Spurlock made to B.K. when he was in Salt Lake City, Utah while Spurlock was in Reno, Nevada for B.K. to purchase a firearm and then to leave for Reno. B.K. testified he did as instructed.

### C. Count Four: Witness Tampering

Defendant argues the government failed to prove a reasonable likelihood that a relevant communication would have been made to a federal law enforcement officer and that Spurlock had the intent to kill Larsen. (ECF No. 718 at 15-17.) As for the latter, Defendant does not address the evidence that a rational juror could find Spurlock had the intent to kill and did kill Larsen when they found guilt as to the other counts. Instead,

---

words, the gap between was found and what was promised to be found does not mean a promise was not made or was made based on pure speculation.

[9] B.K. and O.O. testified that they observed who they believed to be Larsen engaging in a drug transaction outside his hotel in Reno when they were surveilling the Larsens. B.K. testified based on his experience in marijuana trafficking that he saw Larsen come out of the hotel with some kind of "deal" because Larsen brought out a trolley with boxes that B.K. knew to contain marijuana. B.K. testified he observed Larsen exchange a few handshakes with others, who took the boxes from Larsen and then left. As the government points out in its response, O.O. also testified that Larsen conducted what appeared to be a drug transaction. (ECF No. 726 at 16.) Defendant argues that B.K. and O.O.'s testimony amounts to pure speculation. However, viewing the evidence in the light most favorable to the government, a rational juror could infer that Larsen was engaging in a drug transaction as B.K. testified based on his experience engaging in marijuana trafficking.

Defendant argues that the government relies entirely on two cooperating witnesses' testimony to establish Spurlock's intent to kill and that Spurlock was responsible for the killing. (*Id.* at 17.) However, again, the Court cannot usurp the jury's role in determining witness credibility.

As to Defendant's first argument on the reasonable likelihood that a relevant communication would have been made to a federal law enforcement officer, the government "need not show that [a relevant] communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it was more likely than not." *Fowler v. United States*, 563 U.S. 668, 678 (2011). As the government points out in its response, the Court previously identified evidence such that, viewed in the light most favorable to the government, a rational juror could find a reasonable likelihood that that Larsen would have communicated with a federal law enforcement officer. (ECF No. 726 at 12.) In particular, the Court found that Sharpe generated significant media attention about her missing son, including from her appearance on a YouTube podcast in October 2020. Additionally, after having met with local law enforcement officers through Tom Greene's contacts and efforts on her behalf, Sharpe met with an FBI agent in Nevada in October 2020, even though she did not think it was an official interview. B.K. testified that Spurlock said Larsen gave an interview on the podcast about J.S.'s disappearance and that Larsen needed to die because he was "rat." O.O. testified that she overheard Spurlock's conversation with B.K. where Spurlock said Larsen was accusing him of the disappearance of J.S. and they traveled to Reno to shut Larsen up for making such an accusation.

### D. Counts Five and Six: Stalking Resulting in Death (of W.L. and Y.L.)

Defendant contends that even under the Court's resolution of the legal disputes, the government failed to offer evidence to prove the third element—that Defendant's conduct placed the Larsens in reasonable fear of death—and the fourth element—that the Larsens died as result of Defendant's conduct. (ECF No. 719 at 19-21.) Defendant again insists that the Court disregard B.K. and O.O.'s testimony, which the Court cannot

do for the reasons discussed earlier. And as the Court noted, Defendant improperly characterizes the testimony of B.K. and O.O. and draws inferences in his favor. Evidence that Defendant, B.K. and O.O. stalked the Larsens includes B.K. and O.O.'s testimony, as well as surveillance videos that the government offered showing that their vehicles followed the Larsens' vehicle through Carson City as it stopped at a storage facility and continued on U.S. 395 Highway, south into California. Ample evidence supports the jury's finding of causation beyond a reasonable doubt. Viewing the evidence in the light most favorable to the government, the jury could find that Larsen experienced fear before his death based on O.O.'s testimony that Larsen "looked startled" and that she saw him give a "nervous laugh." The jury could find the same from B.K.'s testimony that Spurlock told him Larsen did not die from the first gunshot, and that Spurlock tried unsuccessfully to fire a second shot before using a knife to stab Larsen. Dr. Knight's testimony—that Larsen died of gunshot wounds and sharp force injuries—is consistent with B.K.'s testimony as to what Spurlock described.

In other words, there was a period of time between when Larsen realized Spurlock was involved in stopping him on the side of a remote stretch of U.S. Highway 395 and when Larsen died from injuries that Spurlock inflicted. A rational juror could find that this period of time was even longer for Y.L., based on B.K.'s testimony that he saw Spurlock appeared to be stabbing at something next to the Larsens' vehicle and that Spurlock later told him he was curious what it would be like to stab through a breast implant and now he knew. Dr. Knight's testimony—opining as to evidence of stab wounds on Y.L.'s left breast (Exhibit 33-h), right breast (Exhibit 33-3) and other sharp force injuries—is also consistent with B.K.'s testimony.

In sum, the Court agrees with the government that it established all elements of counts five and six beyond a reasonable doubt.

### E. Count Seven: Interference with Commerce by Robbery

Defendant's arguments that the government failed to establish the essential elements of this offense relies on contentions that the Court has rejected in addressing

the other counts, including the evidence that Defendant was criminally responsible for robbing and killing Larsen and that the agreement and discussion to take money from Larsen was purely speculative. (ECF No. 719 at 22.) Defendant makes an additional argument as to jurisdiction—that the robbery affected interstate commerce—that the Court finds unpersuasive. Viewing the evidence in the light most favorable to the government, a rational juror could find that Larsen had no source of income other than from drug trafficking out of Mound House, Nevada, so money that Spurlock found on Larsen was the source of drug proceeds. And a rational juror could find that Spurlock intended to steal drug proceeds based on B.K.'s testimony that they anticipated to find a substantial amount of drug money on Larsen during that time of year.

### F. Count Eight: Causing Death Through Use of a Firearm During a Crime of Violence

Defendant's argument is premised on his contention that the government failed to prove a Hobbs Act robbery as charged in count seven and that he was responsible for killing Larsen, which is based solely on B.K. and O.O.'s testimony. Defendant's arguments are deficient for the reasons discussed above.

### G. Venue

Defendant contends that at a minimum, the government failed to establish venue for counts three, four, seven and eight.[10] (ECF No. 719 at 24-27.) Defendant argues that the government failed to prove by a preponderance of the evidence[11] that Spurlock was in the District of Nevada when an agreement was reached to commit murder for hire. (*Id.* at 25.) As the Court noted, B.K. testified that Spurlock called him from Reno while B.K.

---

[10] Defendant argues the government failed to prove venue for all eight counts. (ECF No. 719 at 24.) However, Defendant did not elaborate on these other counts so the Court will address only arguments raised with respect to each of the four counts.

[11] The government must prove venue by a preponderance of the evidence. *United States v. Lukashov,* 694 F.3d 1107, 1120 (9th Cir. 2012.)

was on road trip with Camacho and said he needed B.K.'s help, B.K. "said okay."[12] B.K. testified he knew what that his response meant he was going to Reno to help with Spurlock's plan was to kill Larsen. Viewing the evidence in the light most favorable to the government, a rational juror could find that B.K. agreed to commit murder-for-hire during the phone call with Spurlock that was made when Spurlock was in the District of Nevada.

As for count four, Defendant argues that for venue to be proper in Nevada, the government would have to prove by a preponderance of the evidence that Spurlock "intended to frustrate a federal investigation that had a reasonable likelihood of commencing specifically in the District of Nevada." (ECF No. 719 at 27.) The government responded that J.S. was involved in the drug trafficking operation in Nevada and the ultimate investigation intended to be affected was in the District of Nevada. (ECF No. 726 at 18.) The Court agrees with the government. In finding that a rational juror could find a reasonable likelihood that that Larsen would have communicated with a federal law enforcement officer, the Court considered evidence that Sharpe met with an FBI agent in Nevada after having met with local law enforcements in Nevada through Tom Green. J.S. disappeared when he drove to the Carson City area to retrieve drug money and investigation into his disappearance was mainly conducted by local law enforcement in Nevada, not California.

Defendant argues that venue for counts seven and eight was not proper in Nevada because the alleged acts—robbery and murder—took place in California, and the government failed to establish that the robbery affected commerce in Nevada. "'[I]n a prosecution under the Hobbs Act [count seven], venue is proper in any district where commerce is affected because the terms of the statute itself forbid *affecting commerce* in particular ways.'" *United States v. Fortenberry,* 89 F.4th 702, 708 (9th Cir. 2023) (quoting *United States v. Bowens,* 224 F.3d 302, 313 (4th Cir. 2000).) The government responded that it established venue by a preponderance of the evidence under the Hobbs Act. (ECF

---

[12] As Defendant points out, B.K. testified he did not agree to participate when Spurlock asked him in October 2020. (ECF No. 719 at 11-12.)

No. 726 at 18.) The Court agrees with the government. As the Court noted, a rational juror could find the money taken from Larsen was part of drug proceeds from a drug trafficking organization that operated out of Mound House, Nevada, thus affecting commerce in Nevada.

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion for judgment of acquittal, or, in the alternative, a new trial (ECF No. 719) is denied.

DATED THIS 5th Day of December 2025.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE